## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **THE WASHINGTON POST**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action |
| | ) | |
| **DEPARTMENT OF HOMELAND** | ) | |
| **SECURITY**, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Pursuant to Fed. R. Civ. P. 65, plaintiff The Washington Post respectfully moves for entry of a preliminary injunction to enjoin defendant Department of Homeland Security's unlawful attempts to impede plaintiff's efforts to obtain agency records concerning individuals who visited, or sought to visit, Vice President Cheney and his senior staff.  Plaintiff seeks an order requiring defendant and its component, the United States Secret Service, 1) to preserve the requested records pending resolution of this litigation; and 2) to immediately process plaintiff's Freedom of Information Act request and disclose the requested records within 10 days of the court's order.

The grounds for this motion are set forth in the accompanying memorandum of points and authorities.  Plaintiff asks that the Court, pursuant to Local Rule 65.1(d), schedule a hearing on this application for a preliminary injunction at the Court's earliest convenience.

Respectfully submitted,


___/s/_____
DAVID L. SOBEL
D.C. Bar No. 360418

1875 Connecticut Avenue, N.W.
Suite 650
Washington, DC 20009
(202) 246-6180
sobel@att.net


ERIC N. LIEBERMAN
D.C. Bar No. 436331

The Washington Post
1150 15th Street, N.W.
Washington, DC 20071
(202) 334-6017

Counsel for Plaintiff

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **THE WASHINGTON POST**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action |
| | ) | |
| **DEPARTMENT OF HOMELAND SECURITY**, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION**

Plaintiff The Washington Post ("the Post") respectfully submits this

memorandum of points and authorities in support of its motion for a preliminary

injunction.

**Preliminary Statement**

This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. §

552, seeking the expedited processing and release of agency records concerning

individuals who visited, or sought to visit, Vice President Cheney and his senior staff.

Defendant Department of Homeland Security ("DHS") and its component, the United

States Secret Service, have acknowledged that the requested information fits squarely

within the narrow category for which Congress has mandated expedited processing and,

on August 31, 2006, purported to grant the Post's request for such expeditious treatment.

Nonetheless, in clear violation of the FOIA, the Secret Service has refused to process the

Post's request, asserting a position that is contrary to explicit statutory language, relevant

caselaw and the agency's own recent actions.

As we demonstrate below, defendant's refusal to process the Post's request clearly violates the law. Because time is at the essence of the Post's rights and the agency's obligations, and because the information at issue concerns a matter of substantial and uncontested public interest, the Post seeks the Court's expedited consideration of this matter and entry of an order compelling the Secret Service to immediately process the Post's request and disclose the requested records within 10 days.

### Statement of Facts

### A. The Post's FOIA Request and Request for Expedited Processing

By letter to the Secret Service dated June 12, 2006, the Post requested under the FOIA copies of certain records created and used by the agency for controlling and monitoring access to the White House complex and the Vice President's Residence, including those contained in two particular systems – the Worker and Visitor Entrance System ("WAVES") and the Access Control Records System ("ACR"). Specifically, the Post requested:

> a) All records and visitor logs, including WAVES and/or ACR records, from October 2004 to present, reflecting or concerning the entries and/or exits of any persons who sought or were scheduled to visit the following people in the Office of the Vice President: Vice President Cheney; David Addington, I. Lewis "Scooter" Libby, C. Dean McGrath, Steven Schmidt, John Hannah, Eric Edelman, Ron Christie, Victoria Nuland, Aaron Friedberg, Stephen Yates Samantha Ravich, and David Wurmser. Pertaining to the WAVES records, this request includes, but is not limited to, the portion of the WAVES records that lists the name of the person who is visiting, the room number visited, and the name of the person who arranged the visit with the Secret Service; [and]

> b) All records and visitor logs, including WAVES and/or ACR records, from October 2004 to present, reflecting or concerning the entries and/or exits of any persons, other than the members of the Cheney family, visiting the vice-president's residence. Pertaining to the WAVES records, this request includes, but is not limited to, the portion of the WAVES records that lists the name of the person who is visiting, where the person

went and the name of the person who arranged the visit with the Secret
Service.

Letter from the Post to Latita M. Huff, Disclosure Office, United States Secret Service,

June 12, 2006 (attached hereto as Exhibit 1).

In its letter, the Post requested "expedited processing" of its FOIA request,

asserting that the request met the statutory standard for expedition because there is "an

urgency to inform the public" about the activities reflected in the requested records.  *Id.*;

*see* 5 U.S.C. § 552(a)(6)(E)(v)(II).  The Post noted that the standard was satisfied for two

distinct reasons.  First, the Post asserted that the requested records "will help the public

understand the degree to which lobbyists and special interest representatives may have

influenced policy decisions of the Bush administration and in particular the positions

taken by the Office of the Vice President."  The Post noted that "[t]he relationship

between administration officials and lobbyists has emerged as a significant issue in the

wake of the ongoing scandals involving lobbyists Jack Abramoff as well as various

members of Congress, and of course in the controversy over Vice President Cheney's

role in setting federal energy policy."  Second, the Post asserted that "[t]he vice-

president's office – and the contacts it had – is under scrutiny in the CIA-leak case

currently under investigation by special prosecutor Patrick Fitzgerald."  The Post noted

that "[t]he public interest in the CIA leak case will only intensify as Scooter Libby's

criminal trial approaches."  Exhibit 1.

With respect to the specific need for an expedited response to its FOIA request,

the Post stated that "the consequences of delaying a response would compromise a

significant public interest.  With the midterm elections looming, any delay in processing

this request would deprive the public of its ability to make its views known in a timely

3

fashion either at the polls, by lobbyist or through other contacts with public officials." *Id*.

   **B.  <u>The Agency's Initial Denial of the Post's Request for Expedited
        Processing, The Post's Appeal and the Agency's Final Determination</u>**

By letter to the Post dated June 16, 2006, the Secret Service issued its initial

determination to deny the Post's request for expedited processing of its FOIA request.

The Secret Service stated that "[y]ou have not demonstrated that there is . . . a particular

urgency to inform the public about an actual or alleged federal government activity.

Therefore, . . . your request for expedited processing should be denied." Letter from the

Secret Service to the Post, June 16, 2006 (attached hereto as Exhibit 2).   The agency

advised the Post of its right of administrative appeal to challenge the denial of expedited

processing, and stated, "Please be advised we are processing your request.  Your

continued patience is appreciated." *Id*.

The Post appealed the agency's initial determination to deny its request for

expedited processing by letter dated July 12, 2006.  Letter from the Post to the Deputy

Director, United States Secret Service, July 12, 2006 (attached hereto as Exhibit 3).  In

support of its appeal, the Post placed in the administrative record evidence concerning

both the substantial public interest in the requested records and the time-sensitivity of the

information.

With respect to the public interest in disclosure of the requested visitor logs, the

Post stated, *inter alia*,

> Lest there be any doubt as to the accuracy of [the Post's] assertion that
> there is substantial public interest in the relationships between lobbyists
> and administration officials, we attach hereto search results from Google
> News indicating that there have been at least 122 published articles in the
> last several days concerning former lobbyist Jack Abramoff's visits to the
> White House [attached to the appeal letter as Exhibit 3].  Significantly,
> this news coverage was prompted by the Secret Service's disclosure of

White House visitor logs – precisely the sort of information that is at issue here.

*Id*.

Concerning the "urgency to inform the public" about the requested information, the Post stated in its appeal letter, *inter alia*,

> [We] specifically cited the impending November mid-term elections as a basis for expedited processing of [our] request. It is beyond dispute that ethics – primarily the question of lobbyist influence in the White House and Congress – has emerged as a significant campaign issue. As USA Today recently reported, "For the past year, Democrats have been jockeying for the high ground on congressional ethics, hoping a largely Republican lobbying scandal would help propel them into the majority come November's elections." *See* USA Today article [attached to the appeal letter as Exhibit 4]. "Rep. Rahm Emanuel of Illinois, chairman of the House Democratic campaign committee, said Republicans have 'a governing philosophy' to cozy up to lobbyists that has led them to favor industries such as oil and pharmaceuticals, producing higher prices for gasoline and prescriptions." *Id*. There can be no doubt that the relationship between industry lobbyists and high-ranking Republican officials will be a significant issue of debate in the November elections. . . .
>
> Although the Vice President is not a candidate in the upcoming mid-term elections, there is no question that his activities – and the public perception of those activities – will impact his party's prospects. As a Copley News Service report noted earlier this year, some Republican strategists "fear that Cheney has become more of a liability to Republicans running in close congressional races this year." [attached to the appeal letter as Exhibit 7]. The National Review reported that "the talk of Washington has been about" whether the Vice President "should be sacked to help turn around the national GOP's fortunes." [attached to the appeal letter as Exhibit 6]. A recent edition of CBS News' "Face the Nation" program featured a discussion of "Has Vice President Cheney become a political liability for the Republicans?" [attached to the appeal letter as Exhibit 8]. There is thus a clear nexus between the activities of the Vice President and his staff – particularly as they relate to lobbying and ethics issues – and the issues that voters will be considering when they go to the polls in November.

*Id*. The Post concluded its administrative appeal by stressing that the demonstrated need for expedition would only be satisfied if the requested records were disclosed prior to the

November elections:

> For the foregoing reasons, we believe there is clearly an "urgency to inform the public" about the individuals who have visited the Vice President and his key staff members at the White House complex. As noted, that urgency stems from both the pendency of the mid-term elections and the commencement of Mr. Libby's criminal trial early next year. Given that the election will occur first (in early November), our right to expedited process of Ms. Becker's FOIA request will effectively be lost if the requested material is not processed and released prior to the election.

*Id*.

The agency ultimately changed course; by letter to the Post dated August 31, 2006, Brian K. Nagel, Deputy Director of the Secret Service, stated that "it is the determination of the Secret Service that your appeal is granted and that expedited treatment is appropriate in this matter." Mr. Nagel further stated that "[as the Post has been previously advised,] the Secret Service's Freedom of Information and Privacy Acts Office has initiated a search for records." Letter from Brian K. Nagel, Deputy Director, United States Secret Service, to the Post, August 31, 2006 (attached hereto as Exhibit 4).[1]

### C. **The Agency's Refusal to Process the Post's FOIA Request and Disclosure of White House Visitor Records to Other Parties**

Notwithstanding the assurances it had provided over the course of almost three

---

[1] Mr. Nagel's assertion that a search for responsive records had been previously initiated was one of several assurances the agency provided to the Post that its FOIA request was being processed. As noted, *supra*, the agency's letter of June 16, 2006, concluded with this assurance: "Please be advised we are processing your request. Your continued patience is appreciated." Exhibit 2. Following the agency's purported decision to expedite the FOIA request, counsel for the Post wrote to inquire about its status, noting that the "request was received by the Secret Service on June 12, and has now been pending without response for approximately 60 working days," and stating that "[i]n light of the fact that the agency now agrees that the request is legally entitled to expedited processing, such a delay is unacceptable." Letter from Eric N. Lieberman, Deputy Counsel to the Post, to Kathy J. Lyerly, Special Agent in Charge, United States Secret Service, September 5, 2006 (attached hereto as Exhibit 5).

months, and several weeks after acknowledging that the FOIA's expedition standard had

been met, the agency abruptly informed the Post that the records it had requested were

not going to be processed after all.  By letter dated September 20, 2006,[2] the Secret

Service asserted as follows:

> The records you seek are not agency records subject to the FOIA.  These
> records are governed by the Presidential Records Act, 44 U.S.C. § 2201 *et
> seq.*, and remain under the exclusive legal custody and control of the
> White House and the Office of the Vice President.  Accordingly, the
> United States Secret Service lacks the authority to provide such records in
> response to your request.

Letter from Kathy J. Lyerly, Special Agent in Charge, United States Secret Service, to the

Post, September 20, 2006 (attached hereto as Exhibit 6).[3]

Remarkably, on the same day that it was asserting to the Post that it "lack[ed] the

authority" to release the requested records, the Secret Service was completing the process

of disclosing virtually identical records to another party.  On February 2, 2006, Citizens

for Responsibility and Ethics in Washington ("CREW") submitted a FOIA request to the

Secret Service for "all records relating to any visit that any and all of [a list of named

individuals] made to the White House . . . or the residence of the Vice President from

January 1, 2001 to the present."  Declaration of Kathy J. Lyerly, dated September 21,

2006 (filed in *CREW v. Department of Homeland Security*, Civ. No. 06-883 (D.D.C.))

("Lyerly CREW Decl.") (attached hereto as Exhibit 7), ¶ 4.  According to the Secret

Service, "[o]n September 20, 2006 [the date on which the agency refused to process the

_____

[2]  The letter from the Secret Service was not received by the Post until October 2.

[3]  The Secret Service did not inform the Post of any right of administrative appeal with
respect to its determination that the requested records are not subject to FOIA.

Post's request], all documents responsive to CREW's February 2, 2006 FOIA request with [certain] redactions . . . were produced to CREW." *Id.*, ¶ 32. Indeed, this was not the first time that the Secret Service disclosed, pursuant to FOIA requests, precisely the type of information at issue here. "[T]he Secret Service released to CREW, on May 10, 2006 and July 7, 2006, its WAVES and ACR data/records concerning Jack Abramoff." *Id.*, ¶ 23. Similarly, on May 10, 2006, the agency released to Judicial Watch "without redactions or claims of exemptions, all documents located in response to [the organization's] January 20, 2006 FOIA request," which sought disclosure of records "concerning, relating to, or reflecting . . . (a)ll White House visitor logs from January 1, 2001 to present that reflect the entries and exit(s) of lobbyist Jack Abramoff from the White House." Declaration of Kathy J. Lyerly, dated May 16, 2006 (filed in *Judicial Watch v. United States Secret Service*, Civ. No. 06-310 (D.D.C.)) ("Lyerly Judicial Watch Decl.") (attached hereto as Exhibit 8), ¶¶ 4, 19.

## **ARGUMENT**

The issue raised in this motion is simple and straightforward. After repeatedly assuring the Post that its FOIA request was being processed, and after grudgingly acknowledging that the request satisfied the FOIA's standard for expedited treatment, the Secret Service belatedly asserted that the requested records are not subject to FOIA. As we explain below, that assertion is untenable and contravenes clear statutory language and controlling caselaw. The invalidity of the agency's position is demonstrated by the fact that the Secret Service complied with another party's FOIA request for White House visitor logs and related records *on the same day* that the agency represented to the Post that such records "are not agency records subject to the FOIA" and that it "lack[ed] the

8

authority" to release them.  The agency's refusal to process the Post's request constitutes

a continuing impediment to the Post's (and the public's) ability to learn about the

individuals who have visited the Vice President and his key staff members, and whose

visits are controlled and monitored by the Secret Service.  The agency's action is clearly

unlawful and should be enjoined.

## I.  The Court has Jurisdiction to Grant the Requested Relief

The Court's jurisdiction to consider this matter and grant appropriate relief is

clear.  The FOIA provides, in pertinent part:

> On complaint, the district court of the United States . . . in the District of
> Columbia, has jurisdiction to enjoin the agency from withholding agency
> records and to order the production of any agency records improperly
> withheld from the complainant.  In such a case the court shall determine
> the matter de novo . . . .

5 U.S.C. § 552(a)(4)(B).  While exhaustion of administrative remedies, through the filing

of an administrative appeal, is generally required before a court can review an agency's

determination to withhold requested records, this Court has recognized an exception that

is applicable here:

> The FOIA specifically provides that the agency "shall immediately notify
> the person making such request of [its] determination, and the reasons
> therefor, and the right of such person to appeal to the head of the agency
> any adverse determination." 5 U.S.C. § 552(a)(6)(A).  *Courts have treated
> an agency's failure to notify a requestor of his right to appeal a FOIA
> denial as constructive exhaustion of the requestor's administrative
> remedies.  See, e.g.*, *Hudgins v. IRS*, 620 F. Supp. 19, 21 (D.D.C. 1985)
> (finding that a "failure to inform an individual of the right to appeal
> constitutes a failure to reach a determination within the statutory time
> limitations . . . [and thus a] plaintiff[is] deemed to have exhausted [his]
> administrative remedies . . .").

*Nurse v. Sec'y of the Air Force*, 231 F. Supp. 2d 323, 328 (D.D.C. 2002) (emphasis

added).

In its letter to the Post dated September 20, 2006, in which the Secret Service asserted that the requested records "are not agency records subject to the FOIA," the agency did not inform the Post of any right to appeal that determination.  Exhibit 6.   The Post's claim is thus ripe for adjudication, as all applicable administrative remedies have been exhausted.

## II.  The Post is Entitled to Entry of a Preliminary Injunction

In considering the Post's request for the entry of a preliminary injunction compelling defendant DHS and the Secret Service to process the Post's FOIA request and disclose responsive records, the court must assess four factors — 1) likelihood of success on the merits; 2) irreparable injury to the plaintiff; 3) burden on others' interests; and 4) the public interest.  *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)); *see also Bancoult v. McNamara*, 227 F. Supp. 2d 144, 150 (D.D.C. 2002). Consideration of these factors in this case firmly establishes the Post's entitlement to injunctive relief.[4]

### A.  The Post is Likely to Prevail on the Merits

Given the clarity of the Post's statutory entitlement to the expeditious processing of its FOIA request, the Post's likelihood of prevailing on the merits is extremely high. In assessing plaintiff's likelihood of success, the Court must consider the merits of one discrete issue: whether the requested records constitute "agency records" under the FOIA. As we demonstrate, unequivocal statutory language, controlling precedent and the

---

[4]  This Court recently recognized that "[o]n numerous occasions, federal courts have entertained motions for a preliminary injunction in FOIA cases and, when appropriate, have granted such motions."  *Elec. Privacy Info. Ctr. v. DOJ*, 416 F. Supp. 2d 30, 35 (D.D.C. 2006) (citations omitted).

agency's own conduct all require the Court to reject the Secret Service's belated assertion that the visitor logs sought by the Post are not "agency records."

As the Supreme Court has held, "[t]he burden is on the agency to demonstrate, not the requester to disprove, that the materials sought are not 'agency records.'" *United States Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989) (citations omitted). The D.C. Circuit recently reiterated that an agency must "sustain[] its burden of demonstrating that the documents requested are not 'agency records.'" *Consumer Federation of Am. v. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006), quoting *Gallant v. NLRB*, 26 F.3d 168, 171 (D.C. Cir. 1994) (internal quotation marks and additional citations omitted). In most cases in which the "agency records" issue arises, the agency asserts that the requested material is a "personal" record of an agency employee or official, *see*, *e.g.*, *Consumer Federation* (officials' appointment calendars), or that the material was created by a non-agency third-party and subsequently acquired by the agency, *see*, *e.g.*, *Tax Analysts* (court decisions). Here, in contrast, the Secret Service asserts that records it created and possesses are not "agency records," but are instead "governed by the Presidential Records Act, 44 U.S.C. § 2201 *et seq.*, and remain under the exclusive legal custody and control of the White House and the Office of the Vice President." Exhibit 6. As we show, the agency cannot sustain its burden.

As an initial matter, it is important to note that the D.C. Circuit has expressly rejected the suggestion that a document's purported status under the Presidential Records Act is dispositive of its status as an "agency record" under FOIA.

> [W]e reject the government's invitation to hold that the treatment of documents for disposal and retention purposes under the various federal records management statutes determines their status under FOIA. Those statutes prescribe how federal agencies are to create, dispose of, and

> otherwise manage documents and other material.  [citing, *inter alia, Presidential Records Act*].  However tempting such a "bright line" test may be, it cannot be used as the divining rod for the meaning of "agency records" under FOIA.

*Bureau of Nat'l Affairs v. United States Dep't of Justice*, 742 F.2d 1484, 1493 (D.C. Cir. 1984) (citations omitted).

While the Court need not determine whether the Secret Service records at issue here could somehow be characterized as "presidential" records, such an inquiry would, in any event, quickly dispose of the agency's novel assertion.  The Presidential Records Act provides, in pertinent part, that

> The term "Presidential records" means documentary materials, or any reasonably segregable portion thereof, created or received by the President, his immediate staff, or *a unit or individual of the Executive Office of the President whose function is to advise and assist the President*, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President. Such term—
>
> (A) includes any documentary materials relating to the political activities of the President or members of his staff, but only if such activities relate to or have a direct effect upon the carrying out of constitutional, statutory, or other official or ceremonial duties of the President; but
>
> (B) *does not include* any documentary materials that are . . . *official records of an agency* (as defined in [the FOIA, 5 U.S.C. § 552(f)]) . . .

44 U.S.C. § 2202(2) (emphasis added); *see also Armstrong v. Executive Office of the President*, 90 F.3d 553, 556 (D.C. Cir. 1996).  The Secret Service is a component of defendant DHS, and is *not* "a unit . . . of the Executive Office of the President whose function is to advise and assist the President."  In addition, as we set forth fully below, the requested records are "official records of an agency" (the Secret Service) and are thus expressly excluded from coverage under the Presidential Records Act.

1. **The Secret Service's Visitor Logs Meet the**
   **"Create" and "Control" Test for "Agency Records"**

In *Tax Analysts*, the Supreme Court held that to qualify as an "agency record" subject to FOIA, "the agency must 'either create or obtain' the requested materials," and "the agency must be in control of [them] at the time the FOIA request is made." 492 U.S. at 144 (quoting *Forsham v. Harris*, 445 U.S. 169, 182 (1980)).  Application of that standard here easily demonstrates that the requested visitor logs are "agency records" of the Secret Service.

   a. **The Secret Service Created the Requested Records**

According to the sworn testimony of the Special Agent in Charge of the Liaison Division and the Freedom of Information and Privacy Acts Officer for the United States Secret Service, the visitor logs at issue in this case clearly are created by the agency:

> There are two interrelated systems – collectively termed the White House Access Control System – for controlling and monitoring access to the White House complex: the Worker and Visitor Enstrance System ("WAVES") and the Access Control Records System ("ACR").  The Vice President's residence is not a part of the White House Complex, and the Secret Service does not use WAVES or ACR at that site.
>
> ACR records consist of records generated when a pass holder, worker, or visitor swipes his or her permanent or temporary pass over one of the electronic pass readers located at entrances to and exits from the White House Complex.  . . .
>
> WAVES records consist of records generated when information is submitted by a White House pass holder to the Secret Service about workers and visitors who need access to the White House complex to conduct business or attend social events.  . . .   They may include limited information from background checks performed by the Secret Service and coded instructions to Secret Service officers.  . . .
>
> The Secret Service controls and monitors access to the Vice President's residence through the use of two access lists – a daily access list for individuals with appointments or work orders, and a permanent

> access list for those individuals who regularly access the facility. . . . The
> Secret Service conducts background checks on individuals for whom there
> has been a request for admission, and if there is no information of
> protective interest, the Secret Service places the name on a daily access
> list. A permanent access list is also maintained listing those individuals
> who regularly access the facility. All individuals are logged in by the
> Uniformed Division [of the Secret Service] officer working at the gate
> where the individual arrives.

Lyerly CREW Decl. (attached hereto as Exhibit 7), ¶¶ 6-9.

It is thus clear that the requested records are "generated when information is submitted . . . to the Secret Service," and include "information from background checks performed by the Secret Service and coded instructions to Secret Service officers," names "the Secret Service places" on access lists, and names that "are logged in by" Secret Service officers. There can be no dispute that the visitor logs are "created" by the Secret Service and that the first prong of the *Tax Analysts* test is satisfied here.

### b. The Secret Service Controls the Requested Records

It is also beyond dispute that the logs meet the second prong of the test – that "the agency must be in control of [the records] at the time the FOIA request is made." Notwithstanding the Secret Service's assertion that it "lacks the authority" to provide visitor logs to the Post, as we have shown, the agency has disclosed such logs to at least two other parties on several occasions – most recently on the very day that it refused to comply with the Post's request. Regardless of whether the agency may have belatedly (and conveniently) determined that it somehow lacks the ability to disclose White House visitor logs, there is no question that it was "in control" of the material "at the time the

14

FOIA request [was] made" on June 12, 2006.[5]

The requested visitor logs are clearly "agency records" subject to FOIA, and the Post is entitled to the immediate processing and release of the requested records.

### B. The Post Will Suffer Irreparable Injury in the Absence of the Requested Injunctive Relief

Unless the agency's unlawful failure to expeditiously comply with the Post's FOIA request is immediately enjoined, the Post will suffer irreparable harm.[6]  The very nature of the right that plaintiff seeks to vindicate in this action — expedited processing — depends upon timeliness.  The courts have recognized that the requisite injury is present, and preliminary injunctive relief is appropriate, in cases where "time is of the essence."  *See, e.g.*, *United States v. BNS, Inc.*, 858 F.2d 456, 465 (9th Cir. 1988); *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982).  Under the statutory scheme Congress established in the FOIA, it is clear that "time is of the essence" here and that any further delay in the processing of plaintiff's request will cause

---

[5]  The Secret Service provided logs to CREW and Judicial Watch, in response to FOIA requests, on May 10, July 7, and September 20, 2006.  Lyerly CREW Decl.; Lyerly Judicial Watch Decl.

[6] Given the strength of the Post's position on the merits, even "a relatively slight showing of irreparable injury" is adequate to justify the issuance of a preliminary injunction.  As the D.C. Circuit has held:

> The test is a flexible one.  "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak."  We have often recognized that injunctive relief may be justified, for example, "where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury."

*CSX Transportation, Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005), quoting *CityFed Financial Corp*, 58 F.3d at 747.  Nonetheless, the Post's showing of harm here is substantial.

irreparable injury. Unless the Secret Service is ordered to process the Post's request immediately, the Post's undisputed right to expedition under the FOIA will be irretrievably lost.

In addition to the loss of its clearly established statutory right, any further delay in the processing of the Post's FOIA request will irreparably harm its ability, and that of the public, to obtain in a timely fashion information relevant to the upcoming mid-term Congressional election. Indeed, in support of its administrative appeal on the issue of expedited processing, which the agency ultimately conceded was "appropriate in this matter," Exhibit 4, the Post stressed that its "right to expedited process of [our] FOIA request will effectively be lost if the requested material is not processed and released prior to the election," Exhibit 3. The public oversight mechanism provided by the FOIA is central to open and democratic debate on critical policy issues such as those raised in next month's election. As the Supreme Court has observed, the Act is "a means for citizens to know 'what the Government is up to.' This phrase should not be dismissed as a convenient formalism. *It defines a structural necessity in a real democracy*." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171-172 (2004) (emphasis added; citation omitted).

It is clear that the information the Post seeks, if it is to contribute to the public debate, must be disclosed expeditiously. There is, as the Secret Service was constrained to acknowledge, "an urgency to inform the public about" the requested information. Because time is of the essence in this matter, the Post will be irreparably harmed unless the Court acts now, "when it [is] still possible to grant effective relief," and before "all opportunity to grant the requested relief [is] foreclosed.*" Local Lodge No. 1266, Int'l*

*Ass'n of Machinists and Aerospace Workers v. Panoramic Corp.*, 668 F.2d 276, 290 (7th

Cir. 1981).  As this Court recently noted,

> [t]he 1996 amendments to FOIA creating the statutory right to
> expedition in certain cases "underlined Congress' recognition of the value
> in hastening release of certain information." As [plaintiff] correctly notes,
> "the loss of that 'value' constitutes a cognizable harm."  As time is
> necessarily of the essence in cases like this, such harm will likely be
> irreparable.

*Elec. Privacy Info. Ctr. v. DOJ*, 416 F. Supp. 2d 30, 40-41 (D.D.C. 2006) (citations

omitted) (granting preliminary injunction).[7]

### C.  Injunctive Relief Will Not Burden Others' Interests

Defendant DHS and the Secret Service cannot be said to be "burdened" by a

requirement that they comply with the law.  The immediate relief the Post seeks will

require nothing more of the government than what the law already mandates — the

expedited processing of the Post's FOIA request.  Nor will the requested relief burden the

interests of other parties who have submitted FOIA requests to the Secret Service in any

manner beyond that foreseen by Congress.  In providing for expedited processing of

qualifying requests, Congress intended that such requests would take precedence over

those that do not qualify for such treatment.  Fulfillment of the legislative intent cannot

be characterized as a burden on any party's interests.

---

[7]  This Court has likewise recognized that delay in the processing of FOIA requests "may
well result in disclosing the relevant documents after the need for them in the formulation
of national . . .  policy has been overtaken by events."  *Natural Resources Defense
Council v. Department of Energy*, 191 F. Supp. 2d 41, 43 (D.D.C. 2002) (granting motion
for release of documents).

**D.  The Public Interest Favors the Requested Relief**

The final criterion for the issuance of a preliminary injunction is clearly satisfied in this case.  The D.C. Circuit has long recognized that "there is an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate." *Jacksonville Port Authority v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977). Likewise, it is axiomatic that an "agency is required to follow its own regulations." *Cherokee National of Okla. v. Babbitt*, 117 F.3d 1489, 1499 (D.C. Cir. 1997)).  Such adherence is all that the Post seeks here.  The public interest will also be served by the expedited release of the requested records, which will further the FOIA's core purpose of "shedding light on an agency's performance of its statutory duties." *Dep't of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 773 (1989).  As this Court has noted, "[t]here is public benefit in the release of information that adds to citizens' knowledge" of government activities. *Ctr. to Prevent Handgun Violence v. Dep't of the Treasury*, 49 F. Supp. 2d 3, 5 (D.D.C. 1999).  The public interest favors the issuance of an order directing defendant DHS and the Secret Service to immediately process and release the requested information.

**III.  The Court Should Order the Agency to Preserve the Requested Records and to Process the Post's FOIA Request Immediately**

In light of the agency's assertion that the requested records are not subject to the FOIA's disclosure requirements, the agency apparently does not concede its obligation to maintain the material pending resolution of the Post's request.  As such, in aid of its jurisdiction, and to prevent irreparable harm to the Post and the general public, the Court should immediately order the agency to preserve the requested material.   The Court has previously recognized that, in circumstances similar to those present here, it has

"jurisdiction to issue a Temporary Restraining Order [requiring preservation] where the parties dispute the adequacy of the government's record keeping procedure and disagree whether records are covered by the [Presidential Records Act]." *Armstrong v. Bush*, 807 F. Supp. 816, 823 (D.D.C. 1992); *see also American Friends Service Committee v. Webster*, 485 F. Supp. 222 (D.D.C. 1980). An exercise of that jurisdiction is clearly appropriate here.

Beyond the protective preservation of the disputed material, the appropriate form of further relief to which the Post is entitled is clear. The applicable DHS regulations dictate the manner in which FOIA requests requiring expedition must be processed. The regulations provide that DHS components "ordinarily shall respond to requests according to their order of receipt," 6 C.F.R. § 5.5(a), but that requests "will be taken out of order and given expedited treatment whenever it is determined that they [meet the criteria for expedited processing]." *Id*. § 5.5(d)(1). "If a request for expedited treatment is granted, the request shall be given priority and shall be processed as soon as practicable." *Id*. § 5.5(d)(4).

Application of those requirements here should not be unduly burdensome nor result in further delay. The Secret Service carries a relatively small FOIA caseload, and handles very few (if any) requests that require expedited processing. The most recently published DHS statistics on FOIA processing (for fiscal year 2005) show that the Secret Service processed 701 FOIA requests in the fiscal year, and that *none* of them qualified for expedited treatment. U.S. Department of Homeland Security, 2005 Annual Freedom of Information Act Report to the Attorney General of the United States, October 1, 2004 – September 30, 2005, p. 20 (*available at* http://www.dhs.gov/interweb/assetlibrary/

privacy_rpt_foia_2005.pdf).[8] As such, the agency clearly possesses the needed resources to immediately process the Post's request.

Recognizing the substantial public interest in the records at issue here, and in light of the fact that the Secret Service received the Post's FOIA request almost four months ago, the Court should direct the agency to immediately process the Post's request, and produce all non-exempt, responsive records within 10 days of the issuance of the order the Post seeks.[9]

### CONCLUSION

For the foregoing reasons, the Post's motion for a preliminary injunction should be granted. The Post asks that the Court, pursuant to Local Rule 65.1(d), schedule a hearing on this motion at the Court's earliest convenience.

Respectfully submitted,

___/s/_____
DAVID L. SOBEL
D.C. Bar No. 360418

1875 Connecticut Avenue, N.W.
Suite 650
Washington, DC 20009
(202) 246-6180
sobel@att.net

---

[8] By way of comparison, other DHS components handle a much larger volume of requests. Customs and Border Protection, for instance, processed 7,878 requests, and the U.S. Coast Guard processed 6,654 requests. *Id.*

[9] Judicial resolution of the Post's request for preliminary relief will not resolve all issues raised in the complaint. Once FOIA processing is completed, the Court would retain jurisdiction to review the completeness and propriety of the agency's substantive determination of the Post's FOIA request. *See Open America v. Watergate Special Prosecution Force*, 547 F. 2d 605 (D.C. Cir. 1976).

ERIC N. LIEBERMAN
D.C. Bar No. 436331

The Washington Post
1150 15th Street, N.W.
Washington, DC 20071
(202) 334-6017

Counsel for Plaintiff

# EXHIBIT 1

*The Washington Post v. Department of Homeland Security*

Motion for a Preliminary Injunction

EXHIBIT 2

June 12, 2006

Latita M. Huff
Disclosure Office
United States Secret Service
Building 410
245 Murray Drive
Washington DC 200223
Fax No. 202-406-5154
via email: latita.huff@usss.dhs.gov

Dear Ms. Huff:

## FREEDOM OF INFORMATION ACT REQUEST
## AND REQUEST FOR EXPEDITED PROCESSING

Pursuant to the Freedom of Information Act, 5 U.S.C. § 552, the Washington Post hereby requests that the United States Secret Service (USSS) produce access to and copies of the following records:

1. All records and visitor logs, including WAVES and/or ACR records, from October 2004 to present, reflecting or concerning the entries and/or exits of any persons who sought or were scheduled to visit the following people in the Office of the Vice President: Vice President Cheney; David Addington, I. Lewis "Scooter" Libby, C. Dean McGrath, Steven Schmidt, John Hannah, Eric Edelman, Ron Christie, Victoria Nuland, Aaron Friedberg, Stephen Yates Samantha Ravich, and David Wurmser. Pertaining to the WAVES records, this request includes, but is not limited to, the portion of the WAVES records that lists the name of the person who is visiting, the room number visited, and the name of the person who arranged the visit with the Secret Service.

2. All records and visitor logs, including WAVES and/or ACR records, from October 2004 to present, reflecting or concerning the entries and/or exits of any persons, other than the members of the Cheney family, visiting the vice-president's residence. Pertaining to the WAVES records, this request includes, but is not limited to, the portion of the WAVES records that lists the name of the person who is visiting, where the person went and the name of the person who arranged the visit with the Secret Service.

If you regard any of these records as exempt from disclosure under the Act, I hereby request that you exercise your discretion to disclose them. If the Secret Service no longer has custody of the requested records because they have been turned over to the White House, please spell out in detail which specific suboffice within the White House the records were turned over to, which person(s) within the White House was given custody of the records, and please provide any relevant WAVES retention scheduling records as well as all records dating back to the January 2001 concerning or related to the turnover of WAVES records to the White House.

If you deny this request in whole or in part, I ask that you justify all deletions by reference to specific exemptions of the Act. I also note that you are obligated under the law to redact any exempt portions and provide all non-exempt portions that are reasonably segregable.

I further request that you disclose the listed documents, as they become available to you, without waiting until all the documents have been assembled.

*I request expedited processing of this request for records for the following reasons:*

*First, as a journalist, I am primarily engaged in disseminating information to the public.*

*Second, the subject matter of the request concerns actual operations of the federal government, namely meetings of the Vice President and his senior aides on official business.*

*Third, there is an urgency to inform the public about these government activities. There is no question that the activities of the Office of the Vice President are a matter of current exigency to the American public:*

*a. The visitor logs will help the public understand the degree to which lobbyists and special interest representatives may have influenced policy decisions of the Bush administration and in particular the positions taken by the Office of the Vice President. Both have been the subject of intense public interest as evidenced by media reports and congressional interest. The relationship between administration officials and lobbyists has emerged as a significant issue in the wake of the ongoing scandals involving lobbyists Jack Abramoff as well as various members of Congress, and of course in the controversy over Vice President Cheney's role in setting federal energy policy.*

*b. There is an ongoing investigation into the conduct of the Office of the Vice President. The vice-president's office -- and the contacts it had - is under scrutiny in the CIA-leak case currently under investigation by special prosecutor Patrick Fitzgerald. (In the last three months alone, more than 1000 stories have been written about the case, according to a Nexis search.) The public interest in the CIA leak case will only intensify as Scooter Libby's criminal trial approaches.*

*Fourth, the consequences of delaying a response would compromise a significant public interest. With the midterm elections looming, any delay in processing this request would deprive the public of its ability to make its views known in a timely fashion either at the polls, by lobbyist or through other contacts with public officials. In addition, the ongoing scandals have raised possible questions about the government's integrity which could affect public confidence.*

*I certify that my statements concerning the need for expedited processing are true and correct to the best of my knowledge and belief.*

I am making this request on behalf of The Washington Post, a newspaper of general circulation in the Washington, D.C. metropolitan area. The records disclosed pursuant to this request will

be used in the preparation of news articles for dissemination to the public. For purposes of FOIA fee assessments, I request that you waive all fees in the public interest. The furnishing of the information sought by this request is likely to contribute significantly to public understanding of the operations or activities of government and is not primarily in the commercial interest of the requester. If, however, you decline to waive all fees, I am prepared to pay your normal fees for news media requesters. Please notify me if you expect the processing fees to exceed $100.

I would appreciate your communicating with me by telephone or e-mail, rather than mail, if you have questions regarding this request. My direct telephone number is 202-334-6107; my e-mail address is beckerj@washpost.com As the FOIA and applicable regulations, 6 CFR Sec. 5.5(d)(4), require, I will anticipate your response to my request for expedited processing within ten (10) calendar days."


As the FOIA requires, I look forward to your prompt response.

Sincerely,


Jo Becker
Staff Writer
The Washington Post

**\*Please see previous litigation on related matters involving Judicial Watch. Examples of the types of records that have been turned over by the Secret Service in the past can be found at http://www.judicialwatch.org/archive/ois/cases/filegate/Exhibits/EXHIBIT-43.pdf**

# EXHIBIT 2

*The Washington Post v. Department of Homeland Security*

Motion for a Preliminary Injunction

EXHIBIT 1



**DEPARTMENT OF HOMELAND SECURITY**
UNITED STATES SECRET SERVICE
WASHINGTON, D.C. 20223

JUN 16 2006

Freedom of Information and Privacy Acts Branch
245 Murray Drive
Building 410
Washington, D.C. 20223

The Washington Post
1150 15th Street NW
Washington, DC 20071
Attn: Jo Becker

File Number: 20060351 - 20060364

Dear Requester:

This letter is intended to acknowledge the receipt of your recent Freedom of Information/Privacy Acts request received by the United States Secret Service on June 12, 2006, for all records and visitor logs, including WAVES and/or ACR records, from October 2004 to present, reflecting or concerning the entries and/or exits of any persons who sought or were scheduled to visit the following people in the Office of the Vice President:

File No. 20060351 – Vice President Cheney;
File No. 20060352 – David Addington;
File No. 20060353 – I. Lewis "Scooter" Libby;
File No. 20060354 – C. Dean McGrath;
File No. 20060355 – Steve Schmidt;
File No. 20060356 – John Hannah;
File No. 20060357 – Eric Edelman;
File No. 20060358 – Ron Christie;
File No. 20060359 – Victoria Nuland;
File No. 20060360 – Aaron Friedberg;
File No. 20060361 – Stephen Yates;
File No. 20060362 – Samantha Ravich; and
File No. 20060363 – David Wurmser.

Also, this letter will acknowledge your request for the following information:

File No. 20060364 – All records and visitor logs, including WAVES and/or ACR records from October 2004 to present, reflecting or concerning the entries and/or exits of any persons, other than members of the Cheney family, visiting the vice-president's residence.

You have requested expedited processing of your request under the Department of Homeland Security standard permitting expedition when a requester demonstrates a "compelling need." A compelling need is defined as follows:

1. Failure to obtain requested records on an expedited basis could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; or

2. With respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity.

You have not demonstrated that there is a threat to life or physical safety of an individual nor have you demonstrated that there is a particular urgency to inform the public about an actual or alleged federal government activity. Therefore, I have determined that your request for expedited processing should be denied.

If you disagree with our determination, you have the right of administrative appeal within 35 days by writing to Freedom of Information Appeal, Deputy Director, U.S. Secret Service, 245 Murray Drive, Building 410, Washington, DC 20223.

Please be advised we are processing your request. Your continued patience is appreciated.

Please use the file number indicated above in all future correspondence with this office.

Sincerely,

Kathy J. Lyerly
Special Agent In Charge
Freedom of Information &
Privacy Acts Officer

# EXHIBIT 3

*The Washington Post v. Department of Homeland Security*

Motion for a Preliminary Injunction

# The Washington Post

1150 15th STREET N. W.
WASHINGTON, D.C. 20071
(202) 334-6000

ERIC N. LIEBERMAN

Deputy Counsel & Director of Government Affairs

(202) 334-6017

FAX (202) 334-5075

E-MAIL: liebermane@washpost.com

July 12, 2006

## BY HAND DELIVERY

Freedom of Information Appeal
Deputy Director
U.S. Secret Service
245 Murray Drive
Building 410
Washington, DC 20223

RE: Appeal of Denial of Request for Expedited Processing

Dear Sir or Madam:

This letter constitutes an appeal under the Freedom of Information Act ("FOIA") and applicable Department of Homeland Security regulations, 6 CFR § 5.9, and is submitted on behalf of The Washington Post. Specifically, we appeal the initial determination of Kathy J. Lyerly, dated June 16, 2006, to deny our request for expedited processing of a FOIA request (attached hereto as Exhibit 1).

By letter dated June 12, 2006, Jo Becker, a Post Staff Writer, requested "[a]ll records and visitor logs, including WAVES and/or ACR records, from October 2004 to present, reflecting or concerning the entries and/or exits of any persons who sought or were scheduled to visit" several named individuals in the Office of the Vice President (attached hereto as Exhibit 2). Ms. Becker requested expedited processing of her request, noting that there is "an urgency to inform the public" about the activities reflected in the requested records for two distinct reasons.

First, the requested logs "will help the public understand the degree to which lobbyists and special interest representatives may have influenced policy decisions of the Bush administration and in particular the positions taken by the Office of the Vice President." Ms. Becker noted that "[t]he relationship between administration officials

and lobbyists has emerged as a significant issue in the wake of the ongoing scandals involving lobbyists Jack Abramoff as well as various members of Congress, and of course in the controversy over Vice President Cheney's role in setting federal energy policy."

Second, "[t]he vice-president's office – and the contacts it had – is under scrutiny in the CIA-leak case currently under investigation by special prosecutor Patrick Fitzgerald." Ms. Becker noted that "[t]he public interest in the CIA leak case will only intensify as Scooter Libby's criminal trial approaches."

With respect to the specific need for an expedited response to her FOIA request, Ms. Becker stated that "the consequences of delaying a response would compromise a significant public interest. With the midterm elections looming, any delay in processing this request would deprive the public of its ability to make its views known in a timely fashion either at the polls, by lobbyist or through other contacts with public officials."

Without explanation or elaboration, Ms. Lyerly asserted in her initial determination that the Post has not "demonstrated that there is a particular urgency to inform the public about an actual or alleged federal government activity." She did not even attempt to question or refute the specific grounds for expedition that Ms. Becker cited. In support of this appeal, we incorporate the statements contained in our June 12 FOIA request and provide the following additional material in support of our entitlement to expedited processing.

1. Lest there be any doubt as to the accuracy of Ms. Becker's assertion that there is substantial public interest in the relationships between lobbyists and administration officials, we attach hereto search results from Google News indicating that there have been at least 122 published articles in the last several days concerning former lobbyist Jack Abramoff's visits to the White House (Exhibit 3). Significantly, this news coverage was prompted by the Secret Service's disclosure of White House visitor logs – precisely the sort of information that is at issue here.

2. In her FOIA request, Ms. Becker noted that "[i]n the last three months alone, more than 1000 stories have been written about the [CIA-leak] case, according to a Nexis search." She certified that the facts provided in support of the expedition request were "true and correct," and the agency's initial determination does not question or refute the accuracy of that assertion of newsworthiness.

3. Ms. Becker specifically cited the impending November mid-term elections as a basis for expedited processing of her request. It is beyond dispute that ethics – primarily the question of lobbyist influence in the White House and Congress – has emerged as a significant campaign issue. As USA Today recently reported, "For the past year, Democrats have been jockeying for the high ground on congressional ethics, hoping a largely Republican lobbying scandal would help propel them into the majority come November's elections." See USA Today article (attached hereto as Exhibit 4). "Rep. Rahm Emanuel of Illinois, chairman of the House Democratic campaign committee, said

Republicans have 'a governing philosophy' to cozy up to lobbyists that has led them to favor industries such as oil and pharmaceuticals, producing higher prices for gasoline and prescriptions." *Id.* There can be no doubt that the relationship between industry lobbyists and high-ranking Republican officials will be a significant issue of debate in the November elections. *See also* Exhibit 5 (Democratic National Committee press release asserting that a "Republican culture of corruption [includes] the Bush White House"). A recent article in the National Review stated:

> [T]here is legitimate cause for GOP worry on the ethics front. A recent Washington Post/ABC poll found the Democratic party was trusted more than Republicans "to do a better job handling corruption in Washington" by 52 percent to 27 percent. Last month, a Pew Research Center survey found that by 44 percent to 28 percent, voters believed that Democrats "could do a better job in reforming government." Will the corruption issue alone sink the GOP? No. But it adds to the fabric of the public's discontent. With ongoing criminal investigations involving Abramoff and former congressman Duke Cunningham, Republicans are only one new indictment or guilty plea away from another cycle of the "culture of corruption" charges they now witlessly dismiss as innocuous.

Exhibit 6.

4. Although the Vice President is not a candidate in the upcoming mid-term elections, there is no question that his activities – and the public perception of those activities – will impact his party's prospects. As a Copley News Service report noted earlier this year, some Republican strategists "fear that Cheney has become more of a liability to Republicans running in close congressional races this year." Exhibit 7. The National Review reported that "the talk of Washington has been about" whether the Vice President "should be sacked to help turn around the national GOP's fortunes." Exhibit 6. A recent edition of CBS News' "Face the Nation" program featured a discussion of "Has Vice President Cheney become a political liability for the Republicans?" Exhibit 8. There is thus a clear nexus between the activities of the Vice President and his staff – particularly as they relate to lobbying and ethics issues – and the issues that voters will be considering when they go to the polls in November.

For the foregoing reasons, we believe there is clearly an "urgency to inform the public" about the individuals who have visited the Vice President and his key staff members at the White House complex. As noted, that urgency stems from both the pendency of the mid-term elections and the commencement of Mr. Libby's criminal trial early next year. Given that the election will occur first (in early November), our right to expedited process of Ms. Becker's FOIA request will effectively be lost if the requested material is not processed and released prior to the election.

Finally, we note that the submission of an administrative appeal is not a prerequisite to judicial review of an agency's denial of a request for expedited processing. *ACLU v. Department of Justice*, 321 F. Supp. 2d 24, 29 (D.D.C. 2004) ("plaintiffs'

Deputy Director, U.S. Secret Service                                    FOIA Appeal
July 12, 2006
Page 4

failure to appeal the [agency's] refusal to expedite their request does not preclude judicial review of the decision").  While we are submitting this appeal to afford the agency an opportunity to correct a clearly flawed initial determination, please be advised of our intention to seek judicial review in the event of an unfavorable or untimely response.  As the statute requires "expeditious consideration" of appeals involving expedited processing requests,  5 U.S.C. § 552(a)(6)(E)(ii)(II), we will anticipate your prompt response.  Please feel free to contact me at (202) 334-6017 if I can provide you with additional information concerning this matter.


                                        Sincerely,

                                        Eric Lieberman.

                                        Eric Lieberman

EXHIBIT 1



**DEPARTMENT OF HOMELAND SECURITY**
UNITED STATES SECRET SERVICE
WASHINGTON, D.C. 20223

JUN 16 2006

Freedom of Information and Privacy Acts Branch
245 Murray Drive
Building 410
Washington, D.C. 20223

The Washington Post
1150 15th Street NW
Washington, DC 20071
Attn: Jo Becker

File Number:  20060351 - 20060364

Dear Requester:

This letter is intended to acknowledge the receipt of your recent Freedom of Information/Privacy Acts request received by the United States Secret Service on June 12, 2006, for all records and visitor logs, including WAVES and/or ACR records, from October 2004 to present, reflecting or concerning the entries and/or exits of any persons who sought or were scheduled to visit the following people in the Office of the Vice President:

File No. 20060351 – Vice President Cheney;
File No. 20060352 – David Addington;
File No. 20060353 – I. Lewis "Scooter" Libby;
File No. 20060354 – C. Dean McGrath;
File No. 20060355 – Steve Schmidt;
File No. 20060356 – John Hannah;
File No. 20060357 – Eric Edelman;
File No. 20060358 – Ron Christie;
File No. 20060359 – Victoria Nuland;
File No. 20060360 – Aaron Friedberg;
File No. 20060361 – Stephen Yates;
File No. 20060362 – Samantha Ravich; and
File No. 20060363 – David Wurmser.

Also, this letter will acknowledge your request for the following information:

File No. 20060364 – All records and visitor logs, including WAVES and/or ACR records from October 2004 to present, reflecting or concerning the entries and/or exits of any persons, other than members of the Cheney family, visiting the vice-president's residence.

You have requested expedited processing of your request under the Department of Homeland Security standard permitting expedition when a requester demonstrates a "compelling need." A compelling need is defined as follows:

1. Failure to obtain requested records on an expedited basis could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; or

2. With respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity.

You have not demonstrated that there is a threat to life or physical safety of an individual nor have you demonstrated that there is a particular urgency to inform the public about an actual or alleged federal government activity. Therefore, I have determined that your request for expedited processing should be denied.

If you disagree with our determination, you have the right of administrative appeal within 35 days by writing to Freedom of Information Appeal, Deputy Director, U.S. Secret Service, 245 Murray Drive, Building 410, Washington, DC 20223.

Please be advised we are processing your request. Your continued patience is appreciated.

Please use the file number indicated above in all future correspondence with this office.

Sincerely,

Kathy J. Lyerly
Special Agent In Charge
Freedom of Information &
Privacy Acts Officer

EXHIBIT 2

June 12, 2006

Latita M. Huff
Disclosure Office
United States Secret Service
Building 410
245 Murray Drive
Washington DC 200223
Fax No. 202-406-5154
via email: latita.huff@usss.dhs.gov

Dear Ms. Huff:

## FREEDOM OF INFORMATION ACT REQUEST
## AND REQUEST FOR EXPEDITED PROCESSING

Pursuant to the Freedom of Information Act, 5 U.S.C. § 552, the Washington Post hereby requests that the United States Secret Service (USSS) produce access to and copies of the following records:

1. All records and visitor logs, including WAVES and/or ACR records, from October 2004 to present, reflecting or concerning the entries and/or exits of any persons who sought or were scheduled to visit the following people in the Office of the Vice President: Vice President Cheney; David Addington, I. Lewis "Scooter" Libby, C. Dean McGrath, Steven Schmidt, John Hannah, Eric Edelman, Ron Christie, Victoria Nuland, Aaron Friedberg, Stephen Yates Samantha Ravich, and David Wurmser. Pertaining to the WAVES records, this request includes, but is not limited to, the portion of the WAVES records that lists the name of the person who is visiting, the room number visited, and the name of the person who arranged the visit with the Secret Service.

2. All records and visitor logs, including WAVES and/or ACR records, from October 2004 to present, reflecting or concerning the entries and/or exits of any persons, other than the members of the Cheney family, visiting the vice-president's residence. Pertaining to the WAVES records, this request includes, but is not limited to, the portion of the WAVES records that lists the name of the person who is visiting, where the person went and the name of the person who arranged the visit with the Secret Service.

If you regard any of these records as exempt from disclosure under the Act, I hereby request that you exercise your discretion to disclose them. If the Secret Service no longer has custody of the requested records because they have been turned over to the White House, please spell out in detail which specific suboffice within the White House the records were turned over to, which person(s) within the White House was given custody of the records, and please provide any relevant WAVES retention scheduling records as well as all records dating back to the January 2001 concerning or related to the turnover of WAVES records to the White House.

If you deny this request in whole or in part, I ask that you justify all deletions by reference to specific exemptions of the Act. I also note that you are obligated under the law to redact any exempt portions and provide all non-exempt portions that are reasonably segregable.

I further request that you disclose the listed documents, as they become available to you, without waiting until all the documents have been assembled.

*I request expedited processing of this request for records for the following reasons:*

*First, as a journalist, I am primarily engaged in disseminating information to the public.*

*Second, the subject matter of the request concerns actual operations of the federal government, namely meetings of the Vice President and his senior aides on official business.*

*Third, there is an urgency to inform the public about these government activities. There is no question that the activities of the Office of the Vice President are a matter of current exigency to the American public:*

*a. The visitor logs will help the public understand the degree to which lobbyists and special interest representatives may have influenced policy decisions of the Bush administration and in particular the positions taken by the Office of the Vice President. Both have been the subject of intense public interest as evidenced by media reports and congressional interest. The relationship between administration officials and lobbyists has emerged as a significant issue in the wake of the ongoing scandals involving lobbyists Jack Abramoff as well as various members of Congress, and of course in the controversy over Vice President Cheney's role in setting federal energy policy.*

*b. There is an ongoing investigation into the conduct of the Office of the Vice President. The vice-president's office -- and the contacts it had - is under scrutiny in the CIA-leak case currently under investigation by special prosecutor Patrick Fitzgerald. (In the last three months alone, more than 1000 stories have been written about the case, according to a Nexis search.) The public interest in the CIA leak case will only intensify as Scooter Libby's criminal trial approaches.*

*Fourth, the consequences of delaying a response would compromise a significant public interest. With the midterm elections looming, any delay in processing this request would deprive the public of its ability to make its views known in a timely fashion either at the polls, by lobbyist or through other contacts with public officials. In addition, the ongoing scandals have raised possible questions about the government's integrity which could affect public confidence.*

*I certify that my statements concerning the need for expedited processing are true and correct to the best of my knowledge and belief.*

I am making this request on behalf of The Washington Post, a newspaper of general circulation in the Washington, D.C. metropolitan area. The records disclosed pursuant to this request will

be used in the preparation of news articles for dissemination to the public. For purposes of FOIA fee assessments, I request that you waive all fees in the public interest. The furnishing of the information sought by this request is likely to contribute significantly to public understanding of the operations or activities of government and is not primarily in the commercial interest of the requester. If, however, you decline to waive all fees, I am prepared to pay your normal fees for news media requesters. Please notify me if you expect the processing fees to exceed $100.

I would appreciate your communicating with me by telephone or e-mail, rather than mail, if you have questions regarding this request. My direct telephone number is 202-334-6107; my e-mail address is beckerj@washpost.com As the FOIA and applicable regulations, 6 CFR Sec. 5.5(d)(4), require, I will anticipate your response to my request for expedited processing within ten (10) calendar days."

As the FOIA requires, I look forward to your prompt response.

Sincerely,


Jo Becker
Staff Writer
The Washington Post

**\*Please see previous litigation on related matters involving Judicial Watch. Examples of the types of records that have been turned over by the Secret Service in the past can be found at http://www.judicialwatch.org/archive/ois/cases/filegate/Exhibits/EXHIBIT-43.pdf**

abramoff "white House" "secret service" – Google News

07/11/2006 01:00 PM

**EXHIBIT 3**



<u>Web</u>  <u>Images</u>  <u>Groups</u>  <u>News</u>  <u>Froogle</u>  <u>Maps</u>  <u>more »</u>    <u>Sign in</u>

| abramoff "white House" "secret service" | (Search News) (Search the Web) | <u>Advanced News Search</u> <u>Preferences</u> |

Results **1** - **100** of about **122** for **abramoff white-House secret-service**. (0.09 seconds)

<u>Sort by relevance</u>  **Sorted by date**

**Top Stories**
**World**
**U.S.**
**Business**
**Sci/Tech**
**Sports**
**Entertainment**
**Health**
**Most Popular**

✉ <u>News Alerts</u>

<u>RSS</u> | <u>Atom</u>
<u>About Feeds</u>

<u>Mobile News</u>

<u>About</u>
<u>Google News</u>

## Records Show Bush Met With **Abramoff**
All American Patriots (press release), Sweden - 4 hours ago
... **Secret Service** logs show that **Abramoff** was at the **White House** on March 1, 2001 from 4 pm to 6 pm. [WH WAVES Records 4/2/03, Released 7-7-06]. ...

## Brownback stands in way of stem cell bill
Lawrence Journal World, KS - 5 hours ago
... Links Between **Abramoff**, **White House**: Lobbyist Jack **Abramoff** had a half-dozen **White House** appointments in ... to logs released yesterday by the US **Secret Service**. ...

## Bush Met With **Abramoff** Records Show: DNC FOIA Uncovers Four New ...
noticias.info, Spain - 9 hours ago
... **Secret Service** logs show that **Abramoff** was at the **White House** on March 1, 2001 from 4 pm to 6 pm. [WH WAVES Records 4/2/03, Released 7-7-06]. ...

## **Abramoff** Returns
Yahoo! News - Jul 10, 2006
... Previously the **White House** claimed **Abramoff** had only been there twice. But the Justice Department explained that the **Secret Service** had quote "unexpectedly ...

## Dedicated Santas work through summer heat
Miami Herald, FL - Jul 9, 2006
... One entry on visitor logs kept by the **Secret Service** indicates **Abramoff** visited the **White House** family residence on Dec. 10, 2001, for two hours. ...



## **Secret Service** Reveals More **Abramoff** Visits
KFMB, CA - Jul 8, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## **Secret Service** Reveals 4 More **Abramoff** Visits to **White House**
FOX News - Jul 8, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's

assistant for domestic policy ...

## Logs show **Abramoff** visit to Cheney aide. **White House**
Helena Independent Record, MT - Jul 8, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs,
was on April 20, 2001, to see Cesar Conda, at the time Cheney's
assistant for domestic ...

## **Secret Service** Reveals More **Abramoff** Visits
Frankfort Times, IN - Jul 8, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs,
was on April 20, 2001, to see Cesar Conda, at the time Cheney's
assistant for domestic policy ...



## **Secret Service** Reveals More **Abramoff** Visits
Wyoming News, WY - Jul 8, 2006
... One **Abramoff White House** visit, according to
**Secret Service** logs, was on April 20, 2001, to see
Cesar Conda, at the time Cheney's assistant for
domestic policy ...



## **Secret Service** reveals more **Abramoff** visits
USA Today - Jul 8, 2006
... One **Abramoff White House** visit, according to
**Secret Service** logs, was on April 20, 2001, to see
Cesar Conda, at the time Cheney's assistant for
domestic policy ...

## More **White House** Visits Disclosed
Los Angeles Times, CA - Jul 8, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs,
was on April 20, 2001, to see Cesar Conda, then Cheney's assistant for
domestic policy. ...

## New Links Between **Abramoff. White House**
Canton Repository (subscription), OH - Jul 8, 2006
... In May, the **Secret Service** released partial data showing two **White
House** visits by **Abramoff**. In a letter faxed to Judicial Watch ...

## The Nation in brief
Arkansas Democrat-Gazette (subscription), AR - Jul 8, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs,
was on April 20, 2001, to see Cesar Conda, at the time Cheney's
assistant for domestic ...

## **Abramoff** made other visits to **White House**
AZ Central.com, AZ - Jul 8, 2006
... Another **Abramoff White House** visit, according to the **Secret
Service** logs, was on April 20, 2001, to see Cesar Conda, at the time
Cheney's assistant for ...

## New Links Between **Abramoff** And **White House**

Free Internet Press, NY - Jul 8, 2006
... In May, the **Secret Service** released partial data showing two **White House** visits by **Abramoff**. In a letter faxed to Judicial Watch ...

## Navy sonar agreement reached

The Spokesman Review, WA - Jul 8, 2006
... In May, the **Secret Service** released partial data showing two **White House** visits by **Abramoff**. In a letter faxed to Judicial Watch ...

## Abramoff White House visits revealed

North Adams Transcript, MA - Jul 8, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## Navy posted private information on Web

Seattle Times, United States - Jul 8, 2006
... Judicial Watch and the Democratic National Committee. An earlier **Secret Service** search turned up just two **Abramoff White House** visits. ...

## Secret Service reveals more White House visits by Abramoff

Capitol Hill Blue, VA - Jul 8, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## Logs show 4 more Abramoff visits to White House in '01

Arizona Daily Star, AZ - Jul 8, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## Logs show Abramoff visits to White House

Standard-Speaker, PA - Jul 8, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic ...

## Logs list Abramoff White House visits

Houston Chronicle, United States - Jul 7, 2006
... group Judicial Watch. In May, the **Secret Service** released partial data showing two **White House** visits by **Abramoff**. In a letter faxed ...



## Secret Service Reveals More Abramoff Visits

CBS News - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## Nation Briefs
Austin American-Statesman (subscription), TX - Jul 7, 2006
... The **Secret Service** revealed four more visits to the **White House** in 2001 by disgraced lobbyist Jack **Abramoff**, including one to see a domestic policy aide to ...

## **Secret Service** reveals more **Abramoff** visits
The State, SC - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## New Links Between **Abramoff**, **White House**
Washington Post, United States - Jul 7, 2006
... In May, the **Secret Service** released partial data showing two **White House** visits by **Abramoff**. In a letter faxed to Judicial Watch ...

## Logs show **Abramoff** visits to **White House**
MSNBC - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic ...

## **Abramoff** visited aide to Cheney
Dallas Morning News (subscription), TX - Jul 7, 2006
... Another **Abramoff White House** visit, according to the **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Mr. Cheney's assistant for ...

## **Secret Service** logs show **Abramoff** visit to Cheney aide, White ...
ABC7Chicago.com, USA - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## **Secret Service** logs show **Abramoff** visit to Cheney aide, White ...
KWWL, IA - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## **Secret Service** Reveals More **Abramoff** Visits
WJLA, DC - Jul 7, 2006
One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## **Secret Service** Reveals More **Abramoff** Visits
Mcalester News Capital, OK - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's

assistant for domestic policy ...

## Secret Service Reveals More Abramoff Visits
Guardian Unlimited, UK - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## Secret Service Reveals More Abramoff Visits
ABC News - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## Secret Service Reveals More Abramoff Visits
Forbes - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## Secret Service logs show Abramoff visit to Cheney aide, White ...
KAIT, AR - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## Secret Service reveals more Abramoff visits
Macon Telegraph, GA - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## Secret Service logs show Abramoff visit to Cheney aide, White ...
WVLT, TN - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## Secret Service logs show Abramoff visit to Cheney aide, White ...
WISH, IN - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## Secret Service reveals more Abramoff visits
Sacramento Bee, USA - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## Secret Service logs show Abramoff visit to Cheney aide, White ...
WBAY, WI - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## Secret Service logs show Abramoff visit to Cheney aide, White ...
Providence Eyewitness News, RI - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## Secret Service logs show Abramoff visit to Cheney aide, White ...
WRIC, VA - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## Secret Service logs show Abramoff visit to Cheney aide, White ...
KPLC-TV, LA - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## Secret Service logs show Abramoff visit to Cheney aide, White ...
KOLD-TV, AZ - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## Secret Service logs show Abramoff visit to Cheney aide, White ...
Team 4 News, TX - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## Secret Service logs show Abramoff visit to Cheney aide, White ...
KVIA, TX - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## Secret Service logs show Abramoff visit to Cheney aide, White ...
KAJ News, MT - Jul 7, 2006

... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## Secret Service logs show Abramoff visit to Cheney aide, White ...

KLFY, LA - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## Secret Service logs show Abramoff visit to Cheney aide, White ...

WKYT, KY - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## Secret Service logs show Abramoff visit to Cheney aide, White ...

WALB-TV, GA - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## Secret Service logs show Abramoff visit to Cheney aide, White ...

KXLF-TV, MT - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## Secret Service logs show Abramoff visit to Cheney aide, White ...

KRTV, MT - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## Secret Service logs show Abramoff visit to Cheney aide, White ...

WREG, TN - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## Secret Service logs show Abramoff visit to Cheney aide, White ...

WLNS, MI - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

### Secret Service logs show Abramoff visit to Cheney aide, White ...
KCAU, IA - Jul 7, 2006
... An earlier Secret Service search turned up just two Abramoff White House visits. The newly released records bring the total number of known visits to seven. ...

### Secret Service logs show Abramoff visit to Cheney aide, White ...
KBZK-TV, MT - Jul 7, 2006
... An earlier Secret Service search turned up just two Abramoff White House visits. The newly released records bring the total number of known visits to seven. ...

### Secret Service logs show Abramoff visit to Cheney aide, White ...
KXAN-TV, TX - Jul 7, 2006
... An earlier Secret Service search turned up just two Abramoff White House visits. The newly released records bring the total number of known visits to seven. ...

### Secret Service logs show Abramoff visit to Cheney aide, White ...
KESQ, CA - Jul 7, 2006
... An earlier Secret Service search turned up just two Abramoff White House visits. The newly released records bring the total number of known visits to seven. ...

### Secret Service logs show Abramoff visit to Cheney aide, White ...
KRIS-TV, TX - Jul 7, 2006
... An earlier Secret Service search turned up just two Abramoff White House visits. The newly released records bring the total number of known visits to seven. ...

### Secret Service logs show Abramoff visit to Cheney aide, White ...
WLBT-TV, MS - Jul 7, 2006
... An earlier Secret Service search turned up just two Abramoff White House visits. The newly released records bring the total number of known visits to seven. ...

### Secret Service logs show Abramoff visit to Cheney aide, White ...
KTRE, TX - Jul 7, 2006
... An earlier Secret Service search turned up just two Abramoff White House visits. The newly released records bring the total number of known visits to seven. ...

### Secret Service logs show Abramoff visit to Cheney aide, White ...
KTVO, MO - Jul 7, 2006

abramoff "white House" "secret service" – Google News

07/11/2006 01:00 PM

... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

### Secret Service logs show Abramoff visit to Cheney aide, White ...
KRON 4, CA - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

### Secret Service logs show Abramoff visit to Cheney aide, White ...
WAVY-TV, VA - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

### Secret Service logs show Abramoff visit to Cheney aide, White ...
WWAY NewsChannel 3, NC - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

### Secret Service logs show Abramoff visit to Cheney aide, White ...
WSTM-TV, NY - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

### Secret Service logs show Abramoff visit to Cheney aide, White ...
KLTV, TX - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

### Secret Service logs show Abramoff visit to Cheney aide, White ...
WHBF, IL - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

### Secret Service logs show Abramoff visit to Cheney aide, White ...
WANE, IN - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## Secret Service logs show Abramoff visit to Cheney aide, White ...

WBOC TV 16, MD - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## Secret Service logs show Abramoff visit to Cheney aide, White ...

WOI, IA - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## Secret Service logs show Abramoff visit to Cheney aide, White ...

WTVM, GA - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## Secret Service logs show Abramoff visit to Cheney aide, White ...

WHO-TV, IA - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## Secret Service logs show Abramoff visit to Cheney aide, White ...

WLUC-TV, MI - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## Secret Service logs show Abramoff visit to Cheney aide, White ...

KLAS-TV, NV - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## Secret Service logs show Abramoff visit to Cheney aide, White ...

Fox 12 Boise, ID - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## Secret Service logs show Abramoff visit to Cheney aide, White ...

KVOA.com, AZ - Jul 7, 2006

... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## **Secret Service** logs show **Abramoff** visit to Cheney aide, White ...

Eyewitness News, RI - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## **Secret Service** logs show **Abramoff** visit to Cheney aide, White ...

KFVS, MO - Jul 7, 2006
... An earlier **Secret Service** search turned up just two **Abramoff White House** visits. The newly released records bring the total number of known visits to seven. ...

## **Secret Service** reveals more **Abramoff** visits

Herald News Daily, ND - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic ...

## **Secret Service** Reveals More **Abramoff** Visits

CBS News - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## **Secret Service** logs show **Abramoff** visit to Cheney aide, White ...

San Diego Union Tribune, United States - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## **Secret Service** reveals more **Abramoff** visits

San Jose Mercury News, USA - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## **Secret Service** Reveals More **Abramoff** Visits

San Francisco Chronicle, USA - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## **Secret Service** reveals more **Abramoff** visits

Leading The Charge, Australia - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's

abramoff "white House" "secret service" – Google News

07/11/2006 01:01 PM

Sign in

# Google
News

Web  Images  Groups  News  Froogle  Maps  more »

| abramoff "white House" "secret service" |  ( Search News )  ( Search the Web )

Advanced News Search
Preferences

Results **101 - 122** of **122** for **abramoff white-House secret-service**. **(0.13 seconds)**

Sort by relevance  **Sorted by date**

**Top Stories**
**World**
**U.S.**
**Business**
**Sci/Tech**
**Sports**
**Entertainment**
**Health**
**Most Popular**

✉ News Alerts

RSS | Atom
About Feeds

Mobile News

About
Google News

## Secret Service reveals more Abramoff visits
Olberlin, KS - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic ...

## Secret Service reveals more Abramoff visits
Times Picayune, LA - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## Secret Service reveals more Abramoff visits
Ely Times,  USA - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic ...

## Secret Service reveals more Abramoff visits
Pioneer Press, MN - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## Secret Service reveals more Abramoff visits
Sky Valley Journal,  USA - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic ...

## Secret Service reveals more Abramoff visits
OregonLive.com, OR - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## Secret Service reveals more Abramoff visits
Monterey County Herald, CA - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## Secret Service reveals more Abramoff visits
Fort Worth Star Telegram, TX - Jul 7, 2006

... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## Secret Service reveals more Abramoff visits
Biloxi Sun Herald, USA - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## Secret Service reveals more Abramoff visits
Contra Costa Times, CA - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## Secret Service Reveals More Abramoff Visits
ABC News - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## Secret Service reveals more Abramoff visits
Cleveland Plain Dealer, OH - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## Secret Service Reveals More Abramoff Visits
Guardian Unlimited, UK - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## Secret Service reveals more Abramoff visits
Myrtle Beach Sun News, SC - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## Secret Service reveals more Abramoff visits
Fort Wayne News Sentinel, IN - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## Secret Service reveals more Abramoff visits
Centre Daily Times, PA - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs, was on April 20, 2001, to see Cesar Conda, at the time Cheney's assistant for domestic policy ...

## Secret Service reveals more Abramoff visits

Case 1:06-cv-01737-RMU    Document 3-4    Filed 10/10/2006    Page 24 of 40
abramoff "white House" "secret service" – Google News
07/11/2006 01:01 PM

Belleville News-Democrat, IL - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs,
was on April 20, 2001, to see Cesar Conda, at the time Cheney's
assistant for domestic policy ...

### Secret Service Reveals More Abramoff Visits
Washington Post, United States - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs,
was on April 20, 2001, to see Cesar Conda, at the time Cheney's
assistant for domestic policy ...

### Secret Service Reveals More Abramoff Visits
FOX News - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs,
was on April 20, 2001, to see Cesar Conda, at the time Cheney's
assistant for domestic policy ...

### Secret Service Reveals More Abramoff Visits
Forbes - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs,
was on April 20, 2001, to see Cesar Conda, at the time Cheney's
assistant for domestic policy ...

### Group uncovers more White House visits by Abramoff
Raw Story, MA - Jul 7, 2006
The documents were released by the **Secret Service** late Friday
afternoon, a ... obtained a court order for all logs of **Abramoff's** visits to
the **White House**. ...

### Reed In The Rough
National Journal, DC - Jul 7, 2006
... the firm Greenberg Traurig and to **Secret Service** logs released ...
speak with anyone at the **White House** regarding these ... **Abramoff**
had been prodding Reed for help at ...

New! Get the latest news on **abramoff white-House secret-service** with Google
Alerts.

 ◄ Google

Result Page:    **Previous** 1  **2**

| abramoff "white House" "secret service" | | ( Search News ) ( Search the Web ) |

**Search Tips**

Google Home - Advertising Programs - Business Solutions - About Google - Privacy Policy

Case 1:06-cv-01737-RMU    Document 3-4    Filed 10/10/2006    Page 25 of 40
abramoff "white House" "secret service" – Google News
07/11/2006 01:01 PM

©2006 Google

abramoff "white House" "secret service" – Google News

assistant for domestic ...

### Secret Service reveals more Abramoff visits
Jordan Falls News, Iowa - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs,
was on April 20, 2001, to see Cesar Conda, at the time Cheney's
assistant for domestic ...

### Secret Service reveals more Abramoff visits
Fort Wayne Journal Gazette, IN - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs,
was on April 20, 2001, to see Cesar Conda, at the time Cheney's
assistant for domestic policy ...

### Secret Service reveals more Abramoff visits
San Luis Obispo Tribune, CA - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs,
was on April 20, 2001, to see Cesar Conda, at the time Cheney's
assistant for domestic policy ...

### Secret Service reveals more Abramoff visits
Kansas City Star, MO - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs,
was on April 20, 2001, to see Cesar Conda, at the time Cheney's
assistant for domestic policy ...

### Secret Service reveals more Abramoff visits
Columbus Ledger-Enquirer, GA - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs,
was on April 20, 2001, to see Cesar Conda, at the time Cheney's
assistant for domestic policy ...

### Secret Service reveals more Abramoff visits
Kentucky.com, KY - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs,
was on April 20, 2001, to see Cesar Conda, at the time Cheney's
assistant for domestic policy ...

### Secret Service reveals more Abramoff visits
The Benton Crier, Iowa - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs,
was on April 20, 2001, to see Cesar Conda, at the time Cheney's
assistant for domestic ...

### Secret Service reveals more Abramoff visits
Bradenton Herald, United States - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs,
was on April 20, 2001, to see Cesar Conda, at the time Cheney's
assistant for domestic policy ...

### Secret Service Reveals More Abramoff Visits
phillyBurbs.com, PA - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs,

was on April 20, 2001, to see Cesar Conda, at the time Cheney's
assistant for domestic policy ...

### Secret Service reveals more Abramoff visits
Jackson News-Tribune, WY - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs,
was on April 20, 2001, to see Cesar Conda, at the time Cheney's
assistant for domestic ...

### Secret Service reveals more Abramoff visits
Duluth News Tribune, MN - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs,
was on April 20, 2001, to see Cesar Conda, at the time Cheney's
assistant for domestic policy ...

### Secret Service reveals more Abramoff visits
The Kindred Times, Utah - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs,
was on April 20, 2001, to see Cesar Conda, at the time Cheney's
assistant for domestic ...

### Secret Service Reveals More Abramoff Visits
Mcalester News Capital, OK - Jul 7, 2006
... One **Abramoff White House** visit, according to **Secret Service** logs,
was on April 20, 2001, to see Cesar Conda, at the time Cheney's
assistant for domestic policy ...

New! Get the latest news on **abramoff white-House secret-service** with Google
Alerts.

## Google ▶

Result Page:    **1** 2    **Next**

abramoff "white House" "secret service"    ( Search News )  ( Search the Web )

Search Tips

Google Home - Advertising Programs - Business Solutions - About Google - Privacy Policy

©2006 Google

**EXHIBIT 4**

1 of 3 DOCUMENTS

Copyright 2006 Gannett Company, Inc.
All Rights Reserved
USA TODAY

May 10, 2006 Wednesday
FINAL EDITION

**SECTION:** NEWS; Pg. 7A

**LENGTH:** 761 words

**HEADLINE:** Democrats' own ethics trouble 'dulls the message';
But party rated in poll as better able to clean up corruption

**BYLINE:** Jim Drinkard

**BODY:**

WASHINGTON — For the past year, Democrats have been jockeying for the high ground on congressional ethics, hoping a largely Republican lobbying scandal would help propel them into the majority come November's elections.

But the issue is proving to be a two-edged sword, as Democrats themselves have come under scrutiny for allegations of bribery and conflicts of interest.

"You can attack one party for having a lack of ethics, but if any of your own members have problems, it dulls the message with the American people," said Leon Panetta, an ex-Democratic congressman from California and chief of staff under President Clinton. "They begin to put everybody in the same box. It clearly loses some of its impact as a clean campaign issue."

Carl Forti, spokesman for the GOP House campaign committee, said the "culture of corruption" argument doesn't worry Republicans. "People vote for a person, not a party," he said. "We don't think it's going to be effective."

In a USA TODAY/Gallup Poll taken over the weekend, Americans said the Washington scandals don't have a distinct partisan tilt: 76% say they affect both parties equally, 15% said corruption involves mostly Republicans and 5% said Democrats. But respondents gave a 41%–29% edge to Democrats when asked which party would do a better job of cleaning up corruption.

Democrats facing ethics problems:

*Rep. William Jefferson of Louisiana, who is under investigation of alleged bribery in connection with helping market broadband telecommunication services in Nigeria. Former aide Brent Pfeffer and businessman Vernon Jackson have pleaded guilty. An FBI raid on Jefferson's houses in New Orleans and Washington last year found $90,000 in cash in his freezer. Jefferson hasn't been charged and has denied wrongdoing. His attorney, Robert Trout, declined to comment.

*Rep. Alan Mollohan of West Virginia, who directed federal grants to non-profit groups back home while entering real estate deals with top officials of the groups. The congressman's personal wealth jumped. Mollohan has defended his actions as designed to bring economic development to his district, but he had to step down as the top Democrat on the House ethics committee.

*Rep. John Conyers of Michigan, the subject of staff complaints that he assigned workers to babysit, chauffeur and tutor his children and pushed aides to do campaign work on government time. Conyers attorney Stan Brand said the congressman responded to the charges two years ago and hasn't heard from the ethics committee since then. Republicans are "looking to increase the Democratic body count" in response to their own corruption scandals, he said.

Democrats also have taken hits from a run-in between Rep. Cynthia McKinney of Georgia and a Capitol Police officer, and an early-morning accident in which Rep. Patrick Kennedy of Rhode Island weaved up a street in his car and struck a security barrier near the Capitol. He checked into a drug rehabilitation center Friday.

Democrats' own ethics trouble 'dulls the message'; But pa

House Democratic leader Nancy Pelosi of California sought to distinguish her party's foibles from the scandals that brought down Rep. Randy "Duke" Cunningham, R–Calif., for bribery and three former Republican congressional aides who had ties to ex-lobbyist Jack Abramoff. Abramoff, a Republican, pleaded guilty in January to corruption charges.

"You're talking about two completely different things," Pelosi said Sunday on NBC's Meet the Press. The Democratic ethics cases are "individual challenges that those people will have to deal with," she said, noting that she has called for the House ethics committee to investigate Jefferson. Republicans, she charged, have a system of "corruption, cronyism and incompetence" that goes beyond personal indiscretions.

Rep. Rahm Emanuel of Illinois, chairman of the House Democratic campaign committee, said Republicans have "a governing philosophy" to cozy up to lobbyists that has led them to favor industries such as oil and pharmaceuticals, producing higher prices for gasoline and prescriptions. "That is a fundamental difference," he said.

Panetta said such line–drawing is lost on voters. The best Democrats can hope for is a repeat of 1994, he said, when voters — angered over misbehavior by members of both parties in a House bank scandal — turned 38 incumbents out of office. "It hurt the party in power the most," Panetta said.

That year, the Democrats lost the House majority they had held since the 1950s. Using corruption as a campaign theme is "still a pretty good strategy, but I wouldn't put it at the top of my list of attack issues," Panetta said.

**LOAD–DATE:** May 10, 2006

Copyright 2006 HT Media Ltd.
All Rights Reserved
US Fed News

June 9, 2006 Friday 1:47 AM EST

**LENGTH:** 2867 words

**HEADLINE:** CULTURE OF CORRUPTION CONTINUES WITHOUT FORMER REPUBLICAN HOUSE LEADER DELAY

**BYLINE:** US Fed News

**DATELINE:** WASHINGTON

**BODY:**

The Democratic National Committee issued the following news release:

Today, disgraced former Republican House Leader Tom DeLay is resigning from Congress, although he leaves a legacy of scandal in his wake. In addition to his indictments in a case involving political money laundering in Texas, DeLay is believed to be under investigation in the case against convicted former Republican superlobbyist Jack Abramoff. Two former DeLay aides and Abramoff have pleaded guilty to corruption charges and are cooperating with federal investigators. [Houston Chronicle, 6/9/06]

"For the last twelve years, Tom DeLay helped create the Republicans' culture of corruption in Washington, DC," said Democratic National spokesman Luis Miranda. "But even with DeLay's departure, the Republican culture of corruption still has a strong grip on Washington. This Republican culture of corruption stretches from the Bush White House, with investigations into David Safavian, Scooter Libby and Karl Rove, through the K Street Project, to the Republican-controlled Congress with both Bob Ney and Bill Frist under investigation. It is also the GOP's abuses of power like tax breaks for the energy and pharmaceutical companies, while doing nothing to stop sky-rocketing gas prices and health care costs that put the interests of their party ahead of what's good for America. Together, America can do better. Democrats remain committed to real ethics reform, and to restoring honest leadership and a government as good as the people it serves."

GOP'S CULTURE OF CORRUPTION STILL STRONG

SENATE REPUBLICAN LEADER BILL FRIST (TN)

Frist Subpoenaed By SEC On Suspicion That He Violated "Insider Trading Laws." "Senate Majority Leader Bill Frist... has been subpoenaed to turn over personal records and documents as federal authorities step up a probe of his July sales of HCA Inc. stock, according to sources familiar with the investigation. The Securities and Exchange Commission issued the subpoena within the past two weeks, after initial reports that Frist, the Senate's top Republican official, was under scrutiny by the agency and the Justice Department for possible violations of insider trading laws." [Washington Post, 10/13/05]

HOUSE REPUBLICAN LEADER JOHN BOEHNER

In Wake Of DeLay Scandals, Boehner Had No Plan To Change Lobbying Rules. John Boehner became House Republican Leader after Tom DeLay stepped down amid a swirl of ethics problems. In an interview with the Washington Post shortly after taking his new post, Boehner "emphasized that he has no plan to change lobbying rules." He also said that he would not seek a ban on "provisions in spending bills that fund lawmakers' pet projects," also known as earmarks. [Washington Post, 2/4/06]

Boehner's Ethics Agenda A "Joke." "Do you remember, back when the spotlight was on Jack Abramoff, how House Republican leaders pledged to get tough on lobbyists? Well, you may; apparently they don't. The House plans this week

CULTURE OF CORRUPTION CONTINUES WITHOUT FORMER REPUBLICAN HOUSE LEADER D

to take up the Lobbying Accountability and Transparency Act of 2006, a watered-down sham that would provide little in the way of accountability or transparency. If the Senate-passed measure was a disappointment, the House version is simply a joke — or, more accurately, a ruse aimed at convincing what the leaders must believe is a doltish public that the House has done something to clean up Washington." [Washington Post, Editorial, 4/25/06]

### SEN. CONRAD BURNS (R-MT)

Burns Pushed Interior Department To Build School For Wealthy Indian Tribe and Abramoff Client; Received $152,000 From Abramoff and Clients. In 2004, Conrad Burns pressured the Department of Interior to award the Saginaw Chippewas of Michigan $3 million from a program that was designed to fund schools for cash strapped American Indian tribes, despite the fact that the Saginaw Chippewas were considered one of the richest in the United States. The tribe had donated over $150,000 to Burns' campaign and political action committees, including 42 percent of the total funds raised by his leadership PAC, Friends of the Big Sky Fund. Burns was chairman of the Interior Appropriations subcommittee which gave him the power to control funding for the Bureau of Indian Affairs, making him a valuable asset for Abramoff. [AP, 3/1/05; tray.com]

### REP. BOB NEY (R-OH)

Ney Attempted to Insert Tigua Provision Into Unrelated Legislation. Ney attempted to help re-open the casino of the Tigua Indian tribe represented by disgraced former GOP superlobbyist Jack Abramoff by attempting to slip a provision into the Help America Vote Act, which Ney's committee had jurisdiction over. Tigua had paid Abramoff and his associate Michael Scanlon $4.2 million in an effort to reopen their casino. [Washington Post, 12/26/04; 11/18/04]

Ney Agreed To Introduce Language To Conference Committee To Lift Federal Gaming Ban. Bob Ney, in his capacity as Chairman of a Congressional Conference Committee said that he would "introduce and seek passage of legislation that would lift the existing federal ban against commercial gambling in order to benefit a client of Abramoff, a Native American Tribe in Texas." At the time Abramoff represented the Tigua tribe of Indians, a tribe whose casino he was trying to reopen, after successfully ensuring its closure for one of his other tribal clients. [Factual Basis for the Plea of Tony C. Rudy, 3/31/06]

Abramoff Wined and Dined Ney. Abramoff provided Ney with numerous tickets for sporting events and concerts, and provided him with regular meals and drinks at his restaurant, Signatures. Ney also used Abramoff's MCI Center box for fundraisers and his chief of staff was later hired by Abramoff. Abramoff's fundraising log shows an event for Ney at MCI Center on March 15, 2001. [Washington Post, 12/26/04; Plea Agreement between DOJ and Abramoff, 1/3/06]

Abramoff Gave Donations To and For Ney. Abramoff contributed $4,000 to Ney's personal campaign committee in 2000 and provided a $10,000 donation to the NRCC at Ney's request. [Plea Agreement between DOJ and Abramoff, 1/3/06]

Ney Awarded Contract To Abramoff Client Through "Highly Politicized Process." In 1999, the House of Representatives decided to place a series of cell phone antennas in the Capitol and House Office Buildings, in order to improve cell phone coverage. LGC Wireless was awarded the contract, and LGC proceeded to work with Capitol officials for a year on a plan for the implementation of the new system. In 2001, Ney became Chairman of the House Administration Committee. Soon after, LGC was removed from the project and replaced by Foxcom Wireless, an Israeli telecommunications company and an Abramoff client. Foxcom had paid Abramoff $280,000 for lobbying and had donated $50,000 to Abramoff's charity, The Capitol Athletic Foundation. [Washington Post, 10/18/05]

\* Capitol Officials Expressed Surprise At Sudden Change in Policy. "We were really surprised, given all the work we put in with LGC in designing the system," said Henry F. 'Bud' Collins Jr., the senior network systems engineer for the House. 'Then, all of a sudden this other company showed up. We had to go through this whole thing again.'"

### SENATOR RICK SANTORUM (R-PA)

Santorum Runs K Street Project For GOP – Hand Picks Republicans To Fill High-Level Lobbyist Positions. Santorum runs the K Street project where he "vets the hiring decisions of major lobbyists." The K Street project, created by conservative movement leader Grover Norquist and indicted former Majority Leader Tom DeLay, seeks to place Republicans in high-level corporate and lobbyist positions. As of June 2003, Santorum had successfully placed "33 of 36 top-level Washington positions he [was] monitoring." All positions went to Republicans. As the Washington Post reported, Santorum's colleagues resorted to "intimidation and private threats" to bully lobbyists who try to maintain good

CULTURE OF CORRUPTION CONTINUES WITHOUT FORMER REPUBLICAN HOUSE LEADER D

relations with both parties. [New York Times, 6/27/03; Washington Post, 6/26/03; US News & World Report, 10/17/05; Philadelphia Inquirer, 1/9/06]

* Santorum Worked To Expand Reach Of The K Street Project. In May 2002, Santorum hosted a private meeting in the Capitol where two dozen lobbyists and staffers got a thick list of lobbyists, some with their party affiliation and past political jobs already identified. The meeting's attendees were asked to help fill in the blanks, and told them his own staff would research the political contributions. [Washington Post, 6/10/02]

* Santorum Discussed Consequences Against MPAA When It Hired A Democrat. When Democrat Dan Glickman took over the Motion Picture Association of America, Santorum said he wasn't sure hiring Glickman was "effective" to the movie industry's approach "if they are going to reach across the aisle." A few weeks later, Santorum started discussing consequences for the movie industry in response to its decision to hire Glickman. "Yeah, we had a meeting and, yeah, we talked about making sure that we have fair representation on K Street," Santorum said. "I admit that I pay attention to who is hiring and I think it's important for leadership to pay attention." A few weeks after that, the House removed about $1.5 billion in motion picture industry tax cuts from a pending bill. Glickman then hired a former aide to House Speaker Dennis Hastert and gave $500 to Santorum's campaign. [Wall Street Journal, 8/24/05, Roll Call, 7/21/04, Atlanta Journal-Constitution, 7/4/05]

GROVER NORQUIST OF AMERICANS FOR TAX REFORM, A GOP INTEREST GROUP

Norquist and Abramoff Arranged for Pay to Play Meetings For Bush and the Choctaw and the Coushatta. "An arrangement involving two Indian tribes, the head of an anti-tax organization and a lobbyist now under criminal investigation – plus $50,000 – secured Indian leaders a private audience with President Bush... At the behest of Abramoff, two Indian tribes – the Coushatta Tribe of Louisiana and Mississippi Band of Choctaw – paid $25,000 each to Norquist's group to underwrite a 2001 event that included a private meeting with Bush. Two other entities, which the group declined to identify, also helped underwrite the event. 'The exposure would be incredible and would be very helpful,' Abramoff wrote to one of the tribe's attorneys in asking for the donation. 'One of the things we need to do is get the leaders of the tribe (ideally the chief) in front of the president as much as possible.'" [AP, 6/8/05]

DAVID SAFAVIAN, FORMER CHIEF PROCUREMENT OFFICIAL AT OMB

Safavian Arrested In Connection With Abramoff Probe. The Bush Administration's chief contracting and procurement official at OMB, David Safavian was arrested on charges of making false statements to an ethics official, making false statements to the General Services Agency's Inspector General, and obstruction of a GSA-IG investigation. [Washington Post, 9/20/05; DOJ Release, 9/19/05]

* Safavian Accused of Lying About Abramoff Contacts, At Least Three Times. "The complaint alleges that Safavian lied about his contacts with Abramoff on three occasions after his initial false pledge to the GSA ethics officer. The first was during a 2003 investigation by GSA's inspector general, who was responding to an anonymous tipster's hotline complaint; the second was in a March 17, 2005, letter to the Senate Committee on Indian Affairs; and the third was during an FBI interview on May 26, 2005" [Washington Post, 9/20/05]

Safavian Provided Hands on Assistance to Help Abramoff Lease GSA Property Before Trip to Scotland While Lying to GSA Ethics Officer. While he was the GSA chief of staff in August 2002, Safavian took part in a trip to Scotland hosted by Jack Abramoff's Capital Athletic Foundation. In the days leading up to his trip with Abramoff, Safavian had extensive contact with him regarding his business with GSA. In July of 2002, they discussed the need for possible "Hill pressure" to close the deal on the office space in the Old Post Office building. On the same day that Safavian discussed the golf trip with the GSA ethics officer, assuring him that Abramoff had no business with GSA, Safavian emailed Abramoff from his personal computer, the email advised Abramoff on how to "lay out a case for this lease." The day before the Scotland trip Safavian arranged for a meeting between Abramoff's wife and business partners and GSA officials to discuss the lease. [Washington Post, 1/21/05; Washington Post, 9/20/05]

NEW HAMPSHIRE PHONE-JAMMING SCANDAL

2002 New Hampshire Phone-Jamming Scandal Potentially Involves White House. On Election Day in 2002, a telemarketing company was hired by New Hampshire Republican operatives to jam the phone lines of five Democratic get-out-the-vote centers and one fire fighters union center in New Hampshire. As the plan was developed, implemented and began to unravel, people involved made dozens of telephone calls to a White House phone number in the political department, which was run by current RNC Chairman Ken Mehlman. [AP, 4/11/06]

* **Abramoff and Mehlman Linked to Criminal Phone Jamming Scheme.** When he was White House Political Director, Ken Mehlman's office received dozens of calls from convicted phone-jammer James Tobin, who was sentenced to ten months in prison (Mehlman is now the Chairman of the Republican National Committee.) Four people have now received criminal sentences in the case, but the RNC and White House refuse to answer critical questions about who in Washington was involved in the case. Worse still, Jack Abramoff's tribal clients appear to have directed thousands of dollars to the New Hampshire Republican Party. "[T]wo of his tribal clients made inexplicable contributions to the NHRSC in October 2002. The Mississippi Choctaw cut a check on Oct. 10 for $10,000; according to FEC records, it was deposited on Oct. 28 along with a $5,000 check from the Agua Caliente. Together, the contributions total $15,000, approximate to the $15,600 the NHRSC paid for the jamming. There are no Indian tribes in New Hampshire. If Abramoff wasn't somehow a party to McGee's scheme, why did he direct money at New Hampshire? It is just one more open question emerging from McGee's brilliant idea, which continues to shine an unwelcome light on the Republican Party almost four years later." [In These Times, 6/06]

### TOM NOE

Noe was Regional Chairman of Bush Cheney Campaign and Frequently Spoke with Rove. As a regional chairman of the campaign, Mr. Noe had frequent contact with Karl Rove, the architect of the President's re-election. And Ohio, it turned out, was the pivotal state in the election, narrowly pushing President Bush to victory. [Toledo Blade, 4/28/05]

* **Bush Thanked Noe for "His Leadership".** On October 29, 2004 at a campaign rally in Toledo, Ohio, Bush singled out Noe for his work on the campaign. Bush said, "I want to thank the grassroots activists. I want to thank my friend Bernadette Noe and Tom Noe for their leadership in Lucas County." After the speech, Bush and the first lady met with Noe and his wife backstage, to thank them for their "work on the campaign." [Toledo Blade, 10/30/04; Bush Remarks, 10/29/04]

Noe Plead Guilty To Illegally Funneling Money To The Bush-Cheney Re-Election. Tom Noe later plead guilty to federal criminal charges that he illegally funneled more than $45,000 to the Bush-Cheney campaign in 2004. Noe admitted that he gave tens of thousands of dollars to two dozen people so they could then contribute it to the Bush-Cheney campaign, helping him achieve the elite "pioneer" fundraising status. Yet President Bush has so far refused to return any more than the $6,000 that Noe and his wife directly contributed. Noe's status as a pioneer helped him garner appointments to federal government commissions, and gave him access to President Bush, Karl Rove and other leading Republicans. [Toledo Blade, 6/1/06]

Noe Was Recommended to Coinage Advisory Committee by Hastert and Nominated by Secretary of Treasury John Snowe. On April 23, President Bush signed into law the "American 5-Cent Coin Design Continuity Act of 2003" (Public Law 108-15), which established the Citizens Coinage Advisory Committee (CCAC). According to a Treasury Department press release Noe was recommended by Speaker of the House Dennis Hastert (R-IL) and nominated by Snowe. [Treasury Department Press Release, 5/16/03]

Noe Attended White House Strategy Session With Ken Mehlman, And Possibly Karl Rove, While His Wife Was An Ohio Elections Official. According to emails released by Ohio Governor Bob Taft's office, Thomas Noe used his influence to obtain an invitation to a White House ceremony honoring the Ohio State University football team. The emails also revealed that once Noe had gotten into the White House, he was invited to attend an "Ohio political strategy session." According to additional emails, the meeting was attended by Ken Mehlman and Collister "Coddy" Johnson, Bush's campaign manager and field director. Karl Rove was also listed as a possible attendant of the meeting. At the time Noe's wife Bernadette was an official in Lucas County, Ohio, an area that experienced extreme voting difficulties during the 2004 election, causing Secretary of State Ken Blackwell to ask for her resignation. [Toledo Blade, 7/7/05]

**LOAD-DATE:** June 14, 2006

54 of 816 DOCUMENTS

**EXHIBIT 6**

Copyright 2006 National Review
National Review

May 22, 2006

**LENGTH:** 3037 words

**HEADLINE:** A Congress Gone to Pot – If the GOP majority doesn't wake up, it will lose, and might even deserve to.

**BYLINE:** Kate O'Beirne & Richard Lowry

**BODY:**

In response to a recent jump in gas prices, congressional Republicans reacted in characteristic fashion. They panicked, touted bad policy, and did themselves political harm, all in a spectacle seemingly designed to disgust the conservatives who had voted them into office. This has been a familiar pattern in recent years. The talk of Washington has been about the "shakeup" in the White House and what administration official — Dick Cheney? Don Rumsfeld? John Snow? — should be sacked to help turn around the national GOP's fortunes. We survey this scene and find ourselves asking, Is it Congress that should be fired?

President Bush deserves some of the blame for the rotten results from Congress — sometimes, he has affirmatively pushed bad policy (most recently with his "comprehensive" immigration reform), and he has made it his standard operating procedure not to try seriously to rein in congressional excess. There is no doubt that his coordination with Capitol Hill could be better, and the inability of his team to anticipate political problems — such as the Dubai ports–deal mess — has made life more difficult than it need be for his fellow Republicans. But the GOP in Congress acts as if establishing a smoother White House operation were the key to eliminating all its troubles. In reality, the locus of the national party's malaise is as much, perhaps more, on Capitol Hill than in the Bush administration.

Congressional Republican governance has gone through phases that can be roughly described as Revolution (1994–1996), Consolidation (1996–2002), and Deterioration (2002–present). The deterioration has steadily gotten worse. The Republican majority has lately been notable for its bungling, fecklessness, self-serving defensiveness, and hysteria — sometimes all at once. The congressional majority has repudiated Republican governance before voters even have the chance to do the same this November.

In terms of public esteem, Congress is floating somewhere between contemptible and beneath contempt. A recent poll finds only 22 percent approving of Congress's job performance, down 11 points over a single month. The drop comes with a sharp decline in approval by Republican respondents, according to GOP pollster Bill McInturff. Republicans hope to rally their base by raising the specter of Democratic control of Congress, but they are giving their supporters every reason to wonder: How much worse could that be?

Take gas prices. Speaker Denny Hastert and Majority Leader Bill Frist decided to play on the Democrats' familiar playing field by bashing the Big Bad Oil Companies. They called on the president to launch investigations into possible price gouging by the industry. Hastert called the compensation package for Exxon Mobil's retired CEO "unconscionable." His spokesman said, "Having a profit is good. We believe in that as Republicans. But when you're making this kind of money and American families are being affected, there should be appropriate things done to bring prices down." How exactly the compensation of oil executives affects American families is left unexplained. (Speaking of effects on American families, federal spending has exceeded $20,000 per household for the first time since World War II.)

If Democrats consider more taxes the answer to any question, some Republicans aren't far behind. Sen. Arlen Specter (R–Pa.) has backed Democrats' calls for a windfall-profit tax on oil companies, and Sen. Chuck Grassley (R–Ethanol) asked the IRS to allow Finance Committee aides to review the corporate tax returns of oil and gas companies for the past five years. For what? we wonder. According to the Tax Foundation, in 2005, Exxon Mobil, ConocoPhillips, and Chevron paid $44.3 billion in corporate taxes on their gross earnings. These payments were almost 50 percent higher than taxes paid the previous year. In addition to corporate taxes, these three companies paid or remitted $114.5 billion in other taxes in 2005, including payroll, property, and excise taxes. In any case, Republicans once understood that corporations don't

pay taxes, their shareholders, employees, and customers do.

The political problem with all this is that once Republicans have given away the premises of their governing philosophy — in this case, that prices and executive compensation are determined by the market — they have no foothold to resist Democratic initiatives. Try as they might, there is no way that Republicans can be more socialistic and economically populist than the Democrats. They have set up a bidding war that the GOP must, by definition, lose. The same applies to the immigration debate: The Democrats will always be more pro-amnesty, and therefore more pro-Hispanic in the terms some Republicans have helped set for the debate, than the GOP.

On gas, congressional Republicans have lurched from the substantively and politically wrongheaded to the self-parodic. As part of a panic-induced, hastily assembled legislative proposal that is already falling apart, they are proposing a $100 rebate to compensate voters for high gas prices, which would simply be taking money from taxpayers in a symbolic sprinkling of cash. It is no accident that the proposal closely mirrors a Jimmy Carter-proposed rebate to try to boost the economy, a pathetic initiative from a pathetic administration. Republicans haven't yet gotten around to making President Bush's tax cuts permanent, but can consume themselves with such marginalia.

Republicans can't even get their photo-ops right. When Speaker Hastert held a press event at a local gas station to promote hydrogen cars, he rode in one of the gas-free cars for about a block before getting back in his armored SUV for the return to the Capitol. Photographers suspected some such stunt, and caught him in the act of switching cars.

At least a rebate or a botched photo-op doesn't do harm to the core functions of government. During the last few years, Congress has specialized in problem-causing responses to problems. In response to September 11, it created an enormous, sprawling Department of Homeland Security, endorsed by President Bush. Smart analysts said at the time that a collection of 22 disparate agencies could not be made to function effectively, at least not for years. Indeed, when DHS secretary Mike Chertoff is at a microphone, you never know whether the topic is avian flu, border control, port security, natural disasters, or terrorist threats. These areas are so important, each could easily be the secretary's fulltime responsibility.

When DHS's dysfunction played into the chaotic response to Hurricane Katrina, Congress turned around and excoriated the people in charge of the unmanageable department it itself had created. Being in Congress means never having to own up to your own errors, when you can browbeat other people over them during televised hearings instead. Blame always rolls off Capitol Hill onto someone else.

The same dynamic has played out in the creation of a new national intelligence director. As with the Department of Homeland Security, there was a mad rush to pass the reorganization of the intelligence bureaucracy, this one prompted by a recommendation of the 9/11 commission. Again, some experts warned at the time that creating a new layer of bureaucracy would only . . . create another layer of bureaucracy. In the event, this is exactly what has happened, but the leaders of the House Intelligence Committee now are outraged by it, and can't believe that national intelligence director John Negroponte is presiding over the very over-bureaucratization Congress insisted on.

No doubt, if the near-total ban Congress rushed to pass on coercive interrogation methods last year ever manifestly puts a crimp on efforts to preempt a terror attack, Congress will lead the chorus of outrage. Hearings will be held, and careers ruined — just not the careers of anyone who wrote the restrictions into law in the first place.

DAMN THE TORPEDOES, AND COMMON SENSE What all three of these examples have in common is an unseemly stampede, a rush to take action that overwhelms any critical thought about the proposals in question. Congress couldn't even wait to get the Robb-Silberman report on how the intelligence community had missed the true state of Saddam's weapons program before rushing ahead to pass that intelligence reorganization. For the world's greatest deliberative body, Congress lacks any deliberative sense, lacks the ability or willingness to stop and think.

Congress always feels the need to "do something" in order to be "relevant," without caring too much what the something is. With its extensive oversight role, one would think that occasionally Congress would anticipate problems instead of always being in a reactive — or over-reactive — posture. But it missed the problems with the "wall" within the Justice Department that prevented effective counterterrorism coordination, the fecklessness of the CIA before 9/11 (and after), the rickety state of the electricity grid prior to the 2003 blackout, the fraud in corporate governance during the Internet bubble, the downside of absorbing FEMA into the Department of Homeland Security, and the gas shortages that would be caused by last year's new ethanol mandate. Congress is always about after-the-fact clucking and finger-pointing.

Another thing Congress is incapable of doing is making fiscal choices. Spending discipline is honored only in the breach, and with rhetorical flourishes thrown to the party's base at opportune moments. When ambitious Republican politicians get together for pre-2008 events like the recent straw poll in Memphis, the talk is all of Ronald Reagan and limited government. The kind of governance in Washington that they deliver is exactly the opposite.

Incontinence has become a way of life. When President Bush threatened a veto if the supplemental spending bill for the Iraq War and Katrina cleanup exceeded $92 billion, the Senate promptly voted to keep funding for the Mississippi senators' absurd $700 million railway line in a bill that remains $14 billion over the limit set by Bush. Even when it knows that wasteful spending has fundamentally harmed its standing with the public, and especially with its core supporters, the GOP Congress just can't help itself.

Overall federal spending is up 33 percent during the majority's Deterioration phase, with defense and post-9/11 spending on domestic security representing less than half of this new spending. Republicans are responsible for the largest expansions in federal education spending in history (up 72 percent since 1995), along with record spending increases in agriculture, highways, and entitlements. The Congressional Budget Office estimates that the Senate's "compromise" immigration bill will cost $27 billion in mandatory spending over the first ten years, including $12 billion in Medicaid and $12 billion in Earned Income Tax Credits.

It has become a Republican specialty to get favors from the public trough.

The number of annual earmarks has grown tenfold since the Republicans took over the House in 1995, from 1,439 to 14,000 last year. The House leadership backs cracking down on some earmarks, while the Senate maintains its addiction. Congress seems incapable of acting in the broader public good. It is a collection of parochialisms, jostling for their own spending projects and creature comforts.

WHAT KIND OF REFORMERS ARE THESE? That explains the course of reform in Congress. Earlier this year, the House Republicans elected a new majority leader, John Boehner. He was a relatively fresh face for the party, even if he is no stranger to K Street. But his election quickly became a way to forestall change rather than foster it. Republicans collectively said, in effect, "We have embraced 'change' in the form of a new leader, now we don't have to adopt any of its substance."

Instead of passing a permanent ban on private travel, the GOP is proposing a moratorium on it until the election is over — in the hope that the public heat will abate and that "further study" will provide a rationale to keep this popular perk. New reporting requirements and tougher penalties are imposed on lobbyists (none of which will trip up Jack Abramoff-style operators), while political PACs can continue to wine and dine members and play golf with them.

The reform the GOP can get excited about is attempting to muzzle its opponents. A majority of House Republicans once opposed the McCain-Feingold bill's contribution limits on PACs because they restricted political speech. But irked at the lavish funding of liberal nonprofit groups known as 527s during the 2004 campaigns, House Republicans have now passed a bill extending the McCain-Feingold contribution limits to these independent groups — their prior principles be damned.

Republicans obviously want to duck their heads and hope they don't have to do anything painful to save themselves. The Washington Post reports that GOP lawmakers came back from Easter recess and "said they felt free to pass a relatively tepid ethics bill because constituents rarely mention the issue." Rep. David Hobson (R-Ohio) explained the alleged mistake of caring too much about the party's image on ethics. "We're all being rushed into a bill. We panicked, and we let the media get us panicked," he said. The only time Congress ever pulls back from a panic is to save its own perks.

Of course, panic is never a healthy reaction, but there is legitimate cause for GOP worry on the ethics front. A recent Washington Post/ABC poll found the Democratic party was trusted more than Republicans "to do a better job handling corruption in Washington" by 52 percent to 27 percent. Last month, a Pew Research Center survey found that by 44 percent to 28 percent, voters believed that Democrats "could do a better job in reforming government." Will the corruption issue alone sink the GOP? No. But it adds to the fabric of the public's discontent. With ongoing criminal investigations involving Abramoff and former congressman Duke Cunningham, Republicans are only one new indictment or guilty plea away from another cycle of the "culture of corruption" charges they now witlessly dismiss as innocuous.

Rep. David Dreier (R-Calif.) rebutted criticisms of the watered-down reform proposal by explaining, "If everybody is unhappy with a piece of legislation, it's probably a pretty good bill." By this standard, Congress itself is probably doing a pretty good job.

AN ACT NOT TOGETHER The GOP caucus has both a leadership and a followership problem. If Newt Gingrich exemplified the Revolution phase of the GOP majority and Tom DeLay the Consolidation phase, Senate majority leader Bill Frist is the perfect representative of the Deterioration phase. Unlike Gingrich and DeLay, he is in the Senate, so has an inherently more difficult job managing his majority. But Frist captures the current GOP aimlessness. One day he's in favor of an enforcement-first approach to immigration; the next he's in favor of a "compromise" that's a far-reaching amnesty. He favored an increase in taxes on oil companies to fund the Senate's gas-rebate scheme, before he opposed it.

Not that Frist, or other Republican congressional leaders, are in charge of orderly and sensible flocks. The whiff of defeat, along with the loss of legislative master Tom DeLay, has sent moderates and conservatives in the House scurrying in opposite directions — the moderates to approve even more spending in an attempt to sway swing voters; the conservatives to crack down on spending to prevent a total rupture with the party's base.

In the Senate, Frist has to deal with a GOP caucus that features 54 other Republicans, almost all of whom consider themselves individual power centers. Senator Specter, for instance, is willing to torment the administration on an important national-security issue so Democrats won't have to. He is now threatening to block funding of the National Security Agency's warrantless surveillance program — a popular program that has given the administration one of its few issues that can cut against Democrats. Meanwhile, Sen. John Warner has said he might provide a forum for disgruntled generals to bash Secretary of Defense Rumsfeld, following Hillary Clinton's request to hear from the handful of former flag officers opposed to Rumsfeld. In the midst of a war, other Republican senators have blocked nominations for important national-security posts because of parochial concerns or unrelated policy objections.

The national-security issue that looms largest, of course, is the Iraq War. Republicans facing voters this year recognize that their party is on the "wrong" side of an unpopular war and grouse about the president's apparent inability to assuage doubts about the chances for success in Iraq. Their prospects at the polls would improve dramatically if their constituents better understood how crucial a stable, democratic Iraq is to our national security and if George W. Bush's poll ratings were ten points higher. Rather than being struck dumb on the subject in the face of discouraging public opinion, GOP members should be using their seemingly constant recesses to make the case for the war in their districts.

Presented with their own manifest failures, and the understandable public reaction to them, congressional Republicans have lately been whistling the old Tip O'Neill tune "All Politics Is Local" past the electoral graveyard. Their hope is that paying attention to constituents' casework, touting feel-good federal programs, and attending ribbon-cutting ceremonies at their precious pork projects can save the day. Of course, Tip O'Neill's own party was done in by a disaffected electorate focused on national issues. GOP strategist Dave Winston points out, "For the past 30 years, and maybe longer, the outcome of congressional elections in non-presidential years has, with one lone exception [1990], been determined by a focus on national, not local, issues." As the bad polling piles up, nervous Republicans will ask themselves, Can this Congress be saved? But the question frustrated Republican voters are increasingly asking is, Is it worth saving?

**LOAD-DATE:** May 7, 2006

10 of 31 DOCUMENTS

Copyright 2006 Copley News Service
All Rights Reserved
Copley News Service

February 15, 2006 Wednesday  8:34 PM EST

**SECTION:** DAILY NEWS

**LENGTH:** 845 words

**HEADLINE:** ANALYSIS: Cheney mishandling of incident leaves him a political liability

**BYLINE:** George E. Condon Jr.

**DATELINE:** WASHINGTON

**BODY:**

Vice President Dick Cheney's explanation Wednesday of how he came to accidentally shoot a friend undoubtedly will help douse the Washington firestorm ignited by his office's initial handling of the incident.

But waiting to give an interview to Fox News until fully four days after the shooting will not undo the political damage that leaves Cheney less able to help push the administration agenda and less able to help struggling Republican candidates.

"Pretty much everything was done the wrong way," said pollster John Zogby, looking back at the decision-making by Cheney and his aides since the vice president's Saturday-evening pulling of the trigger at the sound of quail taking flight on a ranch in Texas.

"This could and should have been a 24-hour story – an unfortunate accident," said Zogby. "But now I'm not sure that the vice president's appearance (on Fox) on Wednesday, four days after this has fermented, is going to make this go away."

Perhaps the greatest benefit to Cheney is that he – wisely, in the view of all analysts – dropped the line being peddled by his supporters that somehow the victim was to blame because he did not announce his presence when approaching the shotgun-toting Cheney.

Cheney intimate and former aide Mary Matalin was the first to test that out on Sunday when she told reporters that the vice president "didn't do anything he wasn't supposed to do."

Other than shoot his friend, of course.

Interviewer Brit Hume gave Cheney an opening to parrot that line. But the vice president now was ready to take responsibility, telling Hume, "You can't blame anybody else. I'm the guy who pulled the trigger and shot my friend."

He also is likely to benefit by letting viewers glimpse a more human side of a usually stolid, unemotional man. Viewers saw a vice president shaken by the incident on what he poignantly called "one of the worst days of my life."

Incredibly, this was the first time since the shooting that there had been any hint Cheney was upset over what happened.

"This has been a one-man counteroffensive against the Oprah-ization of American politics," said California Republican Gov. Dan Schnur, a former top aide to Gov. Pete Wilson. "Politicians have been conditioned in recent years to bare their souls, to open themselves up emotionally in order to defuse a crisis. Cheney's response was very much a throwback to an earlier era."

Schnur added that most politicians "would be photographed beside the hospital bed and would be anguishing about how they had done it. But this was the opposite tack."

While the gruff exterior is part of Cheney's public persona, it did not serve him well in this instance. By staying out of public view and not even releasing any statement expressing regret, Cheney was left looking uncaring.

ANALYSIS: Cheney mishandling of incident leaves him a political liabilit

"He looked totally callous," said Larry Sabato, director of the University of Virginia Center for Politics and an expert on how politicians handle this type of media "feeding frenzy."

"It was callous trying to shift the blame to the victim. His entire PR staff should be fired just for that," he said.

Sabato also was critical of the amateurish way the information was released. In that criticism he was joined by such Republican heavyweights as Marlin Fitzwater, press secretary to Presidents Ronald Reagan and George H.W. Bush; Ari Fleischer, former press secretary to the current President Bush; and Torie Clarke, former Pentagon spokeswoman for the current administration.

"They violated every rule in the book," said Sabato. "I've studied feeding frenzies. This is a classic feeding frenzy. And it was created in part by their inability to get the news out. You have to tell the truth. And you need to get the facts out completely as soon as possible. This was a public relations disaster because they didn't do that."

Cheney supporters dismiss the criticism as unimportant. "The average American out there doesn't give a damn whether they called the press Saturday night or Sunday morning and they don't care whether they called the Corpus Christi paper as opposed to the White House pool," said veteran Republican strategist Charlie Black.

Black predicted no lasting political damage to Cheney, saying, "Life goes on and you move on."

But others fear that Cheney has become more of a liability to Republicans running in close congressional races this year. Even before the shooting incident, Cheney's approval numbers had cratered. Six national polls conducted in December and January showed his job approval ranging from 32 percent to 38 percent – lower than President Bush's numbers. He did show some improvement in the CNN/USA Today poll, going from 36 percent in November to 41 percent in January.

"I'll make a prediction – Cheney is not going to any swing districts this fall," said Schnur.

Black did not disagree, but said, "If you want somebody to help you raise money and rally your base, you'd want Cheney almost anywhere in the country. If you're down to the last two weeks of the race and it's a swing district and you're trying to sway moderate voters, you probably won't invite Dick Cheney in there."

**LOAD–DATE:** February 16, 2006

EXHIBIT 8

5 of 31 DOCUMENTS

Copyright 2006 CBS Worldwide Inc.
All Rights Reserved
CBS News Transcripts

**SHOW:** Face the Nation 10:30 AM EST CBS

February 19, 2006 Sunday

**LENGTH:** 156  words

**HEADLINE:** CBS' Face the Nation, 10:30 AM

**ANCHORS:** BOB SCHIEFFER

**BODY:**

BOB SCHIEFFER, host:

Today on FACE THE NATION: the Cheney incident, wiretapping and ethics, all issues for Senate Majority Leader Bill Frist and Senator Barbara Boxer. Has Vice President Cheney become a political liability for the Republicans? And why won't the Senate investigate the NSA wiretapping program? Can the Congress clean up its lobbying ethics problems? These are the questions for the Senate Majority Leader Bill Frist, Republican of Tennessee, and Senator Barbara Boxer, Democrat of California. Elisabeth Bumiller of The New York Times will join in the questions. And I'll have a final word on winning hearts and minds. The secretary of defense has identified the problem, but does he have an answer? First, though, the Cheney incident on FACE THE NATION.

Announcer: FACE THE NATION with CBS News Chief Washington correspondent Bob Schieffer. And now from CBS News in Washington, Bob Schieffer.

SCHIEFFER: And good morning again.

**LOAD-DATE:** February 19, 2006

# EXHIBIT 4

*The Washington Post v. Department of Homeland Security*

Motion for a Preliminary Injunction

**U.S. Department of Homeland Security**

# UNITED STATES SECRET SERVICE

August 31, 2006

Eric N. Lieberman
Deputy Counsel and Director of Government Affairs
The Washington Post
1150 15th St., N.W.
Washington, DC 20071

Re:    Freedom of Information Act Appeal – File Nos. 20060351-20060364

Dear Mr. Lieberman:

Reference is made to your letter dated July 12, 2006, and received by the United States Secret Service (Secret Service) the same day. Through this letter, you appeal the June 16, 2006 determination of Special Agent in Charge, Kathy J. Lyerly, Secret Service Freedom of Information and Privacy Acts Officer, denying the expedited processing of Ms. Jo Becker's Freedom of Information Act requests set forth above. Reference is further made to Ms. Becker's conversations with Latita Huff, Secret Service Disclosure Officer, on August 24, 2006, regarding the status of these requests and appeal.

Having reviewed your letter, it is the determination of the Secret Service that your appeal is granted and that expedited treatment is appropriate in this matter. As Ms. Becker was advised by Ms. Huff, the Secret Service's Freedom of Information and Privacy Acts Office has initiated a search for records.

Please be advised that any future correspondence concerning these requests should be directed to the Freedom of Information and Privacy Acts Office.

Sincerely,

Brian K. Nagel
Deputy Director

# EXHIBIT 5

*The Washington Post v. Department of Homeland Security*

Motion for a Preliminary Injunction

# The Washington Post

1150 15ᵀᴴ STREET, N.W.
WASHINGTON, D.C. 20071
(202) 334-6000

ERIC N. LIEBERMAN
DEPUTY COUNSEL & DIRECTOR OF GOVERNMENT AFFAIRS
(202) 334-6017
FAX (202) 334-5075
E-MAIL: liebermane@washpost.com

September 5, 2006

## BY FACSIMILE – 202-406-5154

Kathy J. Lyerly
Special Agent In Charge
FOIA/PA Officer
U.S. Secret Service
245 Murray Drive, Building 410
Washington, DC 20223

Re: FOIA File Numbers 20060351 - 20060364

Dear Special Agent Lyerly:

I am writing to find out the status of the Freedom of Information Act request bearing the above-listed file numbers. By letter dated August 31, 2006 (attached hereto), Secret Service Deputy Director Brian K. Nagel granted The Washington Post's appeal of your June 16, 2006 determination denying our request for expedited processing. Mr. Nagel further advised me to direct any inquiries concerning this matter to your office.

The disclosure request was received by the Secret Service on June 12, and has now been pending without response for approximately 60 working days. In light of the fact that the agency now agrees that the request is legally entitled to expedited processing, such a delay is unacceptable. I call your attention to a recent ruling of the U.S. District Court that establishes an agency's obligations under such circumstances:

> [T]he court concludes that an agency that violates the twenty-day deadline applicable to standard FOIA requests presumptively also fails to process an expedited request "as soon as practicable." That is, a *prima facie* showing of agency delay exists when an agency fails to process an expedited FOIA request within the time limit applicable to standard FOIA requests.

> The presumption of agency delay raised by failing to respond to an expedited request within twenty days is certainly rebuttable if the agency

Kathy J. Lyerly
September 5, 2006
Page 2

presents credible evidence that disclosure within such time period is truly not practicable.

*Electronic Privacy Information Center v. Department of Justice*, 416 F.Supp.2d 30, 39 (D.D.C. 2006).

The law is clear that the agency's failure to complete its processing of The Post's request constitutes an unlawful delay. While, as the court's decision provides, an agency may present "credible evidence" that compliance with an expedited FOIA request within the standard 20 working days "is truly not practicable," it appears doubtful that the Secret Service could make the requisite showing. According to the Department of Homeland Security's 2005 annual FOIA report, the Secret Service reported *no* requests requiring expedited processing. As such, I assume that The Post's request is likely to be one of very few expedited matters (if not the only one) currently pending in your office.

Given the agency's acknowledgement that there is an "urgency to inform the public" about the information we seek, and its failure to expedite our request in the legally required manner, I am requesting either your assurance that processing will be completed immediately or "credible evidence" that such action is "truly not practicable."

If you would like to discuss this matter directly, please feel free to contact me at (202) 334-6017. I would appreciate your prompt response, and appreciate your consideration.

Very truly yours,

Eric Lieberman

Eric Lieberman

Attachment



**U.S. Department of Homeland Security**
# UNITED STATES SECRET SERVICE

August 31, 2006

Eric N. Lieberman
Deputy Counsel and Director of Government Affairs
The Washington Post
1150 15th St., N.W.
Washington, DC 20071

Re:    Freedom of Information Act Appeal – File Nos. 20060351-20060364

Dear Mr. Lieberman:

Reference is made to your letter dated July 12, 2006, and received by the United States Secret Service (Secret Service) the same day. Through this letter, you appeal the June 16, 2006 determination of Special Agent in Charge, Kathy J. Lyerly, Secret Service Freedom of Information and Privacy Acts Officer, denying the expedited processing of Ms. Jo Becker's Freedom of Information Act requests set forth above. Reference is further made to Ms. Becker's conversations with Latita Huff, Secret Service Disclosure Officer, on August 24, 2006, regarding the status of these requests and appeal.

Having reviewed your letter, it is the determination of the Secret Service that your appeal is granted and that expedited treatment is appropriate in this matter. As Ms. Becker was advised by Ms. Huff, the Secret Service's Freedom of Information and Privacy Acts Office has initiated a search for records.

Please be advised that any future correspondence concerning these requests should be directed to the Freedom of Information and Privacy Acts Office.

Sincerely,

Brian K. Nagel
Deputy Director

# EXHIBIT 6

*The Washington Post v. Department of Homeland Security*

Motion for a Preliminary Injunction



**DEPARTMENT OF HOMELAND SECURITY**
UNITED STATES SECRET SERVICE
WASHINGTON, D.C. 20223

Freedom of Information and Privacy Acts Branch
245 Murray Drive
Building 410
Washington, D.C. 20223

SEP 2 0 2006

Jo Becker
Staff Writer
The Washington Post
1150 15th Street, N. W.
Washington, D. C. 20071

File Number:  20060351-20060364

Dear Ms. Becker:

This letter addresses your request for information submitted under the Freedom of Information Act (FOIA), received by this office on June 12, 2006, seeking access to the following records:

"All records and visitor logs, including WAVES and/or ACR records from, October 2004 to present, reflecting or concerning the entries and/or exits of any persons who sought or were scheduled to visit the following people in the Office of the Vice President:  Vice President Cheney; David Addington, I. Lewis 'Scooter' Libby, C. Dean McGrath, Steven Schmidt, John Hannah, Eric Edelman, Ron Christie, Victoria Nuland, Aaron Friedberg, Stephen Yates[,] Samantha Ravich, and David Wurmser."

"All records and visitor logs, including WAVES and/or ACR records, from October 2004 to present, reflecting or concerning the entries and/or exits of any persons, other than the members of the Cheney family, visiting the vice-president's residence."

The records you seek are not agency records subject to the FOIA.  These records are governed by the Presidential Records Act, 44 U.S.C. § 2201 et seq., and remain under the exclusive legal custody and control of the White House and the Office of the Vice President.  Accordingly, the United States Secret Service lacks the authority to provide such records in response to your request.

Sincerely,

Kathy J. Lyerly
SAIC
Freedom of Information &
Privacy Acts Officer

# EXHIBIT 7

*The Washington Post v. Department of Homeland Security*

Motion for a Preliminary Injunction

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, )<br>)<br>) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Civil Action No. 06-883 (JGP) |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, )<br>)<br>) | |
| Defendant. ) | |
| ) | |
| DEMOCRATIC NATIONAL COMMITTEE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Civil Action No. 06-842 (JGP) |
| UNITED STATES SECRET SERVICE, ) | |
| ) | |
| Defendant. ) | |

## DECLARATION OF KATHY J. LYERLY
## SPECIAL AGENT IN CHARGE, LIAISON DIVISION AND
## FREEDOM OF INFORMATION AND PRIVACY ACTS OFFICER,
## UNITED STATES SECRET SERVICE

I, Kathy J. Lyerly, hereby make the following declaration:

1.      I am the Special Agent in Charge of the Liaison Division and the Freedom of

Information and Privacy Acts (FOI/PA) Officer for the United States Secret Service (hereinafter

"Secret Service"), which is a component of the Department of Homeland Security ("DHS").  I

have been the Secret Service FOI/PA Officer since December 28, 2003, and have been employed

with the Secret Service as a Special Agent (GS-1811) since October 26, 1987.

    2.        DHS regulations, Title 6, Code of Federal Regulations, Section 5.4, and Appendix

A, II(I)(3), vest authority in the FOI/PA Officer, Secret Service, to make initial determinations as

to whether to grant Freedom of Information Act (FOIA), 5 U.S.C. § 552, requests for Secret

Service records (68 FR 4056, 4058, and 4069).

    3.        As the Secret Service's FOI/PA Officer, I am familiar with Citizens for

Responsibility and Ethics in Washington's ("CREW's") FOIA request to the Secret Service. At

my request, the Secret Service conducted a search for documents responsive to CREW's request.

That search uncovered 356 pages of responsive records which were redacted (to protect

individuals' privacy and the security of the White House Complex) and, on September 20, 2006,

released. (The White House Complex refers to the White House, the Eisenhower Executive

Office Building ["EEOB"], the secured grounds encompassing the White House and the EEOB,

and the New Executive Office Building.) A description of the correspondence in this matter and

the processing of CREW's FOIA request is set forth below.

    4.        In a letter dated February 2, 2006, and received February 16, 2006, CREW

submitted to the Secret Service, a component of DHS, a FOIA request for "all records relating to

any visit that any and all of the following individuals made to the White House [including any

office, wherever located, in the Executive Office of the President ("EOP")] or the residence of

the Vice President from January 1, 2001, to the present . . . : Jack Abramoff, Michael Scanlon,

Neil Volz, Tony Rudy, Shawn Vassell, Kevin Ring, Edwin Buckham, [and] Patrick Pizzella."

    5.        In a letter dated March 1, 2006, I acknowledged receipt of CREW's

FOIA request and advised CREW that a search for records responsive to the request was being conducted.

6.     There are two interrelated systems – collectively termed the White House Access Control System – for controlling and monitoring access to the White House Complex:  the Worker and Visitor Entrance System ("WAVES") and the Access Control Records System ("ACR").  The Vice President's residence is not a part of the White House Complex, and the Secret Service does not use WAVES or ACR at that site.

7.     ACR records consist of records generated when a pass holder, worker, or visitor swipes his or her permanent or temporary pass over one of the electronic pass readers located at entrances to and exits from the White House Complex.  ACR records include information such as the pass holder's name and badge number, the time and date of the swipe, and the post at which the swipe was recorded.

8.     WAVES records consist of records generated when information is submitted by a White House pass holder to the Secret Service about workers and visitors who need access to the White House Complex to conduct business or attend social events.  WAVES records include the following information submitted by the pass holder: the visitor's name, date of birth, and Social Security number; the time and location of the planned visit; the name of the pass holder submitting the request; and the date of the request.  They may also include limited information from background checks performed by the Secret Service and coded instructions to Secret Service officers.  Once a visit takes place, WAVES records are typically updated electronically with information showing the actual time and place of the visitor's entry into and exit from the White House Complex.

9.     The Secret Service controls and monitors access to the Vice President's residence through the use of two access lists – a daily access list for individuals with appointments or work orders, and a permanent access list for those individuals who regularly access the facility.  The Secret Service receives requests from the Vice President's staff to allow entry for individuals with appointments or work orders at the facility.  The Secret Service conducts background checks on individuals for whom there has been a request for admission, and if there is no information of protective interest, the Secret Service places the name on a daily access list.  A permanent access list is also maintained listing those individuals who regularly access the facility.  All individuals are logged in by the Uniformed Division officer working at the gate where the individual arrives.

10.     In response to CREW's February 2, 2006 FOIA request, the Secret Service has conducted three searches for records.  The first two searches were for records of visits to the White House Complex, and the third search was for records of visits to the Vice President's residence.  The first search was conducted by the Secret Service's Presidential Protective Division ("the PPD search").  Secret Service employees under the direction of the Secret Service's Office of Inspection performed the second search ("the Inspection team search").  Secret Service Uniformed Division officers assigned to the Vice President's residence conducted searches of visits to the Vice President's residence.

11.     The individuals who performed the PPD search conduct FOIA searches as part of their regular responsibilities.  The PPD searched both the ACR records and the WAVES CD-ROMs for any and all records responsive to CREW's February 2, 2006 FOIA request.

4

12.     The PPD searched for ACR records in a searchable database in which ACR records are stored. The records are searchable by visitor name. In this case, the Secret Service searched the ACR database by searching for records that would have been generated from January 1, 2001 to the date of the search that had the name Michael Scanlon, Neil Volz, Tony Rudy, Shawn Vasell/Vassell, Kevin Ring, Edwin Buckham, or Patrick Pizzella in the visitor field.

13.     It has been the longstanding practice of the Secret Service to transfer WAVES records on CD-ROM to the White House Office of Records Management every 30 to 60 days. The intent of the Secret Service was to ensure that, once transferred, the records were erased from its computer system. The Secret Service has temporarily retained, in a searchable form on CD-ROM, WAVES records generated since October 2004; the records can be searched by visitor name. In this case, the PPD explored the WAVES CD-ROMs by searching for records that had the name Michael Scanlon, Neil Volz, Tony Rudy, Shawn Vasell/Vassell, Kevin Ring, Edwin Buckham, or Patrick Pizzella in the visitor field. The Secret Service did not save on CD-ROM WAVES records for the relevant period (i.e., from January 2001 to the date of the search) generated before October 2004.

14.     PPD ran its initial search in March 2006. The search results were reviewed, and several inconsistencies were noted compared to documents produced to the FOI/PA Office by PPD in response to search requests for other FOIA requests pertaining to some of the same individuals. In running an additional search, what appeared to be a WAVES record was discovered on the hard drive of a Secret Service computer located in the Information Technology Section of the PPD. Upon further examination, it appeared that certain WAVES data pre-dating

October 2004 existed on the hard drive of that computer and the hard drive of a second computer
in the same office.

15.    The PPD search yielded ACR and WAVES records for Michael Scanlon, Neil
Volz, Shawn Vasell, Kevin Ring, and Patrick Pizzella.  The PPD search yielded ACR records for
Tony Rudy.  The PPD search yielded no records for Shawn Vassell (as spelled in the February 2,
2006 CREW FOIA request) or Edwin Buckham.

16.    The Inspection team searched the hard drives of two computers in the
Information Technology Section of the PPD for records regarding visits to the White House
Complex.  The Inspection team was comprised of the following individuals: an Assistant
Inspector in the Inspection Division, whose responsibilities include assessing the effectiveness of
operations, quality of management and supervision, and adherence to policies, regulations, and
procedures within Secret Service offices and divisions; an Assistant to the Special Agent in
Charge in the Criminal Investigative Division (CID), who oversees all Information Technology
programs for the Office of Investigations; a Special Agent in the CID and member of the
Electronic Crimes Special Agent Program, who is a trained computer specialist and whose duties
include forensic examination of computers associated with criminal investigations; and an
Information Technology Specialist in the Information Resources Management Division, who is a
computer specialist skilled in database design and architecture.

17.    I have been advised that the Inspection team believes that the hard drive of the
first computer contains multiple database files of varying degrees of WAVES data that pre-date
October 2004.  The team believes that the database files contain non-comprehensive WAVES
data, with sizeable gaps in the report periods.  The team also believes that the hard drive of the

second computer contains multiple database files of varying degrees of WAVES data that pre-date October 2004. The team further believes that the database files on this computer contain non-comprehensive WAVES data, with gaps in the report periods. The team believes that the validity of the pre-October 2004 WAVES data found on the hard drives of both computers cannot be assured, because some of the data appear to have been used for testing and development. The Inspection team further believes that the pre-October 2004 WAVES data found on the hard drives of the two computers appear to exist in a separate location from the folder where the WAVES CD-ROMs are made.

18.     In addition, the Inspection team located on the hard drives of both computers WAVES data beginning in October 2004. The Inspection team has not examined these data in detail, but did search the data when the search of all Microsoft Access database files on both computers' hard drives was conducted as described in paragraph 21.

19.     The Inspection team determined that WAVES data are on a server. According to standard procedure, every 30 to 60 days, data from that server are downloaded, along with entry/exit data from ACR records, to the hard drive on one of the PPD computers. This information is then used to create the WAVES CD-ROMs.

20.     The Inspection team has found that the WAVES records on the server, older than 60 days, are purged daily and overwritten on the server. The Inspection team also found, however, that some pre-October 2004 WAVES data downloaded from the server to the two computers' hard drives remain on the hard drives.

21.     The Inspection team searched these computers by conducting an automated

search through all Microsoft Access database files on both computers' hard drives for the names Michael Scanlon, Neil Volz, Tony Rudy, Shawn Vasell/Vassell, Kevin Ring, Edwin Buckham, and Patrick Pizzella. The program's search function searched the hard drives for all Microsoft Access database files, and examined each database file for all records containing the names Michael Scanlon, Neil Volz, Tony Rudy, Shawn Vasell/Vassell, Kevin Ring, Edwin Buckham, or Patrick Pizzella. The program created a report of each database file and any data found.

22. The Inspection team search yielded data/records regarding entry/exit to the White House Complex for the following individuals: Michael Scanlon, Neil Volz, Tony Rudy, Shawn Vasell, Kevin Ring, and Patrick Pizzella. No data/records of entry/exit to the White House Complex for Edwin Buckham or Shawn Vassell (as spelled in the February 2, 2006 CREW FOIA request) were discovered by the Inspection team.

23. Neither the PPD search nor the Inspection team search uncovered any WAVES or ACR data/records for Edwin Buckham or Shawn Vassell for the relevant time period. Both searches did reveal data/records for Shawn Vasell. Also, the Secret Service released to CREW, on May 10, 2006 and July 7, 2006, its WAVES and ACR data/records concerning Jack Abramoff. I have signed two declarations filed in <u>Judicial Watch v. United States Secret Service</u>, Civil Action No. 06-310, describing that search.

24. CREW's February 2, 2006 FOIA request asks for records of visits of certain individuals to the Executive Office of the President ("EOP") whether the visits took place at the White House Complex or elsewhere. There are some EOP offices located outside of the White House Complex, but the Secret Service does not maintain or operate access systems at these sites.

25.     The information in WAVES records submitted by a White House pass holder is provided to the Secret Service temporarily for two limited purposes: (1) to allow the Secret Service to perform background checks to determine whether, and under what conditions, to authorize the visitor's temporary admittance to the White House Complex; and (2) to allow the Secret Service to verify the visitor's admissibility at the time of the visit.

26.     Once a visitor's visit to the White House Complex is complete, WAVES and ACR records have no continuing usefulness to the Secret Service, the Secret Service has no continuing interest in preserving or retaining them – indeed, prior to the temporary WAVES-retention practice begun in October 2004, the Secret Service's intent was to retain WAVES records only long enough to effectuate their orderly transfer to the White House – and the Secret Service does not control or direct the ultimate disposition or use of the records.  The White House does have such a continuing interest and therefore the records are turned over to the White House Office of Records Management.

27.     To search for potentially responsive records regarding the Vice President's residence, Secret Service Uniformed Division officers assigned to the Vice President's residence completed three separate computer-based searches and one hand search.  First, the file server utilized by the Secret Service command post at the Vice President's residence was searched. This search was done by entering some portion of the requested names at issue and then allowing the system's search feature to run.  A portion of the name, rather than the name in its entirety, was used to ensure that spellings close to the spelling provided by the requestor would be captured.  Because of the breadth of the records contained on the file server, each name took approximately eight to nine hours to complete.  Second, a search was run in Microsoft Outlook

9

on the three computers in the command post for email records potentially responsive to each request. These searches captured any reference to the requested name in the email subject line and the body of the email. For any email with an attachment, the attachment was opened and searched separately. The hard drives of these computers were also searched to determine whether any emails had been saved as separate documents onto the hard drives. Third, the access list database system that generates the daily and permanent access lists used at the gates was searched. This system is housed on the file server, and this third check was done in an effort to verify the results of the search of the file server. The access database was checked by opening up the basic tables it contains, sorting alphabetically by last name and then checking the sorted list against the request. Additionally, the entry logs were searched by hand.

28.     Potentially responsive data then available on the computer system and all entry logs in the possession of the Secret Service were searched. No responsive records were found.

29.     Prior to producing documents to CREW, the Secret Service redacted information from WAVES data/records to protect the privacy of individuals visiting the White House Complex and the security of the Complex. To protect the individuals' privacy, the Secret Service redacted their dates of birth and Social Security numbers from the WAVES data/records. And to protect the security of the Complex, the Secret Service redacted, from WAVES data/records, limited information from background checks performed by the Secret Service and coded instructions to Secret Service officers who work in the Complex.

30.     Entries for Michael Scanlon were also redacted when information in the documents demonstrated that the entries did not refer to the Michael Scanlon referred to in CREW's request.

31.    With the exception of the redactions noted in paragraphs 29 and 30, no document responsive to CREW's February 2, 2006 FOIA request has been withheld in part or in whole.

32.    On September 20, 2006, all documents responsive to CREW's February 2, 2006 FOIA request with the redactions noted were produced to CREW.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing statements are true and correct to the best of my knowledge and belief.

9-21-06
_____
Date

_Kathy J. Lyerly_

Kathy J. Lyerly
Special Agent in Charge, Liaison Division and
Freedom of Information and Privacy Acts Officer
United States Secret Service

11

# EXHIBIT 8

*The Washington Post v. Department of Homeland Security*

Motion for a Preliminary Injunction

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JUDICIAL WATCH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 06-310 (JGP) |
| UNITED STATES SECRET SERVICE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### DECLARATION OF KATHY J. LYERLY
### SPECIAL AGENT IN CHARGE, LIAISON DIVISION AND
### FREEDOM OF INFORMATION AND PRIVACY ACTS OFFICER,
### UNITED STATES SECRET SERVICE

I, Kathy J. Lyerly, hereby make the following declaration:

1.     I am the Special Agent in Charge of the Liaison Division and the Freedom of Information and Privacy Acts (FOI/PA) Officer for the United States Secret Service (hereinafter Secret Service), which is a component of the Department of Homeland Security (DHS). I have been the Secret Service FOI/PA Officer since December 28, 2003, and have been employed with the Secret Service as a Special Agent (GS-1811) since October 26, 1987.

2.     DHS regulations, Title 6, Code of Federal Regulations, Section 5.4, and Appendix A, II(I)(3), vest authority in the FOI/PA Officer, Secret Service, to make initial determinations as to whether to grant Freedom of Information Act (FOIA), 5 U.S.C. § 552, requests for Secret Service records (68 FR 4056, 4058, and 4069).

3.     As the Secret Service's FOI/PA Officer, I am familiar with plaintiff's FOIA

request to the Secret Service. Under my direction, the Secret Service conducted a search for documents responsive to plaintiff's request. That search produced two records, both of which were released in full without redactions or claims of exemptions. A chronological description of the correspondence in this matter and the processing of plaintiff's FOIA request is set forth below.

4.      By letter to the Secret Service dated January 20, 2006, and received January 23, 2006, plaintiff submitted a FOIA request for records "concerning, relating to, or reflecting . . . [a]ll White House visitor logs from January 1, 2001 to present that reflect the entries and exit(s) of lobbyist Jack Abramoff from the White House."

5.      By letter dated February 2, 2006, I acknowledged receipt of plaintiff's FOIA request and advised plaintiff that a search for records responsive to the request was being conducted.

6.      There are two interrelated systems – collectively termed the White House Access Control System – for controlling and monitoring access to the White House Complex: the Worker and Visitor Entrance System ("WAVES") and the Access Control Records System ("ACR").

7.      ACR records consist of records generated when a pass holder, worker, or visitor swipes his or her permanent or temporary pass over one of the electronic pass readers located at entrances to and exits from the White House Complex. ACR records include information such as the pass holder's name and badge number, the time and date of the swipe, and the post at which the swipe was recorded.

8.      WAVES records consist of records generated when information is submitted to

2

the Secret Service about workers and visitors whose business requires their presence at the White House Complex. WAVES records include information additional to that in the ACR records.

9.    In response to plaintiff's request, the FOI/PA Office conducted a search for responsive information. This search was conducted under the direction of the Secret Service's Presidential Protective Division by personnel who conduct FOIA searches as part of their regular responsibilities. The Secret Service searched both the ACR records and the WAVES records for any and all records responsive to plaintiff's FOIA request.

10.    It has been the longstanding practice of the Secret Service to transfer WAVES records on CD-ROM to the White House every 30 to 60 days. Except as noted in paragraph 11 below, once the Secret Service transferred the WAVES records, the Secret Service ensured that those records were erased from its computer system.

11.    In October 2004, at the request of the National Archives and Records Administration, the Secret Service began temporarily retaining its own copy of the WAVES records that it transferred to the White House. As such, the Secret Service has in its possession WAVES records dating back only to October 2004.

12.    ACR records are stored in a searchable database. Records are searchable by visitor name. In this case, the Secret Service searched the ACR database by searching for records generated from January 1, 2001 to the date of the search that had the name "Jack Abramoff" in the visitor field. The Secret Service does not keep ACR records anywhere other than in this searchable database.

13.    WAVES records are stored in a searchable form on CD-ROMs. Records are

3

searchable by visitor name. In this case, the Secret Service explored the WAVES CD-ROMs by searching for records generated from October 2004 to the date of the search that had the name "Abramoff" in the visitor field. As noted in paragraph 11, the Secret Service only has in its possession WAVES records dating from October 2004.

14.    The Secret Service's search of the ACR records produced two pages of records responsive to plaintiff's FOIA request. These records show that Mr. Abramoff visited the White House Complex on March 6, 2001 and January 20, 2004. The two pages of ACR records responsive to plaintiff's FOIA request have slightly different formats because the ACR system changed somewhat between 2001 and 2004.

15.    The Secret Service's search of the WAVES records maintained by the Secret Service produced no WAVES records responsive to plaintiff's FOIA request.

16.    There are a variety of reasons why ACR records are not comprehensive as to entries and exits. For example, guests who visit the complex in a prearranged group for an official function or reception may not appear on the ACR records. In some of those instances visitors are granted entry without going through the turnstiles.

17.    No other documents responsive to plaintiff's FOIA request were found in the search.

18.    No document located in response to plaintiff's request has been withheld in part or in whole.

19.    Pursuant to the terms of a joint stipulation and agreed order, on May 10, 2006, defendant produced, without redactions or claims of exemptions, all documents located in response to plaintiff's January 20, 2006 FOIA request.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing statements are true and correct to the best of my knowledge and belief.

5/16/06
Date

*Kathy J. Lyerly*

Kathy J. Lyerly
Special Agent in Charge, Liaison Division and
Freedom of Information and Privacy Acts Officer
United States Secret Service

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**THE WASHINGTON POST**,                    )
                                            )
                            Plaintiff,      )
                                            )
            v.                              )            Civil Action
                                            )
**DEPARTMENT OF HOMELAND**                  )
  **SECURITY**,                             )
                                            )
                            Defendant.      )
_____)

## O R D E R

     **UPON CONSIDERATION** of plaintiff's motion for a preliminary injunction,

defendant's response, and the entire record, it is this ___ day of October, 2006;

     **ORDERED** that plaintiff's motion is granted; and it is

     **FURTHER ORDERED** that defendant DHS, and its component the United

States Secret Service, shall preserve all records responsive to plaintiff's June 12, 2006,

Freedom of Information Act request, until further order of this Court; and it is

     **FURTHER ORDERED** that defendant DHS, and its component the United

States Secret Service, shall complete the processing of plaintiff's June 12, 2006, Freedom

of Information Act requests, and produce or identify all responsive records, within 10

days of the date of this order.


_____                    _____
Date                               United States District Judge