# EXHIBIT 7

*The Washington Post v. Department of Homeland Security*

Motion for a Preliminary Injunction

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, )<br><br>Defendant. ) | Civil Action No. 06-883 (JGP) |
| DEMOCRATIC NATIONAL COMMITTEE, )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES SECRET SERVICE, )<br><br>Defendant. ) | Civil Action No. 06-842 (JGP) |

<u>DECLARATION OF KATHY J. LYERLY
SPECIAL AGENT IN CHARGE, LIAISON DIVISION AND
FREEDOM OF INFORMATION AND PRIVACY ACTS OFFICER,
UNITED STATES SECRET SERVICE</u>

I, Kathy J. Lyerly, hereby make the following declaration:

      1.      I am the Special Agent in Charge of the Liaison Division and the Freedom of

Information and Privacy Acts (FOI/PA) Officer for the United States Secret Service (hereinafter

"Secret Service"), which is a component of the Department of Homeland Security ("DHS"). I

have been the Secret Service FOI/PA Officer since December 28, 2003, and have been employed

with the Secret Service as a Special Agent (GS-1811) since October 26, 1987.

2.       DHS regulations, Title 6, Code of Federal Regulations, Section 5.4, and Appendix

A, II(I)(3), vest authority in the FOI/PA Officer, Secret Service, to make initial determinations as

to whether to grant Freedom of Information Act (FOIA), 5 U.S.C. § 552, requests for Secret

Service records (68 FR 4056, 4058, and 4069).

3.       As the Secret Service's FOI/PA Officer, I am familiar with Citizens for

Responsibility and Ethics in Washington's ("CREW's") FOIA request to the Secret Service.  At

my request, the Secret Service conducted a search for documents responsive to CREW's request.

That search uncovered 356 pages of responsive records which were redacted (to protect

individuals' privacy and the security of the White House Complex) and, on September 20, 2006,

released.  (The White House Complex refers to the White House, the Eisenhower Executive

Office Building ["EEOB"], the secured grounds encompassing the White House and the EEOB,

and the New Executive Office Building.)  A description of the correspondence in this matter and

the processing of CREW's FOIA request is set forth below.

4.       In a letter dated February 2, 2006, and received February 16, 2006, CREW

submitted to the Secret Service, a component of DHS, a FOIA request for "all records relating to

any visit that any and all of the following individuals made to the White House [including any

office, wherever located, in the Executive Office of the President ("EOP")] or the residence of

the Vice President from January 1, 2001, to the present . . . : Jack Abramoff, Michael Scanlon,

Neil Volz, Tony Rudy, Shawn Vassell, Kevin Ring, Edwin Buckham, [and] Patrick Pizzella."

5.       In a letter dated March 1, 2006, I acknowledged receipt of CREW's

2

FOIA request and advised CREW that a search for records responsive to the request was being conducted.

6.     There are two interrelated systems – collectively termed the White House Access Control System – for controlling and monitoring access to the White House Complex:  the Worker and Visitor Entrance System ("WAVES") and the Access Control Records System ("ACR").  The Vice President's residence is not a part of the White House Complex, and the Secret Service does not use WAVES or ACR at that site.

7.     ACR records consist of records generated when a pass holder, worker, or visitor swipes his or her permanent or temporary pass over one of the electronic pass readers located at entrances to and exits from the White House Complex.  ACR records include information such as the pass holder's name and badge number, the time and date of the swipe, and the post at which the swipe was recorded.

8.     WAVES records consist of records generated when information is submitted by a White House pass holder to the Secret Service about workers and visitors who need access to the White House Complex to conduct business or attend social events.  WAVES records include the following information submitted by the pass holder: the visitor's name, date of birth, and Social Security number; the time and location of the planned visit; the name of the pass holder submitting the request; and the date of the request.  They may also include limited information from background checks performed by the Secret Service and coded instructions to Secret Service officers.  Once a visit takes place, WAVES records are typically updated electronically with information showing the actual time and place of the visitor's entry into and exit from the White House Complex.

3

9.     The Secret Service controls and monitors access to the Vice President's residence through the use of two access lists – a daily access list for individuals with appointments or work orders, and a permanent access list for those individuals who regularly access the facility.  The Secret Service receives requests from the Vice President's staff to allow entry for individuals with appointments or work orders at the facility.  The Secret Service conducts background checks on individuals for whom there has been a request for admission, and if there is no information of protective interest, the Secret Service places the name on a daily access list.  A permanent access list is also maintained listing those individuals who regularly access the facility.  All individuals are logged in by the Uniformed Division officer working at the gate where the individual arrives.

10.     In response to CREW's February 2, 2006 FOIA request, the Secret Service has conducted three searches for records.  The first two searches were for records of visits to the White House Complex, and the third search was for records of visits to the Vice President's residence.  The first search was conducted by the Secret Service's Presidential Protective Division ("the PPD search").  Secret Service employees under the direction of the Secret Service's Office of Inspection performed the second search ("the Inspection team search").  Secret Service Uniformed Division officers assigned to the Vice President's residence conducted searches of visits to the Vice President's residence.

11.     The individuals who performed the PPD search conduct FOIA searches as part of their regular responsibilities.  The PPD searched both the ACR records and the WAVES CD-ROMs for any and all records responsive to CREW's February 2, 2006 FOIA request.

12.     The PPD searched for ACR records in a searchable database in which ACR records are stored. The records are searchable by visitor name. In this case, the Secret Service searched the ACR database by searching for records that would have been generated from January 1, 2001 to the date of the search that had the name Michael Scanlon, Neil Volz, Tony Rudy, Shawn Vasell/Vassell, Kevin Ring, Edwin Buckham, or Patrick Pizzella in the visitor field.

13.     It has been the longstanding practice of the Secret Service to transfer WAVES records on CD-ROM to the White House Office of Records Management every 30 to 60 days. The intent of the Secret Service was to ensure that, once transferred, the records were erased from its computer system. The Secret Service has temporarily retained, in a searchable form on CD-ROM, WAVES records generated since October 2004; the records can be searched by visitor name. In this case, the PPD explored the WAVES CD-ROMs by searching for records that had the name Michael Scanlon, Neil Volz, Tony Rudy, Shawn Vasell/Vassell, Kevin Ring, Edwin Buckham, or Patrick Pizzella in the visitor field. The Secret Service did not save on CD-ROM WAVES records for the relevant period (i.e., from January 2001 to the date of the search) generated before October 2004.

14.     PPD ran its initial search in March 2006. The search results were reviewed, and several inconsistencies were noted compared to documents produced to the FOI/PA Office by PPD in response to search requests for other FOIA requests pertaining to some of the same individuals. In running an additional search, what appeared to be a WAVES record was discovered on the hard drive of a Secret Service computer located in the Information Technology Section of the PPD. Upon further examination, it appeared that certain WAVES data pre-dating

5

October 2004 existed on the hard drive of that computer and the hard drive of a second computer in the same office.

15.     The PPD search yielded ACR and WAVES records for Michael Scanlon, Neil Volz, Shawn Vassell, Kevin Ring, and Patrick Pizzella.  The PPD search yielded ACR records for Tony Rudy.  The PPD search yielded no records for Shawn Vassell (as spelled in the February 2, 2006 CREW FOIA request) or Edwin Buckham.

16.     The Inspection team searched the hard drives of two computers in the Information Technology Section of the PPD for records regarding visits to the White House Complex.  The Inspection team was comprised of the following individuals: an Assistant Inspector in the Inspection Division, whose responsibilities include assessing the effectiveness of operations, quality of management and supervision, and adherence to policies, regulations, and procedures within Secret Service offices and divisions; an Assistant to the Special Agent in Charge in the Criminal Investigative Division (CID), who oversees all Information Technology programs for the Office of Investigations; a Special Agent in the CID and member of the Electronic Crimes Special Agent Program, who is a trained computer specialist and whose duties include forensic examination of computers associated with criminal investigations; and an Information Technology Specialist in the Information Resources Management Division, who is a computer specialist skilled in database design and architecture.

17.     I have been advised that the Inspection team believes that the hard drive of the first computer contains multiple database files of varying degrees of WAVES data that pre-date October 2004.  The team believes that the database files contain non-comprehensive WAVES data, with sizeable gaps in the report periods.  The team also believes that the hard drive of the

second computer contains multiple database files of varying degrees of WAVES data that pre-date October 2004. The team further believes that the database files on this computer contain non-comprehensive WAVES data, with gaps in the report periods. The team believes that the validity of the pre-October 2004 WAVES data found on the hard drives of both computers cannot be assured, because some of the data appear to have been used for testing and development. The Inspection team further believes that the pre-October 2004 WAVES data found on the hard drives of the two computers appear to exist in a separate location from the folder where the WAVES CD-ROMs are made.

18.     In addition, the Inspection team located on the hard drives of both computers WAVES data beginning in October 2004. The Inspection team has not examined these data in detail, but did search the data when the search of all Microsoft Access database files on both computers' hard drives was conducted as described in paragraph 21.

19.     The Inspection team determined that WAVES data are on a server. According to standard procedure, every 30 to 60 days, data from that server are downloaded, along with entry/exit data from ACR records, to the hard drive on one of the PPD computers. This information is then used to create the WAVES CD-ROMs.

20.     The Inspection team has found that the WAVES records on the server, older than 60 days, are purged daily and overwritten on the server. The Inspection team also found, however, that some pre-October 2004 WAVES data downloaded from the server to the two computers' hard drives remain on the hard drives.

21.     The Inspection team searched these computers by conducting an automated

search through all Microsoft Access database files on both computers' hard drives for the names Michael Scanlon, Neil Volz, Tony Rudy, Shawn Vasell/Vassell, Kevin Ring, Edwin Buckham, and Patrick Pizzella. The program's search function searched the hard drives for all Microsoft Access database files, and examined each database file for all records containing the names Michael Scanlon, Neil Volz, Tony Rudy, Shawn Vasell/Vassell, Kevin Ring, Edwin Buckham, or Patrick Pizzella. The program created a report of each database file and any data found.

22.      The Inspection team search yielded data/records regarding entry/exit to the White House Complex for the following individuals: Michael Scanlon, Neil Volz, Tony Rudy, Shawn Vasell, Kevin Ring, and Patrick Pizzella. No data/records of entry/exit to the White House Complex for Edwin Buckham or Shawn Vassell (as spelled in the February 2, 2006 CREW FOIA request) were discovered by the Inspection team.

23.      Neither the PPD search nor the Inspection team search uncovered any WAVES or ACR data/records for Edwin Buckham or Shawn Vassell for the relevant time period. Both searches did reveal data/records for Shawn Vasell. Also, the Secret Service released to CREW, on May 10, 2006 and July 7, 2006, its WAVES and ACR data/records concerning Jack Abramoff. I have signed two declarations filed in <u>Judicial Watch v. United States Secret Service</u>, Civil Action No. 06-310, describing that search.

24.      CREW's February 2, 2006 FOIA request asks for records of visits of certain individuals to the Executive Office of the President ("EOP") whether the visits took place at the White House Complex or elsewhere. There are some EOP offices located outside of the White House Complex, but the Secret Service does not maintain or operate access systems at these sites.

25.     The information in WAVES records submitted by a White House pass holder is
provided to the Secret Service temporarily for two limited purposes: (1) to allow the Secret
Service to perform background checks to determine whether, and under what conditions, to
authorize the visitor's temporary admittance to the White House Complex; and (2) to allow the
Secret Service to verify the visitor's admissibility at the time of the visit.

26.     Once a visitor's visit to the White House Complex is complete, WAVES and
ACR records have no continuing usefulness to the Secret Service, the Secret Service has no
continuing interest in preserving or retaining them – indeed, prior to the temporary WAVES-
retention practice begun in October 2004, the Secret Service's intent was to retain WAVES
records only long enough to effectuate their orderly transfer to the White House – and the Secret
Service does not control or direct the ultimate disposition or use of the records.  The White
House does have such a continuing interest and therefore the records are turned over to the White
House Office of Records Management.

27.     To search for potentially responsive records regarding the Vice President's
residence, Secret Service Uniformed Division officers assigned to the Vice President's residence
completed three separate computer-based searches and one hand search.  First, the file server
utilized by the Secret Service command post at the Vice President's residence was searched.
This search was done by entering some portion of the requested names at issue and then allowing
the system's search feature to run.  A portion of the name, rather than the name in its entirety,
was used to ensure that spellings close to the spelling provided by the requestor would be
captured.  Because of the breadth of the records contained on the file server, each name took
approximately eight to nine hours to complete.  Second, a search was run in Microsoft Outlook

9

on the three computers in the command post for email records potentially responsive to each request. These searches captured any reference to the requested name in the email subject line and the body of the email. For any email with an attachment, the attachment was opened and searched separately. The hard drives of these computers were also searched to determine whether any emails had been saved as separate documents onto the hard drives. Third, the access list database system that generates the daily and permanent access lists used at the gates was searched. This system is housed on the file server, and this third check was done in an effort to verify the results of the search of the file server. The access database was checked by opening up the basic tables it contains, sorting alphabetically by last name and then checking the sorted list against the request. Additionally, the entry logs were searched by hand.

28.     Potentially responsive data then available on the computer system and all entry logs in the possession of the Secret Service were searched. No responsive records were found.

29.     Prior to producing documents to CREW, the Secret Service redacted information from WAVES data/records to protect the privacy of individuals visiting the White House Complex and the security of the Complex. To protect the individuals' privacy, the Secret Service redacted their dates of birth and Social Security numbers from the WAVES data/records. And to protect the security of the Complex, the Secret Service redacted, from WAVES data/records, limited information from background checks performed by the Secret Service and coded instructions to Secret Service officers who work in the Complex.

30.     Entries for Michael Scanlon were also redacted when information in the documents demonstrated that the entries did not refer to the Michael Scanlon referred to in CREW's request.

10

31.     With the exception of the redactions noted in paragraphs 29 and 30, no document responsive to CREW's February 2, 2006 FOIA request has been withheld in part or in whole.

32.     On September 20, 2006, all documents responsive to CREW's February 2, 2006 FOIA request with the redactions noted were produced to CREW.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing statements are true and correct to the best of my knowledge and belief.


_9-21-06_
Date

_Kathy J. Lyerly_
Kathy J. Lyerly
Special Agent in Charge, Liaison Division and
Freedom of Information and Privacy Acts Officer
United States Secret Service

11