## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| THE WASHINGTON POST, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 06-1737 (RMU) |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| HOMELAND SECURITY, ) | |
| ) | |
| Defendant. ) | |

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION
## FOR A PRELIMINARY INJUNCTION

### STATEMENT

This case is about protecting the effective functioning of the Vice Presidency under the Constitution.  Under the guise of a motion for emergency injunctive relief, plaintiff The Washington Post asks the Court asks the Court to indulge a fishing expedition into the most sensitive details of the Vice Presidency.  Specifically, it seeks the production of any and all records reflecting the visit by any person to the Vice President, his wife, or anyone else at the residence of the Vice President for a two-year period.  The only allowance plaintiff makes for this incredibly broad intrusion into the Vice President's (and his family's) privacy is for those records of visits from the "Cheney family."  But that is not plaintiff's only extraordinary request.  Plaintiff also seeks an injunction that would require the release of all records reflecting every visit (again, over a two-year period) by any person who entered the White House Complex in

order to meet with the Vice President and any of a dozen of his closest advisors in the Office of the Vice President ("OVP"). And in addition to these extraordinary and unprecedented requests, Plaintiff argues that it is entitled to this relief on an emergency basis because "time is of the essence."

A preliminary injunction in this case is plainly inappropriate. As an initial matter, plaintiff's motion does not seek "preliminary" relief at all; rather, plaintiff's motion seeks all the relief to which plaintiff would be entitled if it prevailed on the merits, namely the production of the requested records. Nor is there any exigency presented by this case: the requested records are being preserved; the Secret Service has issued a letter stating that the records are not subject to FOIA; and the general interest to inform the public or to vindicate a statutory right does not, as a matter of law, establish the irreparable harm necessary to demonstrate an entitlement to emergency injunctive relief. Simply put, plaintiff cannot establish the kind of irreparable harm needed for the grant of emergency injunctive relief.

Plaintiff's inability to establish irreparable harm is not the only reason its motion must be denied. As set forth in more detail below, plaintiff is unlikely to succeed on the merits of its FOIA claim. The OVP is indisputably not an agency subject to FOIA. But the records that plaintiff seeks are records created from information supplied by the OVP and controlled by the OVP. The OVP and Secret Service share the understanding that OVP controls the records; the Secret Service does not have an interest in the records sufficient to justify it retaining the records; and, the OVP does have an on-going interest in the records. Accordingly, under the well-settled law of this Circuit, the requested records simply are not "agency records" at all, and therefore are not subject to FOIA. See Burka v. Dep't of Health and Human Servs., 87 F.3d 508, 515 (D.C.

2

Cir. 1996).

Even if this were a close question (which it is not), principles of constitutional avoidance also dictate this result, because to find otherwise would impermissibly impinge upon the ability of the Vice President to receive information and advice in confidence, in contradiction to the recent holdings by the Supreme Court and this Circuit.  See Cheney v. United States Dist. Court, 542 U.S. 367, 385 (2004); In re Cheney, 406 F.3d 723, 727 (D.C. Cir. 2005).  As the sworn declaration of Claire M. O'Donnell makes clear, releasing the records of every visit to the Vice President's residence ("VPR"), as well as every visit to the Vice President and his senior staff, would adversely affect the ability of the Vice President to conduct the business of his office in confidence.  The courts have held that the President and Vice President are not agencies under FOIA because application of that statute to the President and Vice-President could interfere with their ability to discharge their constitutional duties. See Kissinger v. Reporters Committee for Freedom of the Press, 445 U.S. 136 (1980); Soucie v. David, 448 F.2d 1007, 1073 (D.C. Cir. 1971); Armstrong v. Executive Office of the President, 1 F.3d 1274, 1292 (D.C. Cir. 1993); Meyer v. Bush, 981 F.2d 1288, 1295 (D.C. Cir. 1993).  Plaintiff should not be able to end run the constitutional protections afforded the OVP – which permit the Vice President to perform his constitutional duties by receiving information and advice in confidence – by seeking the very same information instead from the OVP's protective service.  Indeed, under plaintiff's theory, it would be entitled to receive through FOIA all records reflecting every visit (over any period) by any person who entered the White House Complex in order to meet with the President and his closest advisors, thereby effecting an end-run around the non-applicability of FOIA to the President, and thereby opening up the deliberative process that the Constitution protects.

Finally, even if the Court were to determine that these records are "agency records" subject to FOIA (which they are not), well-established statutory exemptions protecting the deliberative process and personal privacy, would exempt the records from disclosure.  See infra at pp. 25-28.

For these reasons, and those explained more fully below, the Court should deny plaintiff's request for preliminary injunction, permit the government to answer the complaint, and set an appropriate briefing schedule for motions for summary judgment

## BACKGROUND

By letter dated June 12, 2006, plaintiff submitted to the Secret Service, a component of the Department of Homeland Security (DHS), a FOIA request for "[a]ll records and visitor logs, including WAVES and/or ACR records, from October 2004 to present, reflecting or concerning the entries and/or exits of any persons who sought or were scheduled to visit the following people in the Office of the Vice President ("OVP"): Vice President Cheney; David Addington, I. Lewis 'Scooter' Libby, C. Dean McGrath, Steven Schmidt, John Hannah, Eric Edelman, Ron Christie, Victoria Nuland, Aaron Friedberg, Stephen Yates, Samantha Ravich, and David Wurmser."  Freedom of Information Act Request and Request for Expedited Processing ("FOIA Request"), June 12, 2006, at 1 (attached as Exhibit 1 to the plaintiff's motion).  The request further sought "[a]ll records and visitor logs, including WAVES and/or ACR records, from October 2004 to present, reflecting or concerning the entries of any persons, other than members of the Cheney Family, visiting the vice-president's residence."  Id.  The request also sought expedited processing.  Id. at 2.

The Secret Service acknowledged receipt of plaintiff's FOIA request by mailing its

standard letter dated June 16, 2006, which advised that the agency was processing its request. Letter from Kathy J. Lyerly, Special Agent in Charge and Freedom of Information and Privacy Acts Officer, to the Washington Post (June 16, 2006) (attached as Exhibit 2 to the Plaintiff's motion). The Secret Service initially denied plaintiff's request for expedited processing. Id. at 2. Plaintiff appealed the denial of expedited processing by letter dated July 12, 2006. Appeal of Denial of Request for Expedited Processing, July 12, 2006, at 1 (attached as Exhibit 3 to plaintiff's motion). On August 31, the Secret Service granted the appeal and determined that expedited processing was appropriate. Letter from Brain K. Nagel, Deputy Director, Secret Service, to Washington Post (August 31, 2006) (attached as Exhibit 4 to plaintiff's motion). The Secret Service sent a letter dated September 20, notifying plaintiff that the records it seeks "are not agency records subject to the FOIA." Letter from Lyerly to the Washington Post at 1 (September 20, 2006) (attached as Exhibit 6 to plaintiff's motion). The letter stated further that "these records are governed by the Presidential Records Act, 44 U.S.C. § 2201 et seq., and remain under the exclusive legal custody and control of the White House and the Office of the Vice President. Accordingly, the Secret Service lacks the authority to provide such records in response to your request."[1] Id.

    The Secret Service uses different systems for controlling and monitoring access to the

---

[1] For a review of the history of this request, also see the Declaration of Kathy J. Lyerly, Special Agent in Charge, Liaison Division and Freedom of Information and Privacy Acts Officer, United States Secret Service, October 13, 2006, ¶¶ 2-5 (attached to this memorandum). Similarly, entry logs for the Vice President's Residence that have been turned over by Secret Service to OVP are preserved by OVP as Vice Presidential records subject to the Presidential Records Act (44 U.S.C. § 2207). Declaration of Claire M. O'Donnell, Assistant to the Vice President and Deputy Chief of Staff, Office of the Vice President ("O'Donnell Decl."), October 13, 2006, ¶¶ 14-15 (attached to this memorandum).

facilities of the OVP located within the White House Complex and the VPR.  Declaration of Paul

S. Morrissey, Deputy Assistant Director, United States Secret Service ("Morrissey Decl."),

October 13, 2006, ¶¶ 5, 11 (attached to this memorandum).  The Worker and Visitor Entrance

System ("WAVES") and the Access Control Records System ("ACR") are used to monitor

access to the White House Complex.  Id. ¶ 5.  (The White House Complex encompasses the

Eisenhower Executive Office Building ["EEOB"], which includes most of the office space for

the OVP, the White House, the secured grounds encompassing the EEOB and the White House,

and the New Executive Office building.  Id. ¶ 4)  ACR records, generated when a pass holder

swipes his or her permanent or temporary pass over one of the electronic pass readers located at

entrances to and exits from the White House Complex, do not contain information about who the

entrant is visiting in the Complex and, thus, would not provide the information plaintiff seeks in

its request.  See id. ¶ 6.  WAVES records consist of records generated when information –

including the visitor's personal identifying information, the time and location of the planned

visit; the name of the pass holder submitting the request; and the date of the request  – is

submitted by a White House Complex pass holder to the Secret Service about workers and

visitors who need access to the White House Complex to conduct business or attend social

events.  Id. ¶ 7.  As will be discussed further below, WAVES records from the President's office

and the Vice President's office are intended to be retained only temporarily by the Secret Service

and are, at all times, under the exclusive legal custody and control of the White House and the

OVP, respectively.  Id. ¶ 11; see also O'Donnell Decl., ¶¶ 11-12.

With respect to the VPR, the Secret Service controls and monitors access through the use

of the permanent access list and daily access rosters.  Morrissey Decl. ¶ 11.  The permanent

access list includes those individuals who regularly access the facility.  Id.  The daily access roster is generated pursuant to requests from the Vice President's staff to allow entry for individuals with appointments or work orders at the facility.  Id.  The Secret Service adds names to the daily access list after the individuals clear a background check.  Id.  The names of individuals from the daily access list who actually enter the residence on a particular day are handwritten on an entry log by the Secret Service officer working at the gate of entry, which is the ultimate record created from the initial request for entry.  Id.  As with WAVES records, all materials generated in the visitor clearance process for the Vice President's Residence are under the exclusive legal control of the OVP.  Id. ¶ 13; see also O'Donnell Decl. ¶¶ 14-16.

All records returned to the OVP (or to WHORM on its behalf) relating to OVP appointments, entries and exits from the White House Complex and the Vice President's Residence are preserved as Vice Presidential records pursuant to the Presidential Records Act, 44 U.S.C. § 2207.  O'Donnell Decl. ¶¶ 12, 15.

## ARGUMENT

### PLAINTIFF'S MOTION FOR PRELIMINARY RELIEF SHOULD BE DENIED

Preliminary injunctive relief is "an extraordinary measure, and . . . the power to issue such exceptional relief 'should be sparingly exercised.'" Experience Works, Inc. v. Chao, 267 F. Supp. 2d 93, 96 (D.D.C. 2003) (quoting Dorfmann v. Boozer, 414 F.2d 1168, 1173 (D.C. Cir. 1969)) (internal quotes omitted); accord Boivin v. US Airways, Inc., 297 F. Supp. 2d 110, 116 (D.D.C. 2003) ("preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion") (quoting Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam)) (emphasis in original) .  In

considering a plaintiff's request for a preliminary injunction, a court weighs four factors: "(1) whether the plaintiff has a substantial likelihood of success on the merits; (2) whether the plaintiff would suffer irreparable injury were an injunction not granted; (3) whether an injunction would substantially injure other interested parties; and (4) whether the grant of an injunction would further the public interest."  Al-Fayed v. C.I.A., 254 F.3d 300, 303 (D.C. Cir. 2001); accord Serono Labs., Inc. v. Shalala, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998).  "These factors interrelate on a sliding scale and must be balanced against each other."  Sereno Labs, Inc., 158 F.3d at 1318.

## I.      PLAINTIFF'S MOTION SHOULD BE DENIED BECAUSE IT SEEKS A FINAL, NOT A PRELIMINARY, INJUNCTION

Plaintiff's request for a preliminary injunction is even more extraordinary than in the usual case because plaintiff seeks, purportedly by way of a  "preliminary" remedy, the ultimate relief sought in this lawsuit, i.e. the immediate disclosure of non-exempt documents.  See Univ. of Texas v. Camenisch, 451 U.S. 390, 397 (1981) ("[I]t is generally inappropriate for a federal court at the preliminary injunction stage to give a final judgment on the merits").  "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  Id. at 395.  The preliminary injunction sought by plaintiff would not serve that purpose.

Plaintiff argues that a preliminary injunction is necessary to preserve the records it seeks and to vindicate its right to expedited processing.  Memorandum in Support of Plaintiff's Motion for a Preliminary Injunction ("Pl. Mem."), October 10, 2006, at 15-16, 18-20.  Yet, a preliminary injunction is neither necessary or appropriate to achieve either.  First, the records in the

8

possession of the Secret Service at the time of plaintiff's request that would be responsive to plaintiff's request were they subject to FOIA have been preserved, i.e., <u>no records are being destroyed</u>.[2]  Morrissey Decl. ¶¶ 10, 12; O'Donnell Decl. ¶¶ 14-15.  Second, a preliminary injunction is not necessary to vindicate a right to expedited processing.  The Secret Service granted plaintiff's request for expedited processing, and has finally denied plaintiff's request.[3] Lyerly Decl. ¶¶ 4-5.  There is nothing more for the agency to do.

What plaintiff, in fact, seeks is expedited briefing and judicial review of the agency's decision that the records are not subject to FOIA because they are governed by the Presidential Records Act.  <u>See</u> Letter from Lyerly to the Washington Post at 1 (September 20, 2006) (attached as Exhibit 6 to plaintiff's motion).  Although plaintiff argues (in a footnote) that granting the requested preliminary injunction "will not resolve all of the issues raised in the complaint," Pl. Mem. at 20 n.9, plaintiff's memorandum asks the court to review – at breakneck pace no less – the "propriety of the agency's substantive determination of the Post's FOIA request," i.e., the determination that the records sought are not subject to FOIA.  <u>See</u> Pl. Mem. at 2, 20.  Plaintiff's request in its memorandum that records be preserved is irrelevant because they are being

---

[2]  Pursuant to long standing practices, WAVES records related to visits made to individuals in the OVP, which is located at the White House Complex, are being transferred to the White House Office of Records Management (also "WHORM"), which preserves them in accordance with the Presidential Records Act, 44 U.S.C. 2207.  Morrissey Decl. ¶ 10; O'Donnell Decl. ¶ 12.  Similarly, entry logs for the VPR that have been turned over by Secret Service to OVP are preserved by OVP as Vice Presidential records subject to the Presidential Records Act (44 U.S.C. § 2207). O'Donnell Decl. ¶ 15.

[3]  The letter notifying plaintiff that the records it seeks are not subject to FOIA was dated 20 days after the letter granting expedited processing.  <u>Compare</u> Letter from Brain K. Nagel, Deputy Director, Secret Service, to Washington Post (August 31, 2006) (attached as Exhibit 4 to plaintiff's motion), <u>with</u> Letter from Lyerly to the Washington Post at 1 (September 20, 2006) (attached as Exhibit 6 to plaintiff's motion).

preserved, as is required by law, and the request for expedited processing is similarly irrelevant because plaintiff received expedited processing and the agency has issued a final decision. <u>See</u> Lyerly Decl. ¶¶ 4-5.   Unquestionably, what plaintiff seeks is a final judgment on the merits.

Entering final judgment (or what amounts to final judgment) on the merits in ruling on a preliminary injunction would be inappropriate here given the important and complex statutory and constitutional issues implicated by plaintiff's FOIA request. <u>See</u> <u>West Va. Assoc. of Community Health Ctrs., Inc. v.  Heckler</u>, 734 F.2d 1570, 1579 (D.C. Cir. 1974).  Courts shy away from entering final judgment at the preliminary injunction stage because "findings of fact and conclusions of law at the preliminary injunction stage are often based on incomplete evidence and a relatively hurried consideration of the issues." <u>Communications Maintenance, Inc. v. Motorola, Inc.</u>, 761 F.2d 1202, 1205 (7th Cir. 1985).  This reticence is particularly acute where, as here, the judgment sought raises important and complex statutory and constitutional issues.  <u>See</u> <u>West Va. Assoc. of Community Health Ctrs.</u>, 734 F.2d at 1579.

This case abounds with constitutional questions of great weight.  Plaintiff's request – which seeks records for a nearly two-year period of <u>all visitors</u> to the Vice President and key assistants in the OVP and for all visitors, except members of his family, to his residence – raises weighty questions about the extent to which FOIA applies to records that, if disclosed, would hinder the Vice President's ability to gather advice and effectively discharge his official functions, including his executive function.  <u>See</u> <u>In re Cheney</u>, 406 F.3d 723, 728 (D.C. Cir. 2005).  Protecting the Vice President's ability to discharge his functions is obviously an important constitutional matter, <u>see</u> <u>Cheney v. United States Dist. Ct.</u>, 542 U.S. 367, 389-90 (2004), and not one that should be addressed in the "relatively hurried" atmosphere that attends a

preliminary injunction. <u>Communications Maintenance, Inc.</u>, 761 F.2d at 1205.

Plaintiff's request also raises the statutory question of whether the documents sought –

which reflect the activities of the Vice President and his advisors and which OVP controls– are

Secret Service agency records under FOIA. <u>See</u> 5 U.S.C. § 552(a)(3), (b). Making this

determination is not uninvolved, because FOIA does not define agency records, <u>Forsham v.</u>

<u>Harris</u>, 445 U.S. 169, 183 (1980), and no case has decided, or even addressed, the status of the

records involved in this case. This decision, too, should not be made in the rush of a preliminary

judgment proceeding.

## II. THE FACTORS GOVERNING THE ISSUANCE OF A PRELIMINARY INJUNCTION ALL WEIGH IN FAVOR OF THE GOVERNMENT

### A. Plaintiff Fails To Identify the Existence of any Irreparable Harm in the Absence of a Preliminary Injunction

"The basis of injunctive relief in the federal courts has always been irreparable harm."

<u>CityFed Fin. Corp. v. Office of Thrift Supervision</u>, 58 F.3d 738, 747 (D.C. Cir.1995) (citing

<u>Sampson v. Murray</u>, 415 U.S. 61, 88 (1974)). In order for a plaintiff to meet its burden of

demonstrating irreparable harm sufficient to warrant the entry of preliminary injunctive relief, the

injury complained of must be both certain and great; it must be actual and not theoretical.

Injunctive relief "will not be granted against something merely feared as liable to occur at some

indefinite time." <u>Wisc. Gas. Co. v. Federal Energy Regulatory Comm'n</u>, 758 F.2d 669, 764

(D.C. Cir. 1985) (citation omitted). Instead, the party seeking injunctive relief must show that

"[t]he injury complained of [is] of such imminence that there is a 'clear and present' need for

equitable relief to prevent irreparable harm." <u>Id.</u> (citations and internal quotations omitted). It is

a "well known and indisputable principle[ ]" that a vague or speculative harm cannot constitute

11

"irreparable harm" sufficient to justify injunctive relief.  Id.  A plaintiff's failure to meet its burden of establishing irreparable harm is sufficient, in itself, to deny emergency relief.  CityFed Fin. Corp., 58 F.3d at 747.

Plaintiff seeks an order compelling DHS to release records within ten days of an order from the court.[4]  Pl. Mem. at 20.  But plaintiff has identified no "certain and great" harm it will incur if the records are not released within that time frame.  First, plaintiff claims that its statutory right to expedition will be lost if the preliminary injunction it seeks is not granted.  Pl. Mem. at 15-16.  This argument is specious, because, among other reasons, the Secret Service granted plaintiff's request for expedition.  Lyerly Decl. ¶ 4.  Plaintiff's request was therefore prioritized over other requests pending when its request was filed.  Thereafter, within 20 days of granting expedition, the Secret Service sent the September 20 letter stating that the records sought by plaintiff are not agency records subject to FOIA.  Id. at ¶ 5.

In any event, the loss of an abstract statutory right, namely, the right to expedited processing, does not establish "certain and great" harm if the consequences of the loss of that right are not "certain and great."  Courts have therefore rejected this argument, which if credited would mean that every request for preliminary injunction in the expedited processing context – or indeed, in all FOIA cases, since normal FOIA procedures contain statutory deadlines – could amount to irreparable harm.  See Al-Fayed v. C.I.A., 2000 WL 34342564, at *5 (D.D.C. September 20, 2000) (finding that denial of expedited processing did not constitute irreparable harm).

---

[4] Plaintiff also seeks an order instructing DHS to preserve the records it seeks, but those records are being preserved, see supra at p. 8, so no additional preservation order is necessary or appropriate.

Plaintiff's second claimed injury – that its ability and that of the public to obtain in a timely fashion information relevant to the upcoming Congressional election will be irreparably harmed if preliminary relief is not awarded – is similarly insufficient to establish a right to the extraordinary remedy of a preliminary injunction. Pl. Mem. at 16-17. As an initial matter, plaintiff appears to be describing a harm that is suffered primarily by the public, not by plaintiff itself. The public interest is properly considered as its own factor in the injunction analysis – and, as explained below, in this case the public interest counsels against the award of the preliminary injunction plaintiff seeks – but it cannot be substituted for a showing that plaintiff itself will be harmed.

Moreover, plaintiff can merely speculate about whether any records produced by DHS in response to its request (and an order from this Court) would contain information relevant to the upcoming Congressional election. Pl. Mem. at 16. Indeed, its FOIA request is not targeted to any particular news event, but rather is little more than a two-year fishing expedition into every person who met with the Vice President or any of a number of people on his staff. See Lyerly Decl. ¶ 3. Mere speculation does not establish the "clear showing" of "certain and great" harm. See Wisc. Gas. Co., 758 F.2d at 764. Because plaintiff cannot now show what it would eventually receive if the Court were to rule in its favor, it cannot meet its burden of demonstrating that it will be irreparably harmed absent emergency relief. See The Nation Magazine v. Dep't of State, 805 F. Supp. 68, 74 (D.D.C. 1992) (denying motion for preliminary injunction on ground that plaintiff had failed to demonstrate irreparable harm because "[e]ven if this Court were to direct the speed up of processing of their requests, [plaintiffs] have not shown at this time that they are entitled to the release of the documents that they seek. To the contrary,

13

it is undisputed that at least some of the documents are probably exempt from production under FOIA").

Finally, plaintiff's argument that preliminary injunctive relief must be granted because if it is not "all opportunity to grant the requested relief [is] foreclosed," Pl. Mem. at 16, is untenable.  At bottom, the argument depends on the premise that releasing the records after the Congressional election is essentially worthless.  See id.  This premise is faulty.  If there is any information in these records that will inform the public debate, that information will inform the public debate whether it is released before or after the Congressional elections.  Indeed, it is extraordinary that a newspaper of national prominence would imply that its objective in seeking these records is to influence the Congressional elections, and that the value of the information after the elections falls to zero.

**B.  Plaintiff Fails To Demonstrate a Likelihood of Success on the Merits**

Plaintiff's failure to show that it would be irreparably harmed if the requested injunction is not granted is by itself sufficient to defeat its motion for preliminary injunction.  CityFed Fin. Corp., 58 F.3d at 747.  There is further reason, however, not to grant the injunction – for two reasons, plaintiff cannot prevail on the merits of its claim.  First, the records sought are not "agency records" subject to FOIA, because they are under the exclusive legal control of the OVP, which is indisputably (and for constitutional reasons) not an agency subject to FOIA.[5]  In

---

[5] That certain access records have been voluntarily released, by governmental entities other than OVP, to parties in other cases, see, Judicial Watch v. United States Secret Service, 06-CV-310 (D.D.C.); Democratic National Committee ("DNC") v. United States Secret Service, 06-CV-842 (D.D.C.); Citizens for Responsibility and Ethics in Washington ("CREW") v. Department of Homeland Security, 06-CV-883 (D.D.C.), does not demonstrate that the records at issue in this case should be released.  The Secret Service was authorized to release records to the litigants in the Judicial Watch, DNC and CREW cases, which it is entitled to do as a

14

analyzing that issue, the Court should avoid an interpretation of FOIA that would unconstitutionally infringe on the Vice President's ability to discharge his official duties. Second, even if the records are agency records subject to FOIA, they are exempt under FOIA exemptions 5 and 6.  5 U.S.C. 552(b)(5) and (6).

### 1.  The Records Sought by plaintiff are Not Agency Records

Subject to certain exemptions, FOIA requires an "agency" to make "agency records" available upon request.  See 5 U.S.C. § 552(a)(3), (b).  The statute does not define the term "agency records," Forsham, 445 U.S. at 183, but the courts have defined it.  As defined by the courts, the definition contains two requirements, each of which must be satisfied for the materials at issue to qualify as agency records.  "First, an agency must either create or obtain the requested materials 'as a prerequisite to its becoming an agency record within the meaning of the FOIA.'" Department of Justice v. Tax Analysts, 492 U.S. 136, 144 (1989) (quoting Forsham, 445 U.S. at 182).  "Second, the agency must be in control of the requested materials at the time the FOIA request is made.  By control we mean that the materials have come into the agency's possession in the legitimate conduct of its official duties."  Id. at 145.   The Secret Service is an "agency," but the OVP is not.  Schwarz v. U.S. Dept. of Treasury, 131 F. Supp. 2d 142, 147 (D.D.C. 2001), aff'd 2001 WL 674636 (D.C. Cir. 2001).

The D.C. Circuit has elaborated on the "control" element by adopting a four-factor test for determining "whether an agency exercises sufficient control over requested documents to render them agency records":

(1) the intent of the document's creator to retain or relinquish control over the

discretionary matter.

records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record system or files.

United We Stand America v. IRS, 359 F.3d 595, 599 (D.C. Cir. 2004); see also Burka v. Dep't of Health and Human Servs., 87 F.3d 508, 515 (D.C. Cir. 1996).[6]  The control inquiry ensures that an agency's mere physical possession of certain documents is not sufficient, in and of itself, to establish that documents are agency records.  See Ryan v. Department of Justice, 617 F.2d 781, 785 (D.C. Cir. 1980).  Indeed, this important distinction between mere possession and legal control is an issue "whenever confidential congressional documents or materials from the President's immediate staff come into the possession of an agency."  Id. (rejecting a "standard that automatically made such records subject to FOIA disclosure as soon as they are transferred to agency hands").

### a.  The OVP Controls the Creation and Disposition of WAVES Records

Plaintiff's request implicates two different sets of records, but neither is an agency record

---

[6]  In United We Stand, the D.C. Circuit suggested that the second of these factors takes on special prominence in cases where the documents at issue were "created and possessed by the agency 'in the legitimate conduct of its official duties,'" in distinction to cases in which the documents were either not created by the agency or are not in its possession.  359 F.3d at 602-03 (quoting Tax Analysts, 492 U.S. at 145).  The WAVES records were not created by the Secret Service.  The OVP spurs the generation of a WAVES record by requesting that the proposed visitor be admitted to the Complex, and it provides the information that serves as the core of these records, namely, the visitor's name, date of birth, and Social Security number; the time and location of the planned visit; the name of the pass holder submitting the request; and, the date of the request.  See Morrissey Decl. ¶ 7.  The Secret Service uses this information to determine whether there is any protective concern in admitting the individual, and sometimes includes in WAVES records the results of the background check and the actual time and place of the visit.  See id.; O'Donnell Decl. ¶ 10.  But even if the Court finds that the Secret Service creates WAVES records, they are not agency records because the Secret Service and the OVP agree that the OVP has controlled, and continues to control, these records.  Morrissey Decl. ¶ 10; O'Donnell Decl. ¶ 11.

under FOIA.  The first set of records are records, from October 2004 to the present, of visits <u>to</u>

certain specified people in the OVP, most of the offices of which are physically located in the

White House complex.  <u>See</u> Morrissey Decl. ¶¶ 4, 5; O'Donnell Decl. ¶¶ 9-10.  Two systems –

collectively termed the White House Access Control System ("WHACS") – exist for controlling

and monitoring access to the White House Complex: (1) the WAVES and (2) the ACR.  <u>See</u>

Morrissey Decl. ¶ 5.  WAVES records consist of records generated when information is

submitted by a White House Complex pass holder to the Secret Service about workers and

visitors who need access to the White House Complex, including OVP, to conduct business or

attend social events.  <u>Id.</u> ¶ 7.  WAVES records include the following information submitted by

the pass holder: the visitor's name, date of birth, and Social Security number; the time and

location of the planned visit; the name of the pass holder submitting the request; and the date of

the request.  <u>Id.</u>; O'Donnell Decl. ¶ 10.  Only WAVES records are relevant to plaintiff's request

insofar as it pertains to records of visits to the OVP because ACR records do not reveal who was

visited, and the identity of the visitee is the focal point of plaintiff's request.  Morrissey Decl. ¶ 5;

Lyerly Decl. ¶ 3.  Accordingly, ACR records are not responsive to plaintiff's request.

The WAVES records sought by plaintiff are not agency records under FOIA because they

are not controlled by the Secret Service.  Morrissey Decl. ¶¶ 9-10;  O'Donnell Decl. ¶¶ 11-12.

Indeed, the records are created subject to an understanding that they are under the OVP's control.

Morrissey Decl. ¶¶ 9-10;  O'Donnell Decl. ¶¶ 11-12.  WAVES requests are generated by

employees working in the OVP; when OVP employees submit a request for OVP, which

provides information about an individual invited to conduct business or attend a social event,

OVP provides the information for a very limited time and purpose, without any intent for OVP to

relinquish control over those records or that information.  Morrissey Decl. ¶¶ 9-10; O'Donnell

Decl. ¶¶ 10-11. Quite the contrary, WAVES information has been transferred to the Secret

Service with the clear expectation that the resulting document would be returned to the OVP

(through its agent, the White House Office of Records Management [also "WHORM"]), for

archival preservation under the Presidential Records Act (44 U.S.C. 2207), as soon as practicable

after the visitor was admitted.  Morrissey Decl. ¶ 10; O'Donnell Decl. ¶ 12.  This expectation

both evinces the OVP's retention of ultimate control over the records and (relevant to the second

factor) has the practical effect of limiting the Service's effective control over those records.

Indeed, the OVP's requirement that the records be returned deprives the Service of the authority

simply to dispose of the records as it sees fit.  Morrissey Decl. ¶ 10; see generally Katz v. NARA,

68 F.3d 1438 (D.C. Cir. 1995) (Autopsy records in the possession of the National Archives were

not agency records as they were controlled by President Kennedy's estate.)  Thus, under the first

two factors of the United We Stand test for control, 359 F.3d at 599, it is clear that the OVP

intends to control, and has controlled, the requested records, and that the Secret Service has no

ability to dispose of them except as OVP directs.

As to the third factor, the Secret Service makes only minimal use of WAVES records.

Morrissey Decl. ¶¶ 9-10.  It uses the information submitted by White House passholders to run

its criminal background checks—a process that takes only a few minutes—and then to verify on

the day of the visit that the visitor has been cleared to enter the White House.  Id. ¶ 9.  Beyond

these two narrow functions, the WAVES records are almost wholly irrelevant to the operation of

the Secret Service.  Id. at ¶ 10.  Thus, as described above, once the visit actually occurs, the

Service no longer has any need sufficient to justify preservation or retention of these records, id.;

18

it has them temporarily only under OVP control, O'Donnell Decl. ¶¶ 11-12. .  Accordingly (and

relevant to the fourth factor), the Service does not integrate the WAVES documents into its

ordinary record keeping systems; instead, those documents are maintained in an entirely separate

system, which is used only for the task of regulating entry into the White House Complex, and

that helps facilitate the ultimate return of the documents to the WHORM.  Morrissey Decl. ¶ 10;

O'Donnell Decl. ¶ 12.  These reasons all illustrate why, although the Secret Service does have

the records for a limited time, it does not exercise legal control over those documents.  Instead,

the records are Vice Presidential records under the ultimate control of the OVP.

### b.  The Vice President Controls the Records of Who Enters His Home

Plaintiff also seeks records of all visits to the Vice President's Residence, from October

2004 to the present, by anyone who is not a member of the Vice President's family.  Lyerly Decl.

¶ 3.  These records are not agency records under FOIA.  The Secret Service monitors and

controls access to the Vice President's residence through the use of two lists: a daily access roster

for individuals with appointments or work orders, and a permanent access list for those

individuals who regularly come to the residence such as OVP staff members, contractors,

military personnel, and the Vice President's family members.  Morrissey Decl. ¶ 11.  Both the

permanent access list and the daily access roster are provided to Secret Service officers at

entrances to the residence's grounds and reflect that the individual requested for entry has been

screened by the Secret Service.  Id.  The names of individuals who actually enter on a particular

day are handwritten on an entry log by the officer working at the gate where the individual

arrives.  Id.; O'Donnell Decl. ¶ 13.  The entry log is the ultimate record created from the initial

request for entry.  Morrissey Decl. ¶ 11.  At the end of each month, these logs are turned over to

the Vice-President's staff.  Morrissey Decl. ¶ 12; O'Donnell Decl. ¶ 14.  Prior to June 19, 2006,

daily, the Secret Service purged, from the computer on which it is stored, the daily access

information that had turned 31-days old that day, and at the end of each day, disposed of the

paper daily access rosters.  Morrissey Decl. ¶ 12.  On June 19, the Secret Service initiated the

process of retaining copies of the daily access list, the daily access roster, and the post entry logs.

Id.

        The Secret Service does not control any of the records related to visits to the VPR.  It is

the understanding between the Secret Service and the OVP that the OVP exercises exclusive

control over materials generated in the visitor clearance and entry process to the residence (other

than documents containing information of protective interest such as criminal history printouts).

Morrissey Decl. ¶ 13; O'Donnell Decl. ¶¶ 13-16.  As with WAVES records, when a person needs

to be admitted to the Vice President's Residence, OVP personnel will provide identifying

information to the Secret Service (name, date of birth, Social Security number, and the date and

time of scheduled appointment) to facilitate the clearance process.  Morrissey Decl. ¶ 13.  The

Vice President's staff provides this information for a very limited time and purpose – to allow the

Secret Service to run criminal background checks and authorize admission – without any intent

to relinquish control over those records or that information.  O'Donnell Decl. ¶¶ 14-16.   Given

the fleeting value of this information to the Secret Service, it has not and does not integrate the

documents generated in the clearance and admission process (other than documents containing

materials of protective interest, such as criminal record printouts) into its ordinary record keeping

systems.  Morrissey Decl. ¶¶ 12-13. The temporary alteration of the Secret Service's practices

that began on June 19, id. ¶ 12, does not materially change the analysis because this change does

20

not reflect a change in either the Vice President staff's or the Secret Service's use of or understanding of who controls these records; it simply reflects an attempt to preserve records given the prospect of litigation.[7]  Id.

Finally, the Secret Service does not control the post entry logs.  The post entry logs are subject to an understanding that they are under the control of the OVP.  Morrissey Decl. ¶ 13; O'Donnell Decl. ¶¶ 13-16.  The Secret Service's long-standing practice of transferring of these records to the OVP at the end of every month evinces this understanding.  Morrissey Decl. ¶ 12; O'Donnell Decl. ¶ 14.  It also demonstrates that the Secret Service does not have the ability to use and dispose of these records as it sees fit; the OVP requires that the Secret Service turn over these records at the end of every month.[8]  O'Donnell Decl. ¶¶ 13-16.  Again, the change in practice initiated on June 19, 2006, reflects nothing more than an effort to preserve records, given the prospect of litigation.  Morrissey Decl. ¶ 12.

Under every aspect of this Circuit's four-part test for determining control, records of visits to the OVP and the VPR are clearly controlled by OVP, and thus cannot be construed as agency records under FOIA.  This outcome accords with common sense.  The records – detailed snapshots of the comings and goings at White House Complex and the VPR – capture the workings of the OVP and the details of the Vice President's private life; they do not illuminate the functioning of the Secret Service.  Plaintiff's assertion that these records constitute agency

---

[7] The United We Stand analysis in footnote 5 applies to the daily access rosters as it applies to WAVES records.  For the reasons provided in that footnote, the Secret Service does not create the daily access rosters, but even if it does, the parties agree that OVP controls the daily access rosters.

[8] Also, the Secret Service does not regularly rely the logs or integrate them records into its records system (it transfers them to the OVP).

records thus fundamentally distorts their nature.  And this distortion is not harmless.  As

mentioned above and detailed below, plaintiff's broad request threatens the core deliberative

processes of the OVP, and the Vice President's (and his family's) right to personal privacy.

> **2.    The Doctrine of Constitutional Avoidance Requires Construing FOIA So as
> to Not Conflict With the Confidentiality Afforded to the Vice President**

It is a well established principle of statutory interpretation that "if an otherwise acceptable

construction of a statute would raise serious constitutional problems, and [ ] an alternative

interpretation of the statute is fairly possible, [courts] are obligated to construe the statute to

avoid such problems."  INS v. St. Cyr, 533 U.S. 289, 299-300 (2001) (internal citations and

quotations omitted).  This principle "not only reflects the prudential concern that constitutional

issues not be needlessly confronted, but also recognizes that Congress, like th[e] Court, is bound

by and swears an oath to uphold the Constitution."  Edward J. DeBartolo Corp. v. Fla. Gulf Coast

Bldg. & Construction Trades Council, 485 U.S. 568, 575 (1988); see also Public Citizen v.

United States Dep't of Justice, 491 U.S. 440, 466 (1989).

 For the foregoing reasons, it is apparent that, even apart from constitutional

considerations, the records sought by plaintiff are not "agency records" subject to FOIA.  In any

event, when analyzing the control factors under FOIA, the Court should take care to construe the

statute in such a way so as to avoid a violation of the Constitution.  Public Citizen, 491 U.S. at

466.  If the Court were to interpret FOIA to apply to records sought here – nearly two years'

worth of records of all visits to the Vice President and key members of his staff in the OVP and

all visits to the VPR (with a narrow exception to the latter for the Vice President's family) –  then

the Vice President's ability to discharge his official functions, including his executive functions,

would be hindered because his freedom "to seek confidential information from many sources, both inside the government and outside" will have been compromised. In re Cheney, 406 F.3d at 727.

Courts consider the potential for interference with the effective functioning of the presidency and vice presidency when interpreting statutes. See Franklin v. Massachusetts, 505 U.S. 788, 800-801 (1992) (construing the Administrative Procedure Act ("APA") not to apply to the President). Indeed, the courts (in line with FOIA's legislative history) have decided that the President and Vice President are not agencies under FOIA because application of that statute to the President and Vice-President could interfere with their ability to discharge their constitutional duties. See Kissinger v. Reporters Committee for Freedom of the Press, 445 U.S. 136 (1980); Soucie v. David, 448 F.2d 1007, 1073 (D.C. Cir. 1971); Armstrong v. Executive Office of the President, 1 F.3d 1274, 1292 (D.C. Cir. 1993); Meyer v. Bush, 981 F.2d 1288, 1295 (D.C. Cir. 1993). Plaintiff should not be able to end run the constitutional protections afforded the OVP by seeking the very same information instead from the service assigned to protect the Vice President from harm; the whole point of exempting the OVP from FOIA was to avoid the kind of intrusion into the OVP's deliberative processes that would follow from construing FOIA to require the production of the records sought by plaintiff.

Granting plaintiff's request for records would clearly trench on the Vice President's ability to discharge his official functions, including his executive functions. "It is well established that a President's [and a Vice President's] communications and activities encompass a vastly wider range of sensitive material than would be true of any ordinary individual." Cheney v. U.S. Dist. Court, 542 U.S. at 381 (internal quotation omitted). It is also well established that

to enable the Vice President to most effectively make policy decisions and recommendations, he "must be free to seek confidential information from many sources, both inside the government and outside." In re Cheney, 406 F.3d at 728. Releasing the records sought by plaintiff would impinge on the confidentiality of the Vice President's communications and undermine his ability to make effective policy decisions and recommendations. O'Donnell Decl. ¶ 6. Indeed, it was this very principle that the Vice President successfully defended in Cheney, supra. O'Donnell Decl. ¶ 6.

Plaintiff's FOIA request is exceedingly broad: it seeks the access records for of all people who have visited the Vice President or any of a dozen officials in the OVP over the past two years and for all visitors to the VPR (who are not members of the Vice-President's family). Lyerly Decl. ¶ 3. Ordering these records to be produced would lay bare the most confidential inner workings of the Office of the Vice President, exposing the deliberations of the OVP, including whom the Office chose to hear from and when, and would chill information-gathering and internal debate in the OVP. Interpreting FOIA not to authorize this request is also required by the Supreme Court's instruction that "special considerations control when the Executive Branch's interest in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated." Cheney v. U.S. Dist. Ct., 542 U.S. at 385 (citation omitted). As explained above, there is ample evidence that, under the relevant legal standard, OVP controls the requested records, not the Secret Service. As a result, plaintiff simply cannot show a likelihood of success on the merits.[9]

---

[9] If the Court interprets FOIA to require the release of the records sought by plaintiff, then for the reasons elaborated above, FOIA runs afoul of the Constitution.

3.    **Even if the Requested Records Were Agency Records, They Are Exempt From Disclosure**

a.    **The Requested Records are Exempt Under Exemption 5**

The records plaintiff seeks are exempt from FOIA pursuant to Exemption 5 even if they are deemed to be agency records. Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). The Supreme Court has interpreted this language to "exempt those documents . . . that are normally privileged in the civil discovery context." NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149 (1975). Accordingly, Exemption 5 incorporates the privileges that are available to an agency in civil litigation, the three principal ones being the deliberative process privilege, the attorney-client privilege, and the attorney work product privilege. See id. at 148-49; see also Martin v. Office of Special Counsel, 819 F.2d 1181, 1185 (D.C. Cir. 1987). The first of these – the deliberative process privilege – applies to the WAVES records reflecting who met with the Vice President and his advisors.[10]

The purpose of the deliberative process privilege is to encourage frank discussion of legal and policy issues within the government, and to protect against public confusion resulting from disclosure of reasons and rationales that were not ultimately the bases for executive decision. See, e.g., Mapother, 3 F.3d at 1537; Russell v. Department of the Air Force, 682 F.2d 1045, 1048 (D.C. Cir. 1982); Montrose Chemical Corp. v. Train, 491 F.2d 63, 70 (D.C. Cir. 1974). The type of document at issue is immaterial, as "Congress enacted Exemption 5 to protect the executive's

---

[10] The presidential and vice presidential communications privilege, also encompassed within Exemption 5, applies with equal force. See Judicial Watch v. Dep't of Justice, 365 F.3d 1108, 1112 (D.C. Cir. 2004).

deliberative processes – not to protect specific materials." <u>Dudman Communications Corp. v. Dep't of the Air Force</u>, 815 F.2d 1565, 1568 (D.C. Cir. 1987); <u>accord</u> <u>Schell v. HHS</u>, 843 F.2d 933, 940 (6th Cir. 1988) ("Because Exemption 5 is concerned with protecting the deliberative process itself, courts now focus less on the material sought and more on the effect of the material's release."). Thus, the privilege protects the deliberative process itself; the deliberative process privilege protects the deliberations of White House (and OVP) employees even though the White House and OVP are not an agency. <u>Judicial Watch, Inc. v. Dep't of Energy</u>, 412 F.3d 125, 130 (D.C. Cir. 2005).

Release of the materials sought by Plaintiff would be akin to producing calendars, exposing the meeting schedules of the Vice President and his advisors, thereby exposing the deliberative workings of the Office of the Vice President, including whom the Office chose to hear from and when, and would chill debate in OVP and the Executive Branch. <u>See</u> O'Donnell Decl. ¶ 6. As such, the material is protected by Exemption 5. <u>See, e.g.</u>, <u>Petroleum Info. Corp. v. Dep't of the Interior</u>, 976 F.2d 1429, 1438 (D.C. Cir. 1992) (it is proper to withhold information that "would unveil the agency's reasoning by showing what it considered relevant (and irrelevant)"); <u>Brinton v. Dep't of State</u>, 636 F.2d 600, 604-06 (D.C. Cir. 1980) (names of attorneys advising Secretary of State were properly withheld pursuant to Exemption 5); <u>see also</u> <u>Wolfe v. HHS</u>, 839 F.2d 768, 775 (D.C. Cir. 1988) (factual information that "would reveal the timing of the deliberative process" was properly withheld); <u>Dudman</u>, 815 F.2d at 1569 (information is protected where release would "stifle the . . . candid exchange of ideas").

26

> **b.    Records Concerning Visits to the Vice President's Home Are Exempt from FOIA Pursuant to Exemption 6**

Records concerning visits to the Vice President's residence -- which is provided to him by statute (see 3 U.S.C. § 111 note) to be his private home -- also are exempt from disclosure under FOIA Exemption 6, which exempts information about individuals in "personnel and medical and similar files" where the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." See 5 U.S.C. § 552(b)(6). Exemption 6 was "intended to cover detailed government records on an individual which can be identified as applying to that individual." United States Dep't of State v. Washington Post Co., 456 U.S. 595, 602 (1982). It therefore protects personal information contained in any government file so long as that information "applies to a particular individual." Id. at 602; see also New York Times Co. v. NASA, 920 F.2d 1002, 1006 (D.C. Cir. 1990) (en banc). This "minimal" threshold "ensures that FOIA's protection of personal privacy is not affected by the happenstance of the type of agency record in which personal information is stored." Washington Post Co. v. Dep't of Health & Human Servs., 690 F. 2d 252, 259 (D.C. Cir. 1982).

Exemption 6 requires an agency to balance the individual's right to privacy against the public's interest in disclosure. See United States Dep't of the Air Force v. Rose, 425 U.S. 352, 372 (1976). Where, as here, there is a protectable privacy interest, the agency must weigh that privacy interest against the public interest in disclosure, if any. See Reed, 927 F.2d at 1251.

The Vice President's Residence is, of course, a home to him and his family, see Pub. L. 93-346 (codified at 3 U.S.C. § 111 note), and the Secret Service's presence there is intended to protect the Vice President and his family, see 18 U.S.C. § 3056(a)(1)-(2); 18 U.S.C.

§ 3056A(a)(4), (6), not to invade their personal privacy by making records regarding whom they may meet subject to public scrutiny.  And invading personal privacy is precisely what Plaintiff's FOIA request – seeking records pertaining to every non-family visitor to the Vice President's home over a nearly two year period – would do.  Privacy encompasses the "individual's control of information concerning his or her person," including "the prosaic (e.g., place of birth and date of marriage) as well as the intimate and potentially embarrassing." Painting & Drywall Work Preservation Fund, Inc. v. Dep't of Housing & Urban Dev., 936 F.2d 1300, 1302 (D.C. Cir. 1991) (quotation omitted).  And the sanctity of one's personal residence has long been recognized as a particularly important privacy interest. Cf. Boyd v. United States, 116 U.S. 616, 630 (1886) (noting "the sanctity of a man's home and the privacies of life").

In contrast to these obviously significant privacy interests, Plaintiff has provided no basis for finding a significant public interest in the disclosure of the identity of every non-family visitor to the Vice President's home over a nearly two year period.  As such, these documents are protected by Exemption 6.[11]

---

[11] Narrower exemptions also apply to the records at issue.  Pursuant to FOIA Exemption 6 and 7(c), the Social Security numbers and dates of birth of named individuals would be exempt and appropriate for redaction in order to protect those individuals from unwarranted invasions of their privacy. Cf. Morrissey Decl. ¶ 7.  Exemption 6 protects those matters "the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).  Exemption 7(c) protects law enforcement information that, if disclosed, could reasonably be expected to constitute an unwarranted invasion of personal privacy. Id. at § 552(b)(7)(c).  Also, information from background checks performed by the Secret Service and coded information containing instructions to officers of the Secret Service would be exempt and appropriate for redaction pursuant to FOIA Exemptions 2(high), 6, 7(c), and 7(e). Cf. Morrissey Decl. ¶ 7.  Exemption 2(high) protects information that, if disclosed, would increase the risk that the law would be circumvented. " 5 U.S.C. § 552(b)(2).  Exemption 7(e) affords protection to all law enforcement information that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk

III.     **THE REQUESTED PRELIMINARY INJUNCTION WILL SUBSTANTIALLY INJURE OTHER INTERESTED PARTIES AND HARM THE PUBLIC INTEREST**

As discussed above, the requested preliminary injunction – really a request for final judgment on the merits – would substantially injure another interested party, the Vice President, by infringing on his ability to perform his official functions, including his executive functions. See supra pp. 22-24.  The requested injunction would harm the public interest for the same reason; undoubtedly, the public has a vital interest in the Vice President being able to effectively discharge his official functions.  See id.  Moreover, the public is harmed by the granting of preliminary injunctive relief because by bringing this FOIA suit in the guise of a motion for emergency relief, plaintiff is leaping ahead of other litigants and other FOIA requesters who have neither the resources nor the sophistication of this plaintiff.

Plaintiff's claim that the public interest favors the disclosure of the records because the public has a strong interest in seeing that agencies adhere to their statutory mandates is unfounded.  See Pl. Memo at 18.  The Secret Service has abided by the governing statutes.  The Secret Service provided expedited processing as it said it would, and FOIA does not require the Secret Service to produce the records sought by plaintiff.  Finally, plaintiff does not argue that public's interest in the information being released before the mid-term election militates in favor of the requested relief, id., and this argument would fail in any case because it is entirely speculative – plaintiff has no evidence to suggest that the records would reveal anything that would be relevant to the Congressional elections.

---

circumvention of the law."  Id. at § 552(b)(7)(e).

## CONCLUSION

For the reasons stated herein, plaintiff has failed to demonstrate any entitlement to a preliminary injunction. Plaintiff's motion should be denied.

Dated: October 14, 2006                    Respectfully submitted,


                                            PETER D. KEISLER
                                            Assistant Attorney General

                                            JEFFREY A. TAYLOR
                                            United States Attorney

                                            CARL J. NICHOLS
                                            Deputy Assistant Attorney General

                                            JOSEPH H. HUNT
OF COUNSEL:                                 Branch Director

MOLLY WEBER                                 s/ Justin M. Sandberg
United States Secret Service                ELIZABETH J. SHAPIRO
                                            (D.C. Bar No. 418925)
                                            Assistant Branch Director
                                            SARA CLASH-DREXLER
                                            (Pa. Bar No. 86517)
                                            Trial Attorney
                                            JUSTIN M. SANDBERG
                                            (Ill. Bar. No. 6278377)
                                            Trial Attorney
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            20 Massachusetts Avenue, N.W. #7224
                                            P.O. Box 883 Ben Franklin Station
                                            Washington, D.C. 20044
                                            Telephone: (202) 514-3489
                                            Facsimile: (202) 616-8202
                                            E-mail: justin.sandberg@usdoj.gov

                                            Attorneys for Defendant

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE WASHINGTON POST,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>HOMELAND SECURITY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 06-1737 (RMU) |

## DECLARATION OF CLAIRE M. O'DONNELL, ASSISTANT TO THE VICE PRESIDENT AND DEPUTY CHIEF OF STAFF, OFFICE OF THE VICE PRESIDENT

I, Claire M. O'Donnell, hereby DECLARE:

1.      I am, and have been since January 20, 2001, an employee of the Vice President of the United States appointed by the Vice President pursuant to 3 U.S.C. § 106.  My title is Assistant to the Vice President and Deputy Chief of Staff.  In that capacity, I am responsible for all aspects of the administration and operations of the Office of the Vice President.  Within my area of responsibility is the records management policy and operations of the Office of the Vice President.

2.      This Declaration is based on my personal knowledge and on information available to me in my official capacity.

## THE OFFICE OF THE VICE PRESIDENT

3.      The Vice President performs both executive functions, as recognized by 3 U.S.C.

§ 106, and legislative functions as President of the Senate under the Constitution.  The personnel

employed by, or assigned or detailed to, the Vice President consist of employees paid from the

Vice President's executive appropriations, employees paid from the Vice President's legislative

appropriations, and employees assigned or detailed to the Vice President by executive branch

departments and agencies.  The aggregation of the Vice President and these employees is called

the Office of the Vice President ("OVP").  The personnel in the OVP perform their official

duties at the White House, in the Eisenhower Executive Office Building, at the Vice President's

official residence (*see* 3 U.S.C. § 111 note), and at other locations (including when the Vice

President is traveling).

4.      In the course of conducting activities which relate to or have an effect upon the

carrying out of the constitutional, statutory, or other official or ceremonial duties of the Vice

President with respect to his executive functions, the personnel employed by or assigned or

detailed to the Vice President create or receive records that relate to or have a direct effect upon

the carrying out of those functions.  As provided by 44 U.S.C. § 2207, such records are Vice

Presidential records and the Vice President handles them in accordance with chapter 22 of Title

44.

## RECORDS POLICY OF THE OFFICE OF THE VICE PRESIDENT

5.      From the inception of the Vice Presidency of Richard B. Cheney on January 20,

2001 and after, it was the intent of the OVP, and it was the actual conduct of the OVP, to retain

and not relinquish to anyone control over the records created or received by Vice Presidential

personnel.  The Vice President has resolutely protected Vice Presidential executive records to

preserve the effective functioning of the Vice Presidency under the Constitution. Therefore, it is

the policy of the OVP to maintain control, consistent with the law, over information, documents

and other material relating to the operation of the OVP, so as to preserve the effective

functioning of this Office.

6.     This policy of maintaining control applies in particular with respect to the

movements, appointments and schedule of the Vice President and Vice Presidential personnel.

Systematic public release of the information regarding when and with whom the Vice President

and Vice Presidential personnel conduct meetings would impinge on the ability of the OVP to

gather information in confidence and perform its essential functions, including assisting the Vice

President in his critical roles of advising and assisting the President. The ability of the Vice

President to conduct these functions in confidence is critical to the effective functioning of the

Presidency and Vice Presidency. If the Vice President or the personnel who perform official

duties in the Office of the Vice President must expect public dissemination of with whom they

meet to gather information and advice, they would, as a matter of human nature, be chilled from

meeting with useful sources of information and advice, and individuals outside of the OVP

would be equally chilled in sharing information with the OVP. It was this principle of

confidentiality to ensure the effective functioning of the Vice Presidency that the Vice President

successfully defended in a similar context in *Cheney v. United States District Court for the

District of Columbia*, 542 U.S. 367 (2004), and related cases.

7.     It is the policy of the OVP that documents and materials that relate to Vice

Presidential support of Presidential functions are preserved as Vice Presidential executive

records in accordance with the Presidential Records Act (44 U.S.C. § 2207). This includes the

information that OVP inputs into, and receives as the output of, United States Secret Service-

operated systems that facilitate clearance of visitors to the OVP in the White House Complex (by which I refer to the 18.07 acre area defined as the White House in Public Law 87-286) and to the Vice President's Residence, and any documents derived from that information.

## RECORDS RELATING TO ACCESS TO THE OFFICE OF THE VICE PRESIDENT AND VICE PRESIDENT'S RESIDENCE

8.      By law, the U.S. Secret Service of the Department of Homeland Security ("Secret Service") has a duty to protect the Vice President, members of the Vice President's immediate family, and the Vice President's Residence and other facilities in which the Vice President is from time to time located (see, e.g., 18 U.S.C. § 3056(a), 18 U.S.C. § 3056A).   It is vitally important to the United States that Secret Service protect the Vice President so that he can perform effectively his official functions.

9.      As part of its protective function, the Secret Service provides protective services for and controls access to (a) the White House Complex, which includes much of the office space used by the Office of the Vice President, and (b) the Vice President's Residence.

10.     I am generally familiar with the records control systems for the White House Complex and Vice President's Residence.  When the Vice President or other OVP personnel want to arrange an appointment for a visitor to the White House Complex, OVP personnel will input into the Secret Service-operated Worker and Visitor Entrance System ("WAVES"), identifying information relating to the visitor (such as name, date of birth, and social security number) and the time and location of the scheduled meeting.  The Secret Service then makes use of the information to determine whether there is any protective concern with giving that visitor access to the White House Complex for the meeting.  Once that individual is cleared into the White House Complex, the visitor is issued an appropriate badge.  Upon swiping that badge on a badge reader, the visitor's entry is recorded in an Access Control Record by the Secret Service.

4

11.    In accordance with the policies described above, it has been the understanding

and practice of the OVP that the information provided by the OVP to the Secret Service in order

to facilitate appointments for the OVP within the White House Complex, and any records

generated therefrom that do not relate to the Secret Service's continuing protective function, are

under the exclusive legal control of the OVP and are Vice Presidential records under 44 U.S.C. §

2207. This understanding applies to documents generated using the information provided by the

OVP to the Secret Service.

12.    Since at least January 20, 2001, it has been the practice of the Secret Service to

transfer WAVES records on CD-ROM to the White House Office of Records Management (the

"WHORM") every 30 to 60 days. The WHORM preserves WAVES records relating to OVP

meetings and appointments on behalf of the OVP pursuant to a mutual understanding that

WHORM will hold and manage OVP records, with legal possession, custody and control of the

records remaining with the OVP. This understanding and practice, dating back at least to

January 20, 2001, is that WAVES records remain at all times under the exclusive legal custody

and control of the Office of the Vice President for visitors to the Office of the Vice President and

are Vice Presidential records for purposes of the Presidential Records Act (44 U.S.C. § 2207).

13.    This understanding and practice is similar with respect to entry records for the

Vice President's Residence.  As with WAVES records, when an official or personal visitor to

the Vice President's Residence has an appointment, OVP personnel will provide identifying

information to the Secret Service (name, date of birth, social security number, date and time of

scheduled appointment) in order to facilitate the appropriate clearance process.  As it does with

visitors to the White House Complex, Secret Service then makes use of the information to

determine whether there is any protective concern with giving that visitor access to the Vice

President's Residence. Once that individual is cleared into the Vice President's Residence, the entry of the individual into the Residence complex is recorded manually on an entry log kept by the Secret Service at access control points to the Residence.

14.    OVP provides this identifying information to the Secret Service with the understanding that the information and any materials derived from it which do not relate to the Secret Service's ongoing protective function remain in the exclusive ownership, custody and control of OVP. In accordance with that practice, starting in June 2001, the Secret Service has returned to the OVP on a monthly basis (dating back to January 2001) all entry logs kept by the Secret Service at the Vice President's Residence, showing identity of visitor and time and date of entry.

15.    The OVP preserves all entry and access control records periodically returned by the Secret Service to OVP as Vice Presidential executive records under the Presidential Records Act (44 U.S.C. § 2207). In the case of WAVES records, those records are kept physically by WHORM on behalf of OVP.

16.    As is reflected above, the OVP provides information to the Secret Service for access clearance solely for the limited purpose of Vice Presidential protection, on condition of confidentiality, and with the information, and records containing it, remaining in the exclusive ownership, custody and control of the Vice President, all in a manner consistent with the Presidential Records Act (44 U.S.C. § 2207).

I declare under penalty of perjury, pursuant 28 U.S.C. § 1746 that the foregoing is true and correct.  Dated this 13 day of October 2006.


_Claire M. O'Donnell_
Claire M. O'Donnell

# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

THE WASHINGTON POST,       )
                                 )
       Plaintiff,          )
                                 )
       v.                   )        Civil Action No. 06-1737 (RMU)
                                 )
UNITED STATES DEPARTMENT OF    )
HOMELAND SECURITY,        )
                                 )
       Defendant.      )
                                 )

## DECLARATION OF PAUL S. MORRISSEY
## DEPUTY ASSISTANT DIRECTOR
## UNITED STATES SECRET SERVICE

I, Paul S. Morrissey, hereby make the following declaration:

       1.     I am the Deputy Assistant Director of the Office of Protective Operations for the

United States Secret Service (hereinafter "Secret Service"), which is a component of the

Department of Homeland Security ("DHS"). I have held this position since September, 2006,

and have been a special agent with the Secret Service since January, 1983.

       2.     The Secret Service is a protective and law enforcement agency operating under

the provisions of Title 18 of the United States Code, Sections 3056 and 3056A. Pursuant to

Section 3056, the Secret Service is charged with the protection of the President and Vice

President of the United States and their immediate families; major candidates for President and

Vice President of the United States and their spouses; the President-elect and Vice President-

elect and their immediate families; former Presidents of the United States, their spouses and

minor children; visiting foreign heads of state and heads of government; and other individuals as

directed by the President of the United States.  Additionally, the Secret Service is authorized to

provide security for the White House and the Vice President's official residence; foreign

embassies and missions in the Washington, D.C. area, and certain other locations within the

United States; designated events of national significance, including National Special Security

Events; as well as other locations.

3.     The Office of Protective Operations is one of eight directorates that manage

various operational and support functions within the Secret Service.  It is responsible for

establishing policies related to the Secret Service's protective mission and for overseeing the

operational divisions that protect the persons, places and events we are authorized by statute and

Executive Order to protect.

4.     The "White House Complex" as secured by the Secret Service includes the White

House, the Eisenhower Executive Office Building ("EEOB"), and the grounds encompassing the

EEOB and the White House, and the New Executive Office Building.  Housed in the White

House and the EEOB are the offices of various staff of the Executive Office of the President as

well as offices for the staff of the Office of the Vice President, including the Executive Branch

office of the Vice President himself.   The secured area of the White House Complex also

includes all of the office space used by the Office of the Vice President on the White House

Complex.

5.     It is my understanding that there has been a request by the Washington Post for

information concerning visitor access to the Office of the Vice President, including Access

Control Records ("ACR") and Worker and Visitor Entrance System ("WAVES") records.  These

2

same systems are used in connection with the monitoring of access of visitors to the White House

Complex, including the Executive Office of the President and the Office of the Vice President.

6.     ACR records consist of records generated when a pass holder, worker, or visitor

swipes his or her pass over one of the electronic pass readers located at entrances to and exits

from the White House Complex. ACR records include information such as the pass holder's

name and badge number, the time and date of the swipe, and the post at which the swipe was

recorded. ACR records do not include information about who the entrant is visiting in the

Complex.

7.     WAVES records consist of records generated when information is submitted by

an authorized White House pass holder to the Secret Service about workers and visitors who

need access to the White House Complex to perform work, conduct business, or attend events.

Authorized White House pass holders include members of both the President's and Vice

President's staff. WAVES records include the following information submitted by the

authorized pass holder: the visitor's name, date of birth, and Social Security number; the time

and location of the planned visit; the name of the pass holder submitting the request; and the date

of the request. They may also include limited information from background checks performed by

the Secret Service and coded instructions to Secret Service officers. Once a visit takes place,

WAVES records are typically updated electronically with information showing the actual time

and place of the visitor's entry into and exit from the White House Complex.

8.     Since at least 2001, it has been the practice of the Secret Service to transfer newly-

generated WAVES records on CD-ROM to the White House Office of Records Management (the

"WHORM") every 30 to 60 days. It was the intent of the Secret Service that once transferred to

3

the WHORM, the records were to be erased from its computer system. With regard to the time period at issue in the Washington Post's request (October 2004 to present), in October 2004, at the request of the National Archives and Records Administration, the Secret Service began temporarily retaining a copy of the WAVES records that it transferred to the WHORM.

9.     The information in WAVES records submitted by an authorized White House pass holder is provided to the Secret Service temporarily for two limited purposes: (1) to allow the Secret Service to perform background checks to determine whether, and under what conditions, to provide for the visitor's temporary admittance to the White House Complex; and (2) to allow the Secret Service to verify the visitor's admissibility at the time of the visit.

10.     Once a visitor's visit to the White House Complex is complete, the Secret Service has no continuing interest sufficient to justify preservation or retention of WAVES records, and the Secret Service does not control or direct the ultimate disposition or use of the records. Both the White House and the Office of the Vice President, respectively, do have such a continuing interest and therefore the records are turned over to the WHORM.

11.     The Vice President's residence, located at One Observatory Circle, Washington, D.C., is not part of the White House Complex, and the Secret Service does not use the WAVES or ACR systems at that site. The Secret Service provides security for the Vice President at the Vice President's residence. The Secret Service monitors and controls access to the Vice President's residence through the use of two lists: a daily access roster for individuals with appointments or work orders, and a permanent access list for those individuals who regularly come to the residence such as OVP staff members, contractors, military personnel, and the Vice President's family members. The Secret Service receives requests from the Vice President's staff

4

or from authorized Naval personnel to screen individuals for entry. The Secret Service conducts

background checks on individuals for whom there has been a request for admission (using

personal identifiers provided by the requester, including name, date of birth and Social Security

number), and the name then appears on the daily access roster or the permanent access list. Both

the permanent access list and the daily access roster are provided to Secret Service officers at

entrances to the residence's grounds and reflect that the individual requested for entry has been

screened by the Secret Service. The names of individuals who actually enter on a particular day

are handwritten on an entry log by the officer working at the gate where the individual arrives.

The entry log is the ultimate record created from the initial request for entry.

12.     It has been the Secret Service's consistent practice to transfer the entry logs to the

OVP on a monthly basis since 2001. Information contained in the daily access list database,

which generates the daily access roster, has been maintained by the Secret Service in electronic

form for thirty (30) calendar days.  Historically, on the thirty-first (31st) day, this daily access

information was manually purged from the computer on which it was stored. Similarly, the

Secret Service disposed of the daily access roster on a daily basis. The permanent access list has

been maintained on a computer database on an ongoing basis and updated to reflect changes in

authorized personnel. On June 19, 2006, the Secret Service issued a memorandum directing that

records concerning access to the Vice President's residence be maintained. The records were to

be maintained pending a judicial determination of their status.

13.     It is the understanding between the Secret Service and the OVP that the OVP

exercises exclusive control over materials generated in the visitor clearance and entry process to

the residence for the OVP, other than materials containing information of protective interest to the Secret Service, such as NCIC criminal history check results. The Secret Service has no continuing interest sufficient to justify preservation or retention of the daily access list data, permanent access lists, daily access rosters, and post entry logs.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing statements are true and correct to the best of my knowledge and belief.

_10/13/06_
Date

Paul S. Morrissey
Deputy Assistant Director
Office of Protective Operations
United States Secret Service

6

# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE WASHINGTON POST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 06-1737 (RMU) |
| UNITED STATES DEPARTMENT OF | ) | |
| HOMELAND SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### DECLARATION OF KATHY J. LYERLY
### SPECIAL AGENT IN CHARGE, LIAISON DIVISION AND
### FREEDOM OF INFORMATION AND PRIVACY ACTS OFFICER,
### UNITED STATES SECRET SERVICE

I, Kathy J. Lyerly, hereby make the following declaration:

1.    I am the Special Agent in Charge of the Liaison Division and the Freedom of

Information and Privacy Acts (FOI/PA) Officer for the United States Secret Service (hereinafter

"Secret Service"), which is a component of the Department of Homeland Security ("DHS").  I

have been the Secret Service FOI/PA Officer since December 28, 2003, and have been employed

with the Secret Service as a Special Agent (GS-1811) since October 26, 1987.

2.    DHS regulations, Title 6, Code of Federal Regulations, Section 5.4, and Appendix

A, II(I)(3), vest authority in the FOI/PA Officer, Secret Service, to make initial determinations as

to whether to grant Freedom of Information Act (FOIA), 5 U.S.C. § 552, requests for Secret

Service records (68 FR 4056, 4058, and 4069).

3.    As the Secret Service's FOI/PA Officer, I am familiar with The Washington

Post's ("Post's") FOIA request to the Secret Service. In a letter dated June 12, 2006, the Post

submitted to the Secret Service a FOIA request for "[a]ll records and visitor logs, including

WAVES and/or ACR records, from October 2004 to present, reflecting or concerning the entries

and/or exits of any persons who sought or were scheduled to visit the following people in the

Office of the Vice President: Vice President Cheney; David Addington, I. Lewis "Scooter"

Libby, C. Dean McGrath, Steven Schmidt, John Hannah, Eric Edelman, Ron Christie, Victoria

Nuland, Aaron Friedberg, Stephen Yates[,] Samantha Ravich, and David Wurmser." The request

further sought "[a]ll records and visitor logs, including WAVES and/or ACR records, from

October 2004 to present, reflecting or concerning the entries and/or exits of any persons, other

than members of the Cheney family, visiting the vice-president's residence." The request also

sought expedited processing.

      4.     The Secret Service acknowledged receipt of the Post's FOIA request by mailing

its standard letter dated June 16, 2006, which advised that the agency was processing the Post's

request. The letter also advised that the Post's request for expedited processing was denied. The

Post appealed the denial of expedited processing by letter dated July 12, 2006. On August 31,

2006, the Secret Service granted the appeal and determined that expedited processing was

appropriate.

      5.     On September 20, 2006, the Secret Service sent a letter notifying the Post

that the records it seeks "are not agency records subject to the FOIA." The letter stated further

that "these records are governed by the Presidential Records Act, 44 U.S.C. § 2201 et seq., and

remain under the exclusive legal custody and control of the White House and the Office of the

Vice President.  Accordingly, the Secret Service lacks the authority to provide such records in response to your request."

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing statements are true and correct to the best of my knowledge and belief.

_10/13/06_
Date

_Kathy J. Lyerly_
Kathy J. Lyerly
Special Agent in Charge, Liaison Division and
Freedom of Information and Privacy Acts Officer
United States Secret Service

3