**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE WASHINGTON POST,　　　　　　　)<br>　　　　　　　　　　　　　　　　)<br>　　　　　　　　Plaintiff,　　　　　)<br>　　　　　　　　　　　　　　　　)<br>　　　　　v.　　　　　　　　　　　)<br>　　　　　　　　　　　　　　　　)<br>UNITED STATES DEPARTMENT OF　　)<br>HOMELAND SECURITY,　　　　　　)<br>　　　　　　　　　　　　　　　　)<br>　　　　　　　　Defendant.　　　　)<br>　　　　　　　　　　　　　　　　) | Civil Action No. 06-1737 (RMU) |

## DEFENDANT'S MOTION FOR STAY PENDING APPEAL

Defendant the United States Department of Homeland Security respectfully moves the Court to stay its order of October 18, 2006 and memorandum opinion of October 19, 2006 and this action pending disposition of defendant's appeal from this order and memorandum opinion to the United States Court of Appeals for the District of Columbia Circuit.

In accordance with Local Rule 7(m), undersigned counsel for the defendant has conferred with counsel for the plaintiff in this action regarding the relief sought in this motion. Plaintiff has stated its intent to oppose this motion.

Dated: October 25, 2006

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

CARL J. NICHOLS

|  | Deputy Assistant Attorney General |
|---|---|

OF COUNSEL:

MOLLY WEBER
United States Secret Service

JOSEPH H. HUNT
Branch Director

_____/s_____
ELIZABETH J. SHAPIRO
(D.C. Bar No. 418925)
Assistant Branch Director
JAMES J. GILLIGAN
(D.C. Bar No. 422152)
Assistant Branch Director
SARA CLASH-DREXLER
(Pa. Bar No. 86517)
Trial Attorney
JUSTIN M. SANDBERG
(Ill. Bar. No. 6278377)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W. #7224
P.O. Box 883 Ben Franklin Station
Washington, D.C. 20044
Telephone:  (202) 514-3489
Facsimile:  (202) 616-8202
E-mail:  justin.sandberg@usdoj.gov

Attorneys for Defendant

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE WASHINGTON POST,<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF<br>HOMELAND SECURITY,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No. 06-1737 (RMU) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANTS' MOTION FOR A STAY PENDING APPEAL**

**INTRODUCTION**

Defendant has appealed from this Court's memorandum opinion and order of October 18 and 19, 2006, in which the Court granted plaintiff's motion for a preliminary injunction and directed the United States Secret Service, within 10 days' time, to complete the processing of documents responsive to plaintiff's June 12, 2006 Freedom of Information Act ("FOIA") request. See Notice of Appeal (filed today). Defendant seeks appellate review of the Court's injunction because, in defendant's view, the Court erred in concluding that documents subject to the legal custody and control of the Office of the Vice President ("OVP") under the Presidential Records Act, 44 U.S.C. § 2207, whose disclosure could impair the effective functioning of the Vice Presidency, must nevertheless be processed and disclosed by the Secret Service on a highly expedited timetable. The Court's order raises serious constitutional implications concerning the autonomy of the Vice Presidency under the Constitution and the confidentiality of its communications.

To preserve the government's rights, and to avoid irreparable harm to both the OVP and the Secret Service, defendant respectfully requests that this Court stay its October 18 and 19 orders pending disposition of that appeal.  A stay is called for under each of the factors that the Court must consider.  First, both the Vice President and the Secret Service face the prospect of immediate irreparable harm if a stay is denied.  As set forth in more detail below and in the accompanying declarations, the Vice President's staff could be forced to set aside their essential functions of advising and assisting the Vice President if it became necessary to review the tens of thousands of records at issue in order to invoke and explain FOIA exemptions on a document-by-document basis.  Such an extraordinary diversion of resources would impair the efficient functioning of the Vice Presidency – and deprive the Vice Presidency of the protection Congress intended by excluding the Vice Presidency from the FOIA.  For its part, the Secret Service would incur the enormous administrative burdens of manually cross-referencing tens of thousands of records in order to identify Access Control Records responsive to plaintiff's request.

In contrast, a stay would do no harm to plaintiff, nor disserve any public interest in disclosure that is safeguarded by the FOIA.  The FOIA protects no interest in publicly revealing the deliberative processes of the OVP, the sole interest asserted by plaintiff as a basis for expediting its request.[1]  Moreover, it is entirely conjectural, even if a stay were denied, that any documents disclosed in advance of November 7, 2006 (Election Day) would promote the plaintiff's objective of informing the public about what the plaintiff speculates might be "special

---

[1]  This is not the first case seeking to intrude into the Vice Presidency by attempting to track with whom the Vice President interacts.  See, e.g., Cheney v. U.S. Dist. Court, 542 U.S. 367 (2004); Judicial Watch v. U.S. Dep't of Energy, 412 F.3d 125 (D.C. Cir. 2005); Walker v. Cheney, 230 F. Supp. 2d 51 (D.D.C. 2002); Judicial Watch v. U.S. Naval Observatory, 160 F. Supp. 2d 111 (D.D.C. 2001).

interest" influence on the OVP.  Such a speculative interest in disclosure cannot outweigh the certain and irreparable harm to defendants if a stay is denied.

Finally, the merits of defendant's legal arguments on appeal favor entry of a stay.  First, defendant has presented serious and substantial arguments in support of its position that the records sought by the plaintiff are not agency records under FOIA, but are Vice Presidential records governed by the Presidential Records Act.  Indeed, the Court concluded that three of the four United We Stand factors support defendant's position.  See United We Stand America v. IRS, 359 F.3d 595, 599 (D.C. Cir. 2004).  The Court's ruling, which relies on the remaining United We Stand factor, was in error because it discounted the Vice President's continuing interest in the documents, and misapplied the doctrine of constitutional avoidance.  Second, plaintiff was not entitled to a preliminary injunction because the asserted loss of an abstract statutory right, namely, the right to expedited processing, and rank speculation that the records requested may contain information that would be important to voters in the forthcoming election, fall far short of the "certain and great" harm required to justify entry of a preliminary injunction. Third, the defendant is also likely to prevail on its contention that it need not produce Access Control Records because the search for such records would be unduly burdensome.

For all these reasons, as elaborated below, defendant's motion for a stay pending appeal should be granted.

## STATEMENT OF THE CASE

### Proceedings to Date

By letter dated June 12, 2006, plaintiff submitted the FOIA request at issue to the Secret Service, seeking all records from October 2004 to the present (1) "reflecting or concerning the

3

entries and/or exits of any persons who sought or were scheduled to visit" either the Vice

President or one of 12 Vice Presidential personnel identified in the request; and (2) "reflecting or

concerning the entries of any persons, other than members of the Cheney Family, visiting the

vice-president's residence." Pl. Mot. for Prelim. Inj., Exh. 1 ("Pl. Exh. 1"). Plaintiff also sought

expedited processing of its request, asserting an urgent need to promote the public's

understanding, in advance of the forthcoming congressional elections, of "the degree to which

lobbyists and special interest representatives" may have exerted influence on OVP. Id.

The Secret Service initially denied plaintiff's request for expedition, id., Exh. 2, but later

granted it upon plaintiff's administrative appeal. Id., Exhs. 3, 4. Thereafter, by letter dated

September 20, the Secret Service notified plaintiff that the records it had requested "are not

agency records subject to the FOIA," but, rather, are records "under the exclusive legal custody

and control of the White House and the Office of the Vice President" that the Secret Service

lacks authority to disclose. Id., Exh. 6.

Plaintiff filed this action against the Secret Service on October 10, 2006, and

simultaneously moved for a preliminary injunction requiring, inter alia, that defendant

"immediately process plaintiff's [FOIA] request and disclose the requested records within 10

days of the [C]ourt's order." Pl. Mot. for Prelim. Inj. at 1. The Court issued an Order granting

plaintiff's motion on October 18, directing defendant to "complete the processing of the

plaintiff's . . . FOIA requests and produce or identify all responsive records within 10 days."

The following day, October 19, 2006, the Court issued its Memorandum Opinion ("Mem.

Op.") setting forth its findings and conclusions in support of its decision to grant plaintiff's

motion. The Court first determined that plaintiff is likely to succeed on the merits of its claim

that the records requested are "agency records," created by and under the control of the Secret Service, rather than Vice Presidential executive records under the Presidential Records Act, 44 U.S.C. § 2207, and therefore were subject to processing (if not necessarily disclosure) under the FOIA. Mem. Op. at 9-20. Next, the Court found that plaintiff had demonstrated a potential for irreparable harm on the ground that "if the plaintiff's FOIA request does not receive expedited treatment," plaintiff "would lose out on its statutory right to expedited processing" of information "of vital public interest for an upcoming election." Id. at 21-22. Finally, the Court found that a preliminary injunction would inflict no harm on the Secret Service or the Vice President, because it had not yet ordered disclosure of any documents, and that the public interest would be served by "expedited processing of the plaintiff's request." Id. at 22-24. In conclusion, the Court ordered defendant to complete the processing of plaintiff's FOIA request, to "produce or identify all responsive records," and to submit a Vaughn index and declaration indicating its justifications for withholding any documents, "within 10 days of the date of this opinion." Id. at 24.

On October 23, the Court telephoned the parties' counsel to discuss further proceedings after completion of the ordered processing of plaintiff's FOIA request. The Court instructed that if defendant withholds any records based on one or more FOIA exemptions, then, in addition to its Vaughn index and supporting affidavits, defendant must also submit copies of the withheld documents to the Court for in camera inspection. The Court explained also that it wished to complete briefing of motions for summary judgment on the validity of defendant's withholdings by November 3, so that it could rule on the motions in advance of the forthcoming election.

Counsel for both parties responded that, based on the 10-day deadline established by the Court's October 19 opinion, Mem. Op. at 24, it was their understanding that defendant was not

5

required to complete the processing of plaintiff's FOIA request, or to submit its <u>Vaughn</u> index and supporting affidavit, until November 2, 2006, in accordance with Federal Rule of Civil Procedure 6(a).  Under those circumstances, counsel observed, it would be impracticable to complete briefing on motions for summary judgment by November 3.  Defendant's counsel explained further that the Secret Service had located tens of thousands of potentially responsive records that would have to be processed in order to comply with the Court's order, and that to complete the processing the Secret Service would have to enlist the assistance of knowledgeable OVP staff to review the documents for withholding on the basis of privilege or privacy.

Later that day, the Court again contacted the parties by telephone, and explained that when it had ordered defendant to complete its processing in "10 days," Mem. Op. at 24, its intention had been to establish a deadline of 10 calendar days, rather than 10 business days as would ordinarily have been the case under Rule 6.[2]  Accordingly, the Court instructed defendant to complete its processing and to make its submissions in support of its withholdings -- including <u>in camera</u> submission of the records withheld -- by Monday, October 30.  The Court then directed the parties further to propose a schedule under which summary judgment motions could be briefed and defendant's withholdings ruled upon by Friday, November 3.

### <u>Burdens of Compliance With the Court's Preliminary Injunction</u>

The Secret Service has located tens of thousands of records from the Worker and Visitor Entrance System ("WAVES") that are responsive to plaintiff's request for records reflecting visits at the White House Complex either to Vice President Cheney, or the Vice Presidential

---

[2]  The Court issued a standing order containing this clarification later that afternoon. Standing Order dated October 23, 2006, at 2 n. 4.

personnel identified in plaintiff's FOIA request. Supplemental Declaration of Paul S. Morrissey, ("Morrissey Supp. Decl.") (filed herewith), ¶ 15. In all likelihood, there are tens of thousands of Access Control Records ("ACRs") generated when these visitors entered the complex, as well as thousands of additional records reflecting visits to the Vice President's Residence. Id., ¶¶ 15, 20.

Many if not most of these thousands of records contain no information about the reason for a person's visit to OVP, or his or her affiliation with the Vice President, his family, his staff, or an outside organization. The Secret Service has no means of ascertaining from such records, or otherwise, whether a visitor was scheduled to meet with the Vice President or his staff on official business, was a friend or family member making a social call, or (except as indicated by the WAVES requester) a service worker, contractor, or repair person. Id., ¶¶ 17, 22; see Supplemental Declaration of Claire O'Donnell ("O'Donnell Supp. Decl."), ¶ 7 (filed herewith). If it were necessary, one-by-one, to distinguish records of official visits to the Vice President or his staff that would be subject to a claim of deliberative process (or other) privilege under FOIA Exemption 5, from records of personal visits subject to withholding on grounds of privacy under Exemption 6 or 7(C), or even, perhaps, from records of service workers scheduled to perform maintenance or repairs, then the Secret Service would have to refer the records to OVP and enlist the assistance of knowledgeable OVP personnel in order to process the documents. Morrissey Supp. Decl., ¶¶ 17, 22; O'Donnell Supp. Decl., ¶ 7. Reviewing so large a body of documents would place an enormous burden on the small number of personnel on whom the Vice President relies to advise and assist him in the performance of his official duties, thus intruding into and impairing the effective functioning of the Vice Presidency. O'Donnell Supp. Decl., ¶ 7; see id., ¶¶ 3-5.

**Management of WAVES and ACR Records**

The White House Access Control System (WHACS), which consists of WAVES and ACR records, has been designed as a single unitary system for recording the access of any person to the White House Complex. Morrissey Supp. Decl., ¶ 7. That system contains records relating to visits to the President and his staff and records relating to visits to the Vice President and his staff, commingled in the same database. Id. As noted in earlier declarations, Declaration of Paul S. Morrissey ("Morrissey Decl.") (filed with Def. Opp. to Pl. Mot. for Prelim. Inj.), ¶ 8, the Secret Service transfers WAVES and ACR records to the White House every 30 to 60 days on a CD-ROM that encompasses all of those access records commingled on a single CD-ROM.

With respect to records of the Vice President and his staff, the OVP has an arrangement with the White House Office of Records and Management (WHORM), under which WHORM manages records of the OVP on behalf of the Vice President. See Declaration of Claire M. O'Donnell, ¶ 12 (filed with Def. Opp. to Pl. Mot. for Prelim. Inj.). Those records remain subject to the control of the Vice President under the Presidential Records Act, 44 U.S.C. 2207. Id. WHORM serves as the agent of the Vice President with respect to such records for Presidential Records Act purposes. Id.

In May 2006, the WHORM and the Secret Service entered into a Memorandum of Understanding (the "Memorandum," or "MOU") that both documented past practice regarding White House Access Control System (WHACS) records and formalized the recognition of the legal status of those records and WHORM's custody and management of those WAVES and ACR records. See Morrissey Supp. Decl., ¶ 11 & Exh. 1, thereto. The Memorandum, by its terms, covers all WHACS records for access to the White House Complex, including records of

access to the Complex for purposes of visiting the Vice President and his staff.  See MOU, ¶ 8; Declaration of Paul S. Morrissey, Deputy Assistant Director, United States Secret Service ("Morrissey Decl.") October 13, 2006, ¶ 4 (attached to Defendant's Opposition to Plaintiff's Motion for a Preliminary Injunction). The Memorandum provides that WHACS records "whenever created" and "at all times" "are not Federal Records" or records of an agency subject to FOIA.  Id., ¶ 17.  The Secret Service has therefore expressly disclaimed that these are agency records.[3]

The Memorandum further establishes "exclusive legal custody and control" of WHACS records in the White House, which for these purposes must be construed to include the WHORM, acting on behalf of the Vice President, but not the Secret Service or any federal agency.  MOU, ¶ 18.  In addition, the Memorandum establishes that the information provided to the Secret Service for use in the access control system "is provided under an express reservation of White House control."  Id., ¶ 19.  The Memorandum applies to "[a]ny and all WHACS Records currently in the possession or custody of the Secret Service," which includes records of visitors to the OVP, and "[a]ny and all WHACS Records that may be generated at any time subsequent to the execution of this Memorandum of Understanding."  Id.., ¶ 23.

The Memorandum explains that "the White House, but not the Secret Service, has a continuing interest in WHACS Records" and "continues to use the information contained in such records for various purposes."  MOU, ¶ 20.  The Memorandum recites that the WAVES records

---

[3]  The Memorandum further classifies these records as "Presidential Records," MOU, ¶ 17, and defines that term to include all "documentary materials subject to the Presidential Records Act (44 U.S.C. § 2201 et seq.)," id., ¶ 7, which includes Vice-Presidential executive records. 44 U.S.C. 2207.

9

have "historical and other informational value * * * as evidence of who has been invited and/or granted admission to the White House to meet with the President or members of his staff," and that ACR records similarly have value as "evidence of the comings and goings of staff, visitors, and workers at the White House Complex in the conduct of White House business." Id., ¶ 20. Records of access to OVP personnel can document the activities of OVP personnel undertaken in the provision of advice, information, assistance, or service to the Vice President in connection with any of his official functions, including his functions in support of the President, in the discharge of the Vice President's executive duties. See O'Donnell Supp. Decl., ¶ 8; 3 U.S.C. § 106.

## **ARGUMENT**

## **DEFENDANT'S REQUEST FOR A STAY PENDING APPEAL SHOULD BE GRANTED**

The propriety of a stay pending appellate review turns on:  "(1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." Cuomo v. United States Nuclear Regulatory Comm'n, 772 F.2d 972, 974 (D.C. Cir. 1985) (citing Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977)); accord Hilton v. Braunskill, 481 U.S. 770, 776 (1987).

These factors are not prerequisites to be met, but rather considerations to be balanced. Thus, "[a] stay may be granted with either a high probability of success and some injury, or vice versa." Cuomo, 772 F.2d at 974.  Where the movant has established substantial irreparable harm and the balance of harms weighs heavily in its favor, it need only raise "'serious legal questions

going to the merits'" to obtain a stay pending appeal.  <u>Population Inst. v. McPherson</u>, 797 F.2d 1062, 1078 (D.C. Cir. 1986) (quoting <u>Washington Metro. Area Transit Comm'n</u>, 559 F.2d at 844);  <u>see also</u> <u>Providence Journal Co. v. Federal Bureau of Investigation</u>, 595 F.2d 889, 890 (1st Cir. 1979) (where "the denial of a stay will utterly destroy the status quo, irreparably harming appellants, but the granting of a stay will cause relatively slight harm to appellee, appellants need not show an absolute probability of success in order to be entitled to a stay").

### A.    The Vice President and the Secret Service Will Suffer Certain and Immediate Irreparable Harm If a Stay Is Not Granted.

There can be no question that compliance with the Court's orders will irreparably harm both the Vice President and the Secret Service.  The records in question document the activities and official functions of the Vice President, his staff, and his family, and the Vice President is assigned the authority and duty to preserve these records under 44 U.S.C. § 2207.  <u>See</u> O'Donnell Supp. Decl., ¶¶ 6-8.  Accordingly, the Government respectfully continues to maintain that these records remain under the legal custody and control of the OVP, exclusive of the Secret Service.  <u>See</u> Def. PI Opp. at 15-22.  Compelled production by the Secret Service on October 30 of any records determined not to fall within any FOIA exemption would deprive the Vice President and the Secret Service of a meaningful opportunity on appeal to contest the Court's determination that the records at issue are "agency records" under FOIA, because any disclosure, once made, cannot be undone.  That prospect constitutes irreparable harm and militates in favor of a stay.  <u>See</u> <u>Providence Journal</u>, 595 F.2d at 890 (concluding that irreparable harm exists where the failure to enter a stay will irrevocably destroy the status quo).

The Vice President would also be irreparably harmed if his staff was forced to divert its attention from its duties supporting the Vice President in order to spend countless hours reviewing tens of thousands of pages of access records to ensure that, for example, OVP's internal deliberations or the personal privacy of its staff and their guests are not compromised. See O'Donnell Supp. Decl., ¶¶ 7-8. The Secret Service could not fully perform this review on its own. When making arrangements for visitor access to the White House Complex or the Residence, in many if not most cases OVP does not inform the Secret Service of the purpose of a person's visit, or his or her affiliation, if any, with the Vice President, his family, his staff, or outside organizations. Morrissey Supp. Decl., ¶¶ 17, 22; O'Donnell Supp. Decl., ¶ 7.

In such cases, the Secret Service could not determine from the records whether a person visited the White House Complex or the Residence to repair broken office equipment, to meet with OVP staff about policy issues, or for a social occasion. Morrissey Supp. Decl., ¶¶ 17, 22; O'Donnell Supp. Decl., ¶ 7. Only knowledgeable OVP personnel could make these determinations, if necessary, to ascertain which records might be exempt from mandatory disclosure under the FOIA (if the FOIA were applicable). Id. The task would be made all the more time-consuming and difficult by the fact, first, that a number of OVP staff persons named in plaintiff's FOIA request are no longer employed in the OVP, and second that OVP, because it is exempt from the FOIA, has no personnel dedicated to and experienced at, processing FOIA requests. O'Donnell Supp. Decl., ¶ 7.

Performing such a painstaking review of tens of thousands of access records would irreparably harm the OVP, diverting untold amounts of OVP staff persons' time and attention from their function of supporting the Vice President in the performance of his official duties.

12

See INS v. Legalization Assistance Project, 510 U.S. 1301, 1306 (1993) (O'Connor, J., in

chambers); O'Donnell Supp. Decl., ¶ 7.  The FOIA does not apply to the OVP for the very reason

that Congress wanted to avoid infringing on the Vice President's ability to perform his important

official functions.  See Kissinger v. Reporters Committee for Freedom of the Press, 445 U.S. 136

(1980); Armstrong v. Executive Office of the President, 1 F.3d 1274, 1292 (D.C. Cir. 1993);

Meyer v. Bush, 981 F.2d 1288, 1295 (D.C. Cir. 1993).  Yet the Court's preliminary injunction

effectively saddles OVP with obligations under the FOIA, potentially requiring OVP staff to do a

line-by-line privilege analysis of thousands of access records, intruding into the Vice Presidency,

and impairing the Vice President's ability to effectively perform his duties.  Such an "improper

intrusion" into the workings of a constitutional-level organ of government constitutes a harm that

supports entering a stay pending appeal.  Legal Assistance Project, 510 U.S. at 1306.

In Cheney v. United States Dist. Court, 542 U.S. 367 (2004), the Supreme Court held, in

the context of civil discovery, that in light of the deference owed to high constitutional officers,

the OVP cannot be obligated to go line by line through the potentially responsive documents to

determine what privileges apply before courts have contemplated other options that would spare

the OVP this burden.  Id. at 388 (noting that the Vice President does not, as an initial matter, bear

the burden of "critiquing [ ] unacceptable discovery requests line by line.").  This rationale

supports entering a stay in this case.  The Court should allow defendant to pursue its right to

appeal the preliminary injunction on the issue of whether the FOIA even applies to the

documents at issue before potentially forcing the OVP and the Secret Service to engage in a

detailed review of thousands of access records in order to complete the processing of plaintiff's

FOIA request.

13

Complying with the Court's orders would also inflict irreparable injury on the Secret Service. To comply with the Court's orders, the Secret Service would have to shoulder immense administrative burdens, the imposition of which constitutes irreparable harm.  See Legalization Assistance Project, 510 U.S. at 1305-1306 (balance of equities favored stay pending appeal in part because of the "considerable administrative burden" on the defendant agency).

The costliest and most burdensome obligation imposed on the Secret Service by the Court's order is the obligation to process ACR records, Mem. Op. at 12 n. 5, which, defendant respectfully maintains, are not responsive to plaintiff's FOIA request.  Locating ACR records that reflect visits to the Vice President or the twelve staff members at issue is a herculean task, because one cannot determine from the face of an ACR record whom an individual visited at the White House Complex; an ACR record identifies only the visitor.  Morrissey Supp. Decl., ¶ 14. To locate ACR records corresponding to responsive WAVES records, the Secret Service would have to engage in an arduous multi-step process requiring Secret Service personnel, among other things, to manually sift through thousands of ACR records to find visits reflected in WAVES records.  Id., ¶ 16.  The task would take months to complete.  Id., ¶ 16.

Locating the relevant ACR records is a colossal task that would be impossible to complete within the time frame contemplated by the Court, and it is essentially a worthless one. ACR records contain only a few fields of information that are not included in WAVES records, and these fields contain information that is meaningful only to the technical personnel who work with the system.  Morrissey Supp. Decl., ¶ 10.  None of the information unique to ACR records could possibly inform the public debate, then, and requiring the Secret Service to identify the

14

relevant ACR records would impose great costs on defendant out of all proportion to any

conceivable benefit to plaintiff or the public.[4]

**B.    The Injury to the Secret Service and to the Vice President Far Outweighs
Any Potential Harm to Plaintiff or the Public Interest if a Stay is Granted.**

The entirely speculative prospect of any legally cognizable harm to others, or to the

public interest, also militates in favor of a stay.  "An order maintaining the status quo is

appropriate when a serious legal question is presented, when little if any harm will befall other

interested persons or the public and when denial of the order would inflict irreparable injury on

the movant."  Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841,

844 (D.C. Cir. 1977).  That is the situation here.

As defendant noted previously, see Def. PI Opp. at 13, plaintiff asserts no interest of its

own in the expedited processing of its FOIA request.  It relies on an asserted public interest in

knowing who has had "meetings [with] the Vice President and his senior aides on official

business," so that the public may develop an understanding, in advance of the forthcoming

election on November 7, 2006, of "the degree to which lobbyists and special interest

representatives" may have influenced "positions taken by the Office of the Vice President" on

matters of public policy.  Mem. Op. at 3 (citing Pl. Exh. 1); Pl. PI Mem. at 3, 5-6 (citing Pl.

Exhs. 1, 3).  Plaintiff argues that the public interest will be harmed by any delay in processing its

FOIA request because such delay "would deprive the public of its ability to make its views

---

[4] To comply with the Court's order, the Secret Service would also incur irreparable
administrative costs associated with processing various records of visitor access to the Vice
President's Residence.  These costs stem from the necessity of redacting dates of birth, Social
Security numbers, and sensitive protective information from more than a thousand pages' worth
of records.  Morrissey Supp. Decl., ¶ 21.

known in a timely fashion either at the polls, by lobbyist or through other contacts with public officials." Id. at 3-4 (citing Pl. Exh. 1).

Defendant fully acknowledges the importance of the public interest served by the Freedom of Information Act. But when Congress enacted the FOIA, it recognized that there are substantial countervailing interests in excluding Presidential and Vice Presidential records from the statute's reach, so as to preserve the effective functioning of the Presidency and the Vice Presidency. On careful consideration in light of the particular facts and circumstances of this case, it becomes apparent that no injury to the public interest protected by the FOIA will follow if the Court's October 18 and 19 orders are stayed.

First, the public interest protected by the FOIA "is that in '[o]fficial information that sheds light on an agency's performance of its statutory duties." Quinon v. FBI, 86 F.3d 1222, 1231 (D.C. Cir. 1996) (quoting Reporters Committee, 489 U.S. at 773); Computer Prof'ls for Soc. Responsibility v. U.S. Secret Serv., 72 F.3d 897, 905 (D.C. Cir. 1996) ("the basic purpose of the [FOIA] [is] to open agency action to the light of public scrutiny"). But the documents at issue shed little if any light on the activities of the Secret Service, see Quinon, 86 F.3d at 1231 ("[d]isclosure of information that 'reveals little or nothing about an agency's own conduct' does not further the public interest envisaged by FOIA") (quoting Reporters Committee, 489 U.S. at 773), and plaintiff makes no bones about the fact that the intended purpose of its FOIA request is to expose to public scrutiny the business conducted by the Vice President and his senior staff, not the Secret Service. See Pl. Exh. 1.

The FOIA is not intended, however, to vindicate any interest there may be in public scrutiny of OVP's activities, because, as the Court recognized in its memorandum opinion, the

16

Office of the Vice President is not an agency subject to the FOIA or its disclosure requirements.

Mem. Op. at 12. To the contrary, the FOIA respects the need for confidentiality in the effective

functioning of the Vice Presidency. See Kissinger, 445 U.S. at 156; Armstrong, 1 F.3d at 1292;

Meyer, 981 F.2d at 1295; Soucie, 448 F.2d at 1073; Schwarz v. U.S. Dep't of Treasury, 131

F.Supp. 2d 142, 147 (D.D.C. 2000), aff'd, per curiam, 2001 WL 674636 (D.C. Cir. May 10,

2001). Hence, there can be no injury to a legally cognizable public interest under FOIA if the

processing or production of documents reflecting the activities of the Vice President and his staff

is delayed as a result of entering a stay.[5]

In any event, even if plaintiff had identified a public interest in disclosure of the

information it seeks that is legally protected (even in principle) by the FOIA, it is entirely

speculative under the facts and circumstances of this case that any harm would in fact befall that

interest if defendant's motion for a stay is granted. Plaintiff seeks to shed light on the degree to

which "lobbyists and special interest representatives" may have influenced "positions taken by

the Office of the Vice President," Pl. Exh. 1, but it has not targeted its request at the entry records

of particular individuals who allegedly exerted "special-interest" influence over the Vice

President or his staff. Nor has plaintiff submitted any evidence or reasoned basis to support an

---

[5] Furthermore, insofar as plaintiff means to advance its asserted public interest by revealing to the public all individuals who have met with "the Vice President and his senior aides on official business" during the last two years, and who may have influenced "positions taken by the Office of the Vice President" on matters of national policy, Pl. Exh. 1, then for all intents and purposes, plaintiff means to pursue its objectives by publicly exposing the workings and deliberations of the Office of the Vice President. See Def. PI Opp. at 26 (and cases cited therein). Even if OVP were an agency subject to FOIA, which it is not, this is a public interest in disclosure that Congress never intended the FOIA to vindicate. To the contrary, Congress had the protection of such deliberative processes "specifically in mind" when it adopted Exemption 5. NLRB v. Sears Roebuck & Co., 421 U.S. 132, 150 (1975) (citing EPA v. Mink, 410 U.S. 73, 85-87 (1973)).

expectation that indiscriminately disclosing the entry records of every person scheduled to meet

with the Vice President or his senior staff over a two-year period -- or even scheduled simply to

visit the official residence of the Vice President -- would reveal the existence of unspecified

special-interest influence over positions OVP has taken on matters of national policy.

It is thus sheer conjecture that disclosing the records at issue would advance a public

interest in revealing any such supposed influences.  By the same token, therefore, any harm

posited by a delay in processing these records would be entirely speculative.  Such "speculative

harm [can] not outweigh the immediate harm" that the Secret Service and the Vice President

would suffer "in the absence of a stay."  Hechinger v. Metro. Wash. Airports Auth., 845 F. Supp.

902, 910 (D.D.C. 1994); see Std. Havens Prods., Inc. v. Gencor Indus., Inc., 897 F.2d 511, 515-

16 (Fed. Cir. 1990).  Cf. Computer Professionals, 72 F.3d at 266 (the public interest arising out

of a requester's "mere desire to review how an agency is doing its job, coupled with allegations

that it is not," is "insubstantial" absent evidence of misconduct that the requested records would

tend to confirm or refute) (internal quotation marks and citations omitted).[6]

---

[6] As support for its assertion of a public interest in the expedited processing of its FOIA
request, plaintiff has relied on "the ongoing scandals involving lobbyist[ ] Jack Abramoff," "the
controversy over Vice President Cheney's role in setting federal energy policy," and "the CIA-
leak case" investigated by Special Prosecutor Patrick Fitzgerald.  Pl. PI Mem. at 3 (citing Pl.
Exh. 1).  Yet plaintiff offers no explanation or supporting evidence to show how the records
sought in this case could possibly shed any further light on these thoroughly scrutinized matters
than has already been cast upon them.  Indeed, the Energy Task Force completed its work on
September 30, 2002, well before the October 2004 start date of plaintiff's FOIA request.  Thus,
plaintiff's mere allusion to these controversies is insufficient to establish a public interest in
disclosure of the records at issue.  See Schrecker v. U.S. Dep't of Justice, 349 F.3d 657, 660
(D.C. Cir. 2003) (the focus of the public interest inquiry is "not on the general public interest in
the subject matter of the FOIA request, but rather on the incremental value of the specific
information being withheld") (citing King v. U.S. Dep't of Justice, 830 F.2d 210, 234 (D.C.
Cir.1987)).

Plaintiff has also repeatedly relied on defendant's decision to grant plaintiff's request for expedited processing of its FOIA request as an acknowledgment by defendant of an urgent need to disclose the requested records in advance of the November 7, 2006 elections. See Pl. PI Mem. at 16; Pl. PI Reply at 4. Nothing could be further from the truth. By granting plaintiff's request for expedition, defendant merely agreed to process plaintiff's request "as soon as practicable." See 5 U.S.C. § 552(a)(6)(E)(iii); Pl. Exh. 4. Defendant never agreed to complete the processing of tens of thousands of visitor entry records in advance of November 7, nor did it agree to produce records over which the OVP exerts legal custody and control under the Presidential Records Act, and in which the OVP has continuing interests protected by privilege.[7]

If anything, it is plaintiff that undermined its own claim of urgency when it failed, on or about July 10, 20 business days after it submitted its June 12 FOIA request, to exercise its statutory right of action to compel disclosure of the documents sought, see 5 U.S.C. § 552 (6)(C)(i),[8] and instead waited three additional months, until October 10, to initiate this action.

_____

[7] It is common in the annals of FOIA litigation for agencies, with the approval of this Court, to take months, if not years, to complete the processing of FOIA requests they have agreed to expedite when necessitated by the sheer volume of documents involved, or the demands of making privilege determinations. See American Civil Liberties Union v. U.S. Dept. of Justice, 321 F. Supp. 2d 24, 38 (D.D.C. 2004) (Huvelle, J.) (granting request for expedited processing and ordering that DOJ "shall process plaintiffs' requests for all records relating to section 215 consistent with 5 U.S.C. § 552(a)(6)(E)(iii) and 28 C.F.R. § 16.5(d)(4) ('as soon as practicable')"); Edmonds v. Fed. Bureau of Investigation, 2002 WL 32539613, *4 (D.D.C. 2002) (Huvelle, J.) (directing defendants to advise the Court "of the date when the request will be processed consistent with 5 U.S.C. § 552(a)(6)(E)(iii) and 28 C.F.R. § 16.5(d)(4) ('as soon as practicable')"); see also Leadership Conf. on Civil Rights v. Gonzales, 404 F. Supp. 2d 246, 260 (D.D.C. 2005) (Lamberth, J.) (ordering DOJ to "expedite processing plaintiff's FOIA requests and produce the requested documents to plaintiff as soon as practicable, but no later than . . . two years from the date on which the complaint was initially filed").

[8] 5 U.S.C. § 552 (6)(C)(i) provides that a FOIA requester shall be deemed to have exhausted its administrative remedies if the agency fails to comply with the applicable time

19

Plaintiff suggests that it delayed taking legal action based on assurances from the Secret Service that it was processing the request, see Pl. PI Mem. at 6-7 & n. 1, and defendant does not mean to suggest that FOIA requesters should bring suit as a matter of routine every time a federal agency encumbered with a large backlog of FOIA requests fails to process a request within 20 business days. But having exhibited such forbearance for nearly three months, plaintiff cannot turn around now and declare a state of emergency where none exists.

Finally, any claim that a stay of the Court's order to process the documents by October 30 would be detrimental to the public interest is also fatally undermined by the necessity -- a necessity plaintiff has acknowledged, see Pl. PI Reply at 2 -- of litigating any exemptions claimed by defendant before the Court could order release of the documents withheld. As discussed above, plaintiff locates a public interest in the documents it has requested on the expectation that they will tend to reveal who may have influenced "positions taken by the Office of the Vice President" on matters of national policy. Pl. Exh. 1. Yet it is precisely to the extent that disclosure of these documents would tend to reveal whose counsel the Vice President or his staff sought or received on policy matters, that defendant would withhold them, under Exemption 5, pursuant to the deliberative process privilege. See Def. PI Opp. at 26.

Even if the Court ruled on defendant's exemption claims by November 3, it would be fanciful to suggest (regardless of how the Court ruled) that review of its decision could be had in the Court of Appeals before November 7.[9] Thus, as a practical matter, the prospect that

---

period (generally 20 business days) for processing and responding to the request.

[9] If the Court overruled defendant's claims of exemptions and ordered disclosure of the withheld documents, defendant would be in a strong position to seek a stay pending appeal. See Ctr. for Int'l Envtl Law v. Office of the U.S. Trade Representative, 240 F. Supp. 2d 21, 22-23

processing the documents responsive to plaintiff's FOIA request by October 30 would inure to the benefit of a public interest in knowing more about alleged special-interest influence on the OVP prior to the forthcoming elections is entirely speculative, as would be any harm from granting a stay of that obligation.  For this reason as well, defendant's motion for a stay should be granted.  Hechinger, 845 F. Supp. at 910.

**C.     Defendant Is Likely To Prevail on the Merits of Its Appeal.**

Finally, a stay pending appeal is also warranted because of the likelihood that defendant will prevail on the merits.  As noted above, this standard is satisfied where serious and substantial questions of law exist, as is plainly the case here.

**1.     Defendant has raised a substantial question for appeal on the "agency records" issue.**

First and foremost, defendant is likely to prevail on its contention that the records at issue in this case are not "agency records" subject to FOIA.  At the very least, defendant has raised a serious question about the status of these records that should be resolved by the Court of Appeals before the Secret Service and OVP potentially are required to divert an enormous amount of time and resources to process these tens of thousands of records.

As this Court correctly observed, a finding that the documents at issue are within the "control" of an agency that is subject to FOIA is essential to a determination that the documents are "agency records."  See Department of Justice v. Tax Analysts, 492 U.S. 136, 144 (1989)

_____

(D.D.C. 2003) ("because disclosure of the documents in question will render any appeal moot," defendant made "strong showing of irreparable harm" supporting a stay); Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice, 217 F. Supp. 2d 58, 58-59 (D.D.C. 2002) ("granting of a stay [deemed] appropriate" given, inter alia, "the fact that stays are routinely granted in FOIA cases," and "that disclosure . . . would effectively moot any appeal").

(quoting Forsham, 445 U.S. at 182); Mem. Op. at 10.  This Court correctly recognized that the

OVP "is not an agency subject to FOIA," and that the determination of whether the Secret

Service controls the documents at issue must be based on a "balance of four factors under a

totality of circumstances test:  (1) the intent of the document's creator to retain or relinquish

control over the records, (2) the ability of the agency to use and dispose of the record as its sees

fit, (3) the extent to which agency personnel have read or relied upon the document, and (4) the

degree to which the document was integrated into the agency's record system or files."  Opinion

at 13 (citing United We Stand, 359 F.3d at 599; Consumer Fed'n of Am. v. Dep't of Agric., 455

F.3d 283, 287 (D.C. Cir. 2006)) (internal quotations omitted).

      While this Court correctly held that factors one, two and four support defendant's

position that the Vice President, and not the Secret Service, controls the records, defendant has

substantial grounds on which to argue on appeal that this Court's ultimate conclusion – that the

third factor supports a finding that the records are controlled by the Secret Service, and is entitled

to dispositive weight – is flawed.  First, the Court's conclusion is based on the faulty premise that

"the very purpose of WAVES records is limited," and, thus, that the Secret Service's limited use

of the [ ] records" – to clear visitors to the OVP for entry into the White House Complex or the

Residence -- "encompasses the entire scope of their purpose." Mem. Op. at 14-15.  In fact, the

records do not serve such a discrete and finite function.  The Secret Service turns WAVES

records over to the White House Office of Records Management, subject to the control of the

Vice President, because, unlike the Secret Service, the OVP has a continuing use and

responsibility for them.  Morrissey Decl., ¶ 10 (filed with Def. PI Opp.).  The records serve an

important long-term and legally-mandated historical function under the Presidential Records Act

of documenting the activities and official functions of the Vice President and his staff. 44 U.S.C.

§ 2207; see O'Donnell Supp. Decl., ¶ 6; Armstrong, 924 F.2d at 285 (discussing the Presidential

Records Act). This is the same long-term interest in and use for WAVES records and ACRs that

is recognized generally in the Secret Service's memorandum of understanding with the White

House Office of Records Management. MOU, supra at 8-9, ¶ 20.

Accordingly, under the Presidential Records Act, 47 U.S.C. § 2207, the Vice President

maintains legal custody and control of these documents, exclusive of the Secret Service, to see to

their historic preservation as Vice Presidential Records, O'Donnell Supp. Decl., ¶ 6, again

consistent with the legal status of these records as recognized generally by the Secret Service

MOU. MOU, ¶ 18. Because the documents serve only a temporary and very limited purpose for

the Secret Service, but a long-term and statutorily-mandated purpose for the OVP, the third

factor, like factors one, two, and four, weighs decidedly in favor of a finding that the documents

are subject to the control of the Vice President.

Second, even if the Court's analysis of the third factor were sound, this factor should not

be given the dispositive weight accorded to it by this Court. The Court gave controlling weight

to the third factor based on an inappropriate extension of the reasoning in Bureau of National

Affairs, Inc. v. United States Department of Justice, 742 F.2d 1484 (D.C. Cir. 1984), which

involved a very different set of circumstances from those presented here. In Bureau of National

Affairs, the plaintiff sought daily agendas and desk appointment calendars created by individual

employees of the agency. The issue for the Court was "under what circumstances can an

individual's creation of a record be attributed to the agency, thereby making the material an

"agency record" disclosable under FOIA, rather than personal material not covered by the Act?"

<u>Id</u>. at 1498 (emphasis added).  In that context, emphasis on the third factor – use of the document

by the agency – makes intuitive sense.  <u>See also</u> <u>Consumer Federation of America</u>, 455 F.3d 283

(relying on the analysis in <u>Bureau of National Affairs</u> to determine whether electronic

appointment calendars of six individual agency officials are agency records covered by FOIA).

The Court in <u>Bureau of National Affairs</u> expressly observed, however, that the third factor is not

necessarily entitled to such weight in other circumstances.  742 F.2d at 1490 ("In certain

contexts, such as where a document is created by one agency and transferred to a second agency,

control or possession is the critical analysis.  But in cases such as these, where documents are

created by an agency employee and located within the agency, use of the document becomes

more important to determining the status of the document under FOIA.").

The D.C. Circuit has not suggested in <u>Bureau of National Affairs</u>, <u>Consumer Federation</u>

<u>of America</u>, or in any other case of which defendant is aware that the third factor should be given

special emphasis in the circumstances presented here, where records pertaining directly to the

business of the OVP and ultimately retained subject to the control of OVP, are temporarily held

for a limited purpose by an agency.  At a minimum, this Court's extension of the reasoning

applied in <u>Bureau of National Affairs</u> to the wholly different set of circumstances in this case  –

particularly, where this Court agrees that all other factors tip in favor of a finding of OVP control

of the documents – raises a substantial question of law to be resolved by the Court of Appeals.

Moreover, defendant will argue on appeal that this Court's analysis fails to give proper

weight to the doctrine of constitutional avoidance and the established law that the OVP is not

subject to the FOIA.  The Court rightly did not question clear precedent holding (based on FOIA

and its legislative history) that the President and Vice President are not agencies under FOIA,

because application of the statute to the President and Vice President could interfere with their performance of their official functions.  See Kissinger, 445 U.S. at 156; Soucie, 448 F.2d at 1073; Armstrong, 1 F.3d at 1292; Meyer, 981 F.2d at 1295; Mem. Op. at 12.  The Court also acknowledged that the government's concern may be valid that interpreting FOIA to apply to the documents at issue, which pertain to the confidential workings of the OVP, would interfere with the Vice President's ability to effectively perform his official functions.  See Opinion at 18.  The Court's ultimate conclusion, however, that the government's concerns may be alleviated through proper application of FOIA's nine statutory exemptions from disclosure, runs afoul of this clear precedent holding that FOIA does not apply at all to the OVP.  As discussed, the obligation simply to process plaintiff's FOIA request could interfere with the effective functioning of the Vice Presidency.  See supra at 11-13.  If it were true that the exemptions adequately safeguarded the ability of the President and Vice President to discharge their official functions, then the necessity of excluding them entirely from FOIA's ambit (including its obligations to search for and process records), as recognized by the Supreme Court and the D.C. Circuit in Kissinger, Soucie, and other cases, would never have arisen in the first place.

Finally, with respect to this issue, requiring defendant and the OVP to process the documents at issue under FOIA is not consistent with the teachings of In re Cheney, 406 F.3d 723 (D.C. Cir. 2005) (en banc).  See Mem. Op. at 18.  There, the Court of Appeals considered the issue of whether the National Energy Policy Development Group ("NEPDG"), formed within the Executive Office of the President to advise the President on national energy policy, was subject to the requirements of the Federal Advisory Committee Act ("FACA"), 5 U.S.C.App. § 3.  The D.C. Circuit was called upon to determine whether the private individuals alleged to

have participated in the NEPDG were considered "members" of the committee, which would have subjected the NEPDG to the requirements of FACA, including public disclosure of all relevant committee materials.  See 5 U.S.C.App. §§ 3, 10(b); In re Cheney, 406 F.3d at 726. FACA is silent on the question of who is and who is not a federal advisory committee member, and faced with that statutory ambiguity, the D.C. Circuit held that the separations-of-powers concerns dictated a narrow definition of committee members to exclude the NEPDG from the requirements of FACA.  Id. at 728 ("In making decisions on personnel and policy, and in formulating legislative proposals, the President must be free to seek confidential information").

Here, contrary to the Court's opinion, FOIA is similarly ambiguous on the meaning of "agency records."  See Tax Analysts v. United States Department of Justice, 845 F.2d 1060, 1067 (D.C. Cir. 1988), aff'd, 492 U.S. 136 (1989).  The term is undefined in the statute or legislative history; its meaning is determined by application of an ambiguous balancing test that varies widely depending on the factual circumstances presented.  See Bureau of National Affairs, 742 F.2d at 1490 (quoting Crooker v. United States Parole Commission, 730 F.2d 1, 5 (1st Cir. 1984)).  In light of the substantial demonstration that, under a proper application of the relevant legal standard, the OVP controls the requested documents, In re Cheney teaches that a narrow interpretation of the term "agency record" should be applied that would avoid even the potential for interference with the performance of the Vice President's official functions.  See, e.g., Meyer, 981 F.2d at 1295.  At the very least, defendant has raised a serious and substantial question of law regarding the status of these records to be resolved by the Court of Appeals.

26

2.    **Defendant is likely to prevail on
the question of irreparable harm.**

A stay is also appropriate because defendant is sufficiently likely to prevail on the question of whether plaintiff faced irreparable harm absent the issuance of a preliminary injunction.  With regard to the existence of irreparable harm, the Court concluded that "[w]ithout a preliminary injunction directing the Secret Service to process the plaintiff's FOIA request in an expedited fashion, the plaintiff would lose out on its statutory right to expedited processing and on the time-sensitive public interests which underlay the request."  Order at 22.  Neither of the interests referred to by the Court supports the issuance of a preliminary injunction.

The alleged loss of the statutory right to expedited processing does not constitute irreparable harm.  In order for a plaintiff to meet its burden of demonstrating irreparable harm sufficient to warrant the entry of preliminary injunctive relief, the injury complained of "must be both certain and great; it must be actual and not theoretical."  Wisc. Gas. Co. v. Federal Energy Regulatory Comm'n, 758 F.2d 669, 764 (D.C. Cir. 1985).  The loss of an abstract statutory right, namely, the right to expedited processing, does not establish "certain and great" harm if the consequences of the loss of that right are not "certain and great."  Courts have therefore rejected this argument, which if credited would mean that every denial of a request for expedited processing could serve as the basis for a preliminary injunction motion.  See Al-Fayed v. C.I.A., 2000 WL 34342564, at *5 (D.D.C. September 20, 2000) (finding that denial of expedited processing did not constitute irreparable harm).  In any event, plaintiff would not have irrevocably lost its right to expedited processing in the absence of a preliminary injunction because the right to expedited processing is not a right to processing before some event chosen by the requester (such as an election), but rather the right to be moved to the head of the FOIA

27

processing queue. 5 U.S.C. § 552(a)(6)(E)(III) (noting that an agency should "process <u>as soon as practicable</u> any request for records to which [it has] granted expedited processing"); 6 C.F.R. § 5.5(d)(4) (same).

The supposition that the records may be relevant to a public interest in learning about OVP's internal deliberations before the election also does not suffice to establish irreparable harm. Mem. Op. at 22. It is a "well known and indisputable principle[ ]" that a vague or speculative harm cannot constitute "irreparable harm" sufficient to justify injunctive relief; the injury must be "certain." <u>Wisc. Gas. Co.</u>, 758 F.2d at 764. But all plaintiff has here is speculation. Plaintiff has no evidence that any records produced in response to its request would contain information of interest to voters in the upcoming congressional election – its FOIA request, in fact, is not even targeted to a specific news event, and the Vice President is not even a candidate for office in the election. Pl. PI Mem. at 16. Indeed, the Court's order acknowledges that the harm is not certain, stating in a section heading that "The Plaintiff Demonstrates a <u>Potential</u> for Irreparably Injury." Mem. Op. at 21 (emphasis added). A potential irreparable injury is not a certain one, and therefore not grounds for the issuance of a preliminary injunction. <u>See</u> <u>Wisc. Gas. Co.</u>, 758 F.2d at 764.

### 3.    Defendant is also likely to prevail on appeal on the question of producing Access Control Records.

Finally, defendant is likely to prevail on the question of whether FOIA obligates it to produce ACR records. The Court concluded that ACR records are responsive to plaintiff's FOIA request, Mem. Op. at 12 n. 5, but even if ACR records were technically responsive (a point that defendant does not concede), the Secret Service need not process ACR records because locating

ACR records that correspond to responsive WAVES records would be unduly burdensome, as discussed above.

Agencies need not perform unreasonably burdensome searches. Nation Magazine v. U.S. Customs Service, 71 F.3d 885, 891-92 (D.C. Cir. 1995). The rationale for this rule is "that FOIA was not intended to reduce government agencies to full-time investigators on behalf of requesters. Therefore, agencies are not required to maintain their records or perform searches which are not compatible with their own document retrieval systems." Assassination Archives and Research Center, Inc. v. CIA, 720 F. Supp. 217, 219 (D.D.C. 1989), aff'd in part, 1990 WL 123924 (D.C. Cir. 1990) (per curiam).

Searching for ACR records corresponding to responsive WAVES records would be unreasonably burdensome. ACR records do not indicate whom a person entering the White House Complex is scheduled to visit – the focus of plaintiff's request. Thus, there is no way of determining, from their face, which ACR records reflect a visit by someone to see the Vice President or a member of his staff, rather than any of the many other government employees who work at the White House Complex. See Morrissey Supp. Decl., ¶¶ 8, 14. Although the Secret Service has searched for and gathered WAVES records responsive to the Washington Post's FOIA request, the only way to identify corresponding ACRs is to examine WAVES records for visits to the named individuals, ascertain the date and time of the scheduled visit, and then locate the ACR records corresponding to the date and times of entry and exit indicated on the WAVES records. As discussed above, locating the ACR records that correspond to the tens of thousands of WAVES records responsive to the Washington Post's FOIA request would be an enormous task that would have to be performed manually and would take months to complete. See id.,

¶¶ 15-16.  In short, the search is unreasonably burdensome because it is not compatible with the Secret Service document retrieval systems, <u>Assassination Archives</u>, 720 F. Supp. at 219, and would be enormously time consuming.  Defendant is substantially likely to prevail on this question as well.

**<u>CONCLUSION</u>**

For the foregoing reasons, defendant's motion for a stay pending appeal of the Court's October 18 and 19 orders, preliminarily enjoining defendant to complete its processing of plaintiff's FOIA request within 10 days' time, should be granted.

Dated: October 25, 2006                    Respectfully submitted,

                                           PETER D. KEISLER
                                           Assistant Attorney General

                                           JEFFREY A. TAYLOR
                                           United States Attorney

                                           CARL J. NICHOLS
                                           Deputy Assistant Attorney General

                                           JOSEPH H. HUNT
OF COUNSEL:                                Branch Director

MOLLY WEBER                                _____/s_____
United States Secret Service               ELIZABETH J. SHAPIRO
                                           (D.C. Bar No. 418925)
                                           Assistant Branch Director
                                           JAMES J. GILLIGAN
                                           (D.C. Bar No. 422152)
                                           Assistant Branch Director
                                           SARA CLASH-DREXLER
                                           (Pa. Bar No. 86517)
                                           Trial Attorney
                                           JUSTIN M. SANDBERG
                                           (Ill. Bar. No. 6278377)

30

Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W. #7224
P.O. Box 883 Ben Franklin Station
Washington, D.C. 20044
Telephone:  (202) 514-3489
Facsimile:  (202) 616-8202
E-mail:  justin.sandberg@usdoj.gov

Attorneys for Defendant

31

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| THE WASHINGTON POST, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 06-1737 (RMU) |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| HOMELAND SECURITY | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

### SUPPLEMENTAL DECLARATION OF CLAIRE M. O'DONNELL

I, Claire M. O'Donnell, hereby DECLARE:

1.     I am, and have been since January 20, 2001, an employee of the Vice President of the United States, appointed by the Vice President pursuant to Section 106 of title 3 of the United States Code. My title is Assistant to the Vice President and Deputy Chief of Staff. In this capacity, I am responsible for all aspects of the administration and operations of the Office of the Vice President ("OVP"). I previously submitted a declaration in the above-captioned case dated October 13, 2006.

2.     This declaration is based on my personal knowledge and on information made available to me in my official capacity.

3.     The number of personnel who work for the Vice President is quite small, especially in comparison to the number of personnel in the Executive Office of the President or in executive branch departments and agencies. The personnel employed by, assigned to, or detailed to the Vice President consist of employees of the Vice President paid from the Vice President's

executive appropriations, employees of the Vice President paid from the Vice President's

legislative appropriations, and employees assigned or detailed to the Vice President by executive

branch departments and agencies, and number ninety-two (92) in all. All these personnel are

under the supervision and control of the Vice President and are not under the supervision or

control of any other officer, department, agency or entity of the United States Government. The

aggregation of the Vice President and these personnel is called the Office of the Vice President

(OVP).

4.      The Vice President relies in significant part on OVP personnel for support in the

performance of his official functions. These personnel provide support to the Vice President on

matters of domestic policy, national security, homeland security, legislative affairs,

communications, scheduling, advance, military matters, continuity of government and protective

matters, administration, legal matters, and other official matters as appropriate. The range of

duties they perform extends from providing policy advice to the Vice President to driving motor

pool vehicles. These duties include meeting at the White House Complex, or at the Vice

President's Residence, with individuals from outside OVP to gather information and advice for

the purpose of assisting the Vice President in formulating advice for the President and other

purposes.

5.      Under Public Law 93-346, as amended (3 U.S.C. § 111 note), the Government

furnishes an official residence for use by the Vice President for official functions and as a home.

The law authorizes adequate staffing for the residence, including both civilian staffing and

military staffing, subject to the supervision and control of the Vice President. The staff for the

residence ensures proper care and maintenance for the facilities, assists with performance of

official functions at the residence, such as hosting visiting foreign dignitaries, and assists in

ensuring that it operates properly as a home. The staff assigned to the residence – who are under

the supervision and control of the Vice President – consists of one Department of the Navy

civilian employee serving as residence manager and social secretary, one employee of the Vice

President serving as deputy residence manager, and a number of naval enlisted aides who staff

the day-to-day functioning of the residence. The staff assigned to the residence is included in the

overall number of OVP personnel given in paragraph 3 above.

6.      In paragraphs 10 and 13 of my Declaration of October 13, 2006 filed in this case, I

described the access control systems for the White House Complex and the Vice President's

Residence, and different kinds of records that are generated when OVP personnel make

arrangements with the U.S. Secret Service to provide visitors access to the White House

Complex or the Vice President's Residence. In paragraphs 11, 12, and 13 of my Declaration of

October 13, 2006 filed in this case, I also explained that, at least since January 20, 2001, such

records have remained at all times under the legal custody and control of the Office of the Vice

President under the Presidential Records Act, section 2207 of title 44 of the United States Code.

Unlike the Secret Service, which merely uses the visitor-identifying information provided by

OVP personnel for the very temporary and limited purpose of determining whether admission of

a particular visitor would pose a risk to the safety of the Vice President or other Secret Service

protectees, the Office of the Vice President has a continuing interest in the documents because

they reflect activities and official functions of the Office of the Vice President. Accordingly,

under the Presidential Records Act (44 U.S.C. § 2207), the Vice President maintains legal

custody and control of the documents, exclusive of Department of Homeland Security (which

includes the Secret Service), and sees to their historic preservation as Vice Presidential executive

records.

7.     The documents generated by visits to the White House Complex or the Vice President's Residence during the period October 2004 through June 2006 – the period covered by the Freedom of Information Act ("FOIA") request that resulted in the above-captioned case – number in the tens of thousands. Such documents would relate to individuals visiting for a variety of purposes, including official purposes, ranging from visits by senior officials to address high matters of state to visits by repair personnel to fix broken office equipment; social purposes, ranging from hosting visiting heads of foreign governments to hosting small private meals; and other private purposes.   However, in many if not most cases, the purpose of the visits is not apparent from the face of the documents, nor is the relationship of the visitor to the Vice President, his family, OVP staff, or any outside organization.  In these cases, it would require the assistance of knowledgeable OVP personnel to determine or estimate the purpose of a visit for which the Secret Service received visitor clearance input from OVP personnel.  Only estimation may be possible if the knowledgeable OVP personnel no longer work in OVP, as is true of several of the individuals named in the FOIA request.  If there were a requirement to review such documents and determine the purposes of the visits to which they relate, that task would require an enormous amount of the time of OVP personnel, diverting them from their duties supporting the Vice President.  Moreover, unlike federal agencies, OVP does not have personnel dedicated to or experienced in processing documents under the FOIA because FOIA does not apply to the OVP.  Avoiding such burdens and avoiding intrusion into the effective functioning of the Presidency and Vice Presidency are principal reasons the Freedom of Information Act does not apply to the Presidency and Vice Presidency and that Presidential and Vice Presidential executive records are instead covered by Sections 2201-2207 of title 44.

8.      While the Secret Service has no interest in WAVES or ACR records beyond their brief and time-limited role in ensuring that persons who pose a risk to Secret Service protectees do not have access to protectees, the documents are delivered to and held by the White House Office of Records Management, pursuant to the direction of the Executive Office of the President and the Office of the Vice President, in recognition of their contemporary and historic value as Presidential and Vice Presidential records.  More particularly, the documents at issue in this case could disclose sensitive information protected from disclosure by law regarding the inner workings and deliberations of the Office of the Vice President.  Disclosure of the records could provide a roadmap to the meetings, contacts, and sources of input, information, and advice sought or received by the Vice President and his closest advisors, and could help chronicle the course and timing of substantive policy discussions within the Office.  Also, to the extent such communications and contacts are undertaken in the course of formulating or providing advice to the President or presidential staff, public release could result in the unauthorized disclosure of presidential communications protected from disclosure by law.   In addition, release of the documents could result in the unwarranted disclosure of private information about the Vice President, his staff, and visitors.  Finally, public disclosure of the identities of individuals who have physical access to the Vice President and the areas in which he works or lives, or of patterns of physical access to the Vice President and those areas such as the patterns of service contractors with regular access, could reasonably be expected to adversely affect the safety of the Vice President and his family.  Protection of the President and the Vice President from physical harm is a public interest of paramount importance.

* * * * * *

I declare this 25 day of October 2006, under penalty of perjury, in accordance with 28

U.S.C. § 1746, that the foregoing is true and correct.

*Claire M O'Donnell*

Claire M. O'Donnell, Assistant to the Vice President and Deputy Chief of Staff

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| THE WASHINGTON POST, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )     Civil Action No. 06-1737 (RMU) |
| UNITED STATES DEPARTMENT OF | ) |
| HOMELAND SECURITY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

### SUPPLEMENTAL DECLARATION OF PAUL S. MORRISSEY
### DEPUTY ASSISTANT DIRECTOR
### UNITED STATES SECRET SERVICE

I, Paul S. Morrissey, hereby make the following declaration:

1.     I previously submitted a declaration in this action dated October 13, 2006.  The statements made herein are based on my personal knowledge or information made available to me in my official capacity.

2.     I am the Deputy Assistant Director of the Office of Protective Operations for the United States Secret Service (hereinafter "Secret Service"), which is a component of the Department of Homeland Security ("DHS").  I have held this position since September, 2006 and have been a special agent with the Secret Service since January, 1983.

3.     The Secret Service is a protective and law enforcement agency operating under the provisions of Title 18 of the United States Code, Sections 3056 and 3056A.  Pursuant to Section 3056, the Secret Service is charged with the protection of the President and Vice President of the United States and their immediate families; major candidates for President and

Vice President of the United States and their spouses; the President-elect and Vice President-elect and their immediate families; former Presidents of the United States, their spouses and minor children; visiting foreign heads of state and heads of government; and other individuals as directed by the President of the United States. Additionally, the Secret Service is authorized to provide security for the White House and the Vice President's official residence; foreign embassies and missions in the Washington, D.C. area, and certain other locations within the United States; designated events of national significance, including National Special Security Events; as well as other locations.

4.    The Office of Protective Operations is one of eight directorates that manage various operational and support functions within the Secret Service. It is responsible for establishing policies related to the Secret Service's protective mission and for overseeing the operational divisions that protect the persons, places and events that the Secret Service is authorized by statute and Executive Order to protect.

5.    The Washington Post filed a Freedom of Information Act ("FOIA") request with the Secret Service for records generated since October 2004 reflecting visits by any persons to (i) the Vice President and any of twelve named staff members in the Office of the Vice President (also "OVP") and (ii) the Vice President's Residence, except for visits made by members of the Vice President's family. It is my understanding that the Court has ordered the Secret Service to produce these records unless they are exempt under the FOIA.

6.    The "White House Complex" (also "Complex") as secured by the Secret Service includes the White House, the Eisenhower Executive Office Building ("EEOB"), the grounds encompassing the EEOB and the White House, and the New Executive Office Building. Housed

in the White House and the EEOB are the offices of various staff of the Executive Office of the

President (also "EOP") as well as offices for the staff of the OVP, including the Executive

Branch office of the Vice President himself.   The secured area of the White House Complex also

includes all of the office space used by the OVP in the White House Complex.

### White House Complex Records Request

7.     The Washington Post's FOIA request at issue in this case specifically requests

disclosures of Worker and Visitor Entrance System ("WAVES") and Access Control Records

("ACR").  As I explained in my earlier declaration, the ACR system and the WAVES are used to

monitor the access of visitors to the White House Complex, including the EOP and the OVP.

These same systems are used whether visits pertain to the EOP or the OVP.

8.     ACR records consist of records generated when a pass holder, worker, or visitor

swipes his or her pass over one of the electronic pass readers located at entrances to and exits

from the White House Complex.  ACR records include information such as the pass holder's

name and badge number, the time and date of the swipe, and the post at which the swipe was

recorded.  ACR records do not include information about who the pass holder is visiting in the

Complex, the visitor's affiliation to the Vice President, the OVP, or any outside organization, or

the reason for a person's visit.

9.     WAVES records consist of records generated when information is submitted by

an authorized White House pass holder to the Secret Service about workers and visitors who

need access to the White House Complex to perform work, conduct business, or attend events.

Authorized White House pass holders include members of both the President's and Vice

President's staffs.  WAVES records include the following information submitted by the

3

authorized pass holder: the visitor's name, date of birth, and Social Security number; the time

and location of the planned visit; the name of the pass holder submitting the request; the name of

the person to be visited; the date of the request; and the general category into which the visitor

falls – worker, member of the press, individual on an access list (such as a volunteer, courier, or

temporary staff member), or individual with an appointment. They may also include limited

information from background checks performed by the Secret Service and coded instructions to

Secret Service officers. Once a visit takes place, WAVES records are typically updated

electronically with information showing the actual time and place of the visitor's entry into and

exit from the White House Complex.

      10.    WAVES records as they exist after a visit include a visitor's information from

ACR records such as the badge number, the date and time of entry and exit, and the place of

entry and exit. The remaining ACR fields are strictly internal to the system. One such field is

the "Access Log Id," which is a sequential number of the record in the table.

      11.    Since at least 2001, it has been the practice of the Secret Service to transfer newly-

generated WAVES records on CD-ROM to the White House Office of Records Management (the

"WHORM") every 30 to 60 days. (In May 2006, the Secret Service entered into a memorandum

of understanding ("MOU") that both documented past practice regarding WAVES and ACR

records and formalized the recognition of the legal status of those records and WHORM's

management and custody of those ACR and WAVES records. A true and accurate copy of the

MOU is attached hereto as Exhibit 1.) It was the intent of the Secret Service that once

transferred to the WHORM, the records were to be erased from its computer system. With

regard to the time period at issue in the Washington Post's request (October 2004 to present), in

October 2004, because of a request from the National Archives and Records Administration, the

Secret Service began temporarily retaining a copy of the WAVES records that it transferred to

the WHORM. Thus, at the time of the Washington Post's FOIA request, the Secret Service had

WAVES and ACR records for the period relevant to the Post's request.

12.    The information in WAVES records submitted by an authorized White House

pass holder is provided to the Secret Service temporarily for two limited purposes: (1) to allow

the Secret Service to perform background checks to determine whether, and under what

conditions, to provide for the visitor's temporary admittance to the White House Complex; and

(2) to allow the Secret Service to verify the visitor's admissibility at the time of the visit. Once a

visitor's visit to the White House Complex is complete, the Secret Service has no continuing

interest sufficient to justify preservation or retention of WAVES or ACR records, and the Secret

Service does not control or direct the ultimate disposition or use of the records.

13.    I have been advised that the Secret Service released WAVES and ACR records in

Judicial Watch v. United States Secret Service, 06-CV-310 (D.D.C.); Democratic National

Committee ("DNC") v. United States Secret Service, 06-CV-842 (D.D.C.), and Citizens for

Responsibility and Ethics in Washington ("CREW") v. Department of Homeland Security, 06-

CV-883 (D.D.C.). I understand that the Secret Service's releases were made only after the Office

of the President, in the exercise of its discretion, expressly authorized these releases.

14.    In specific regards to ACR records, ACR records do not indicate who a person

entering the Complex is scheduled to visit. Therefore, there is no way of determining, from their

face, which ACR records reflect a visit by someone to see the Vice President or a member of his

staff. Locating the ACR records that correspond to WAVES records responsive to the

Washington Post's FOIA request would be an enormously time-consuming task.

15.     It is estimated that for the relevant time period, there are approximately 65,000 WAVES records, encompassing an estimated 9,983 pages, that reflect visits to the Vice President or one of the twelve staff members named in the request. Some of these WAVES records may be duplicates. It is estimated that these records involve 2,964 unique visitor names. Relatedly, there are probably tens of thousands of ACR records that correspond to these WAVES records.

16.     The Secret Service has searched for and gathered the WAVES records responsive to the Washington Post's FOIA request which include the information from ACR records other than which is strictly internal to the system. However, the Secret Service has not gathered the additional ACR record information. In order to locate the ACR records corresponding to the responsive WAVES records in this case, the Secret Service would need to use the following procedure. First, it would import the information from the WAVES records into a program that would allow it to determine how many unique visitors there are in the records sought. This has been done and it is estimated that there are approximately 2,964 unique visitor names. Second, the Secret Service would search the entry/exit records (ACR and WAVES) by the visitor's name. Presently, ACR records cannot be electronically searched by simultaneously using multiple criteria, such as visitor name and time of visit. It is estimated that it would take an individual approximately 25 weeks to complete the second step of this process even with the assistance of an automated search program. This estimate is based on the assumptions of 20 minutes per unique visitor's name, 2,964 unique visitor names, and 40 hours of work per week. It is noted that at best, no more than a few searches may be run simultaneously, and that running simultaneous searches may run the risk of computer failure. Third, the records yielded by the

search conducted in step 2 could include records of visits to people other than those listed in the

Washington Post's FOIA request. Therefore, it would then be necessary to sort through the

entry/exit records pertaining to each unique visitor name to determine which of the ACR records

correspond to the responsive WAVES records generated through the Washington Post's FOIA

request. To accomplish the matching, the Secret Service would need to conduct a careful manual

examination, comparing the ACR records produced through step 2 to the WAVES records

responsive to the Washington Post's FOIA request. The matching would be a comparison of

criteria such as date and time.

17.    In addition to the ACR records search, in order to process WAVES records, the

Secret Service would need to refer the WAVES records to the OVP. WAVES records reflect the

general category within which a visitor to the Complex falls, but for individuals with

appointments, WAVES records do not reflect the purpose of the appointment, or the visitor's

affiliations to the Vice President, the OVP, or outside organizations. In other words, the records

do not state whether a person is coming to the Complex for a social visit or to talk about policy

matters. The purpose of a person's appointment, moreover, is not the Secret Service's concern;

the Secret Service's sole concern is whether the person presents a security risk, and it can assess

this without knowing the purpose of an appointment. There are some limited exceptions to

WAVES records not stating the reason for a person's appointment, such as the records

occasionally reflect that a person is being admitted to the Complex for a holiday party, departure

photo, or some other large group function. Therefore, it is my understanding that if there are

FOIA exemptions applicable to these records that depend on the nature of the appointment -

whether for official business, or to pay a social call - then the Secret Service Freedom of

Information and Privacy Acts (FOI/PA) Office would need to refer the records to the OVP for
review.

### Vice President's Residence Records Request

18.      The Secret Service does not use the WAVES or ACR systems for access control
purposes at the Vice President's Residence.  The Secret Service has, however, identified
essentially seven categories of records responsive to the Washington Post's request for records
concerning visits to the Vice President's Residence:  (i) permanent access lists of those
individuals who regularly enter the Residence complex, including OVP staff, military personnel,
contractors, service workers, and members of the Vice President's family; (ii) daily access lists of
individuals having appointments to meet with OVP staff, military personnel, the Vice President,
or his family, as well as service workers requiring access to the complex to perform non-routine
services, maintenance, and repairs; (iii) a database containing information regarding individuals
seeking access, used for generating both the permanent and daily access lists; (iv) requests for
access, from OVP staff, military and Secret Service personnel, received primarily by electronic
mail and occasionally by facsimile or other means; (v) post entry logs recording the names of the
persons who enter the Residence complex on a particular date, with their times of entry;
(vi) daily Watch Commander Journals containing a variety of information not requested by the
Washington Post, but which from time to time also note the entry of particular individuals to the
Vice President's Residence; and (vii) lists of invited guests and workers pertaining to special
events.

19.      As I noted in paragraph 12 of my earlier declaration, it has been the consistent
practice of the Secret Service to update the permanent access list (which is maintained on a

computer database) as changes are made in authorized personnel; to dispose of daily access lists

on a daily basis while purging the daily access database of information every 30 days; and to

transfer post entry logs to the OVP on a monthly basis. On June 19, 2006, however, the Secret

Service directed that records concerning access to the Vice President's Residence be maintained.

The records were to be maintained pending the ultimate resolution of FOIA requests, including

the Washington Post's FOIA request. Consequently, the Secret Service has several months'

worth of permanent access lists, daily access lists, post entry logs, and computer database entries

potentially responsive to the Washington Post's request. The Secret Service also has Watch

Commander Journals dating for the full period of the Washington Post's request, electronic mail

requests dating to April 2006, and some special event lists and faxed access requests within the

time period.

20.     It is estimated that together, the permanent access lists, daily access lists, post

entry logs, and responsive Watch Commander Journal entries total approximately 1,000 pages.

In addition, it is estimated that there are approximately 1,000 electronic mail and/or facsimile

requests for access. These access requests are divided between requests from OVP staff, the

military, and the Secret Service. The e-mails may also have attachments listing multiple

individuals for whom access is requested.

21.     Generally speaking, many of the records concerning visitor access to the Vice

President's Residence contain personal information, such as visitors' dates of birth and Social

Security numbers, as well as law enforcement sensitive information. This information would

have to be redacted before the records could be disclosed. The majority of the redactions would

need to be done on a line-by-line basis.

22.    It is my understanding that a practical obstacle to processing these records would be the determination of which FOIA exemptions apply to them.  As a general rule, when military personnel make a request for visitor access, they provide some explanation of the visitor's purpose, such as grounds maintenance or equipment repair.  This is not the practice, however, with OVP staff, who generally provide no information about a visitor's purpose in coming to the Residence, or with whom the visitor is scheduled to meet.  They do not indicate whether visitors have appointments with the Vice President or his staff to discuss official business, are friends or family members arriving for a personal visit, or are service workers scheduled to perform maintenance or repairs on the Residence.  Therefore, OVP requests for visitor access to the Residence generally provide the Secret Service with no information from which it could tell why particular appointments were made, or determine the affiliations of visiting persons with the Vice President, his family, his staff, or any outside organizations.  As a result, in order to determine which FOIA exemptions apply to these records, the Secret Service would have to refer the records to the OVP.  In addition to referral to the OVP, it is my understanding that e-mails and other access requests from the military may potentially need to be referred to the originating agency for FOIA processing.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing statements are true and correct to the best of my knowledge and belief.

_10/25/06_
Date

Paul S. Morrissey
Deputy Assistant Director
Office of Protective Operations
United States Secret Service

10

# EXHIBIT 1

# MEMORANDUM OF UNDERSTANDING
## Between the White House Office of Records Management and the United States Secret Service Records Management Program Governing Records Generated By the White House Access Control System

### INTRODUCTION

1.  This MEMORANDUM OF UNDERSTANDING between the White House Office of Records Management ("White House") and the United States Secret Service Records Management Program ("the Secret Service") (collectively, "The Parties") memorializes and confirms the agreement governing the status and handling of records generated through the White House Access Control System.

### DEFINITIONS

2.  The White House Access Control System ("WHACS") includes two interrelated systems used by the Secret Service for controlling and monitoring access to the White House Complex:

    a.  The Worker and Visitor Entrance System ("WAVES");

    b.  The Access Control Records System ("ACR").

3.  "WHACS Records" include "WAVES Records" and "ACR Records."

4.  "WAVES Records" consist of records generated when an authorized White House pass holder submits to the Secret Service information about visitors (and workers) whose business requires their presence at the White House Complex.

    a.  WAVES Records include the following information submitted by the pass holder: the visitor's name; the visitor's date of birth; the visitor's Social Security Number; the time and location of the planned visit; the name of the pass holder submitting the request; the date of the request.

    b.  Once a visit takes place, WAVES Records are typically updated electronically with information showing the actual time and place of the visitor's entry into and exit from the White House Complex.

5.  "ACR Records" consist of records generated when a White House pass holder, worker, or visitor swipes his or her permanent or temporary pass over one of the electronic pass readers located at entrances to and exits from the White House Complex.

a.   ACR Records include the following information: the pass holder's name and badge number; the time and date of the swipe; and the post at which the swipe was recorded.

6.   "Federal Records" mean documentary materials subject to the Federal Records Act (44 U.S.C. § 3301 et seq.).

7.   "Presidential Records" mean documentary materials subject to the Presidential Records Act (44 U.S.C. § 2201 et seq.).

8.   "The White House Complex" means the White House and the Eisenhower Executive Office Building, and the secured grounds encompassing them, and the New Executive Office Building.

9.   The "White House Office of Records Management" ("WHORM") means the office in the White House responsible for preserving Presidential Records.

## BACKGROUND

10.   WHACS is operated by the Secret Service in order to control and monitor the entry and exit of persons into and out of the White House Complex.

11.   The information contained in WHACS Records originates with White House pass holders, visitors, and workers as a result of White House business.

a.   Such information reflects the conduct of the President's business by providing details about the comings and goings of staff, workers, and visitors to the White House.

12.   The authorized White House pass holders provide information contained in WAVES Records to the Secret Service temporarily for two limited purposes:

a.   To allow the Secret Service to perform background checks to determine whether, and under what conditions, to authorize the visitor's temporary admittance to the White House Complex;

b.   To allow the Secret Service to verify the visitor's admissibility at the time of the visit.

13.   Once the visit ends, the information contained in WAVES Records and ACR Records has no continuing usefulness to the Secret Service.

14.   It has been the longstanding practice of the Secret Service to transfer WAVES Records on CD-ROM to WHORM every 30 to 60 days. Except as noted in paragraph 16 below, once the Secret Service transferred the WAVES Records, the Secret Service ensured that those records were erased from its computer system.

a.   Under this practice, the Secret Service has retained WAVES Records for completed visits for only a brief period, and solely for the purpose of facilitating an orderly and efficient transfer of those records to WHORM.

15.  The Secret Service historically has retained ACR Records in its computer system without transferring those records to WHORM. In 2004, however, the Secret Service and the White House recognized and agreed that ACR Records should be treated in a manner consistent with the treatment of WAVES Records, and concluded that ACR Records should be transferred to WHORM and eliminated from the Secret Service's files. The Secret Service has continued to maintain ACR Records pending a legal determination of their status as Presidential Records.

16.  In October 2004, at the request of the National Archives and Records Administration ("NARA"), the Secret Service began retaining its own copy of the WAVES Records that it transferred to the White House.

a.   The Secret Service agreed to NARA's request on the understanding that it would be a temporary practice maintained until a legal determination was made confirming the propriety of handling WHACS Records as Presidential Records.

## UNDERSTANDING AND AGREEMENT

17.  The purpose of this Memorandum of Understanding is to express and embody The Parties' understanding and agreement that WHACS Records whenever created:

a.   are at all times Presidential Records;

b.   are not Federal Records; and

c.   are not the records of an "agency" subject to the Freedom of Information Act (5 U.S.C. § 552).

18.  The Parties understand and agree that all WHACS Records are at all times under the exclusive legal custody and control of the White House.

a.   Although the Secret Service may at times have physical possession of WHACS Records, such temporary physical possession does not alter the legal status of those records, and does not operate in any way to divest the White House of complete and exclusive legal control.

19.  The Parties understand and agree that any information provided to the Secret Service for the creation, or in the form, of WHACS Records is provided under an express reservation of White House control.

20. The Parties understand and agree that the White House, but not the Secret Service, has a continuing interest in WHACS Records and that the White House continues to use the information contained in such records for various purposes.  Specifically:

   a. WAVES Records have historical and other informational value to the White House as evidence of who has been invited and/or granted admission to the White House to meet with the President or members of his staff.

   b. ACR Records have historical or other informational value to the White House, as evidence of the comings and goings of staff, visitors, and workers at the White House Complex in the conduct of White House business.

21. The Parties understand and agree that, once a visitor's visit to the White House Complex is complete, the Secret Service has no continuing interest in preserving or retaining WAVES Records.  The Parties also understand and agree that the Secret Service has no interest whatsoever in preserving or retaining ACR Records.

   a. WHACS Records are therefore not appropriate for preservation by the Secret Service either as evidence of the Secret Service's activities or for their informational value.

22. The Secret Service understands and agrees that it will regularly transfer all WHACS Records in its possession to WHORM, and that it will not retain its own copies of any WHACS Records except as is necessary to facilitate the transfer of those records to WHORM.

   a. Any temporary retention of WHACS Records by the Secret Service after the visit, entrance, or exit memorialized by those records is solely for the purpose of facilitating an orderly and efficient transfer of those records, and does not operate in any way to divest the White House of complete and exclusive legal control.

23. The understandings and agreements expressed herein apply to:

   a. Any and all WHACS Records currently in the possession or custody of the Secret Service;

   b. Any and all WHACS Records that may be generated at any time subsequent to the execution of this Memorandum of Understanding.

24. It is specifically intended by The Parties that the understandings and agreements set forth herein serve as evidence that the White House at all times asserts, and the Secret Service disclaims, all legal control over any and all WHACS Records subject to this Memorandum of Understanding.

a.    The foregoing is not intended, and should not be construed, to suggest that WHACS Records in the possession or custody of the Secret Service before the execution of this Memorandum of Understanding were under the legal control of the Secret Service.

_____
Director, White House Office
of Records Management

_____
Chief Records Officer,
United States Secret Service

Dated: _S - 17____ , 2006

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

THE WASHINGTON POST,                    )
                                        )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )
                                        )        Civil Action No. 06-1737 (RMU)
UNITED STATES DEPARTMENT OF             )
HOMELAND SECURITY,                      )
                                        )
                    Defendant.          )
_____)

## <u>PROPOSED ORDER</u>

Upon consideration of defendant's motion for stay pending appeal of the Court's order of October 18, 2006 and memorandum opinion of October 19, 2006, preliminarily enjoining defendant to complete processing of plaintiff's FOIA request within 10 days, and any opposition thereto, the Court concludes that it is appropriate to stay its orders and this action pending resolution of the appeal taken by defendant.

SO ORDERED.

ENTERED:_____

_____
RICARDO M. URBINA
United States District Court for the
District of Columbia

cc:     ELIZABETH SHAPIRO
        JAMES J. GILLIGAN
        SARA CLASH-DREXLER
        JUSTIN M. SANDBERG
        United States Department of Justice
        Civil Division, Rm. 7224
        20 Massachusetts Ave., N.W.
        Washington, D.C.  20530

        DAVID L. SOBEL
        1875 Connecticut Avenue, N.W.
        Suite 650
        Washington, D.C. 20009

        ERIC N. LIEBERMAN
        The Washington Post
        1150 15th Street, N.W.
        Washington, D.C. 20071